# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 |
| CROSIER FATHERS AND BROTHERS PROVINCE, INC., a Minnesota non-profit corporation, | Case No. 17-41681 |
| Debtor. | |
| In re: | Case No. 17-41682 |
| CROSIER FATHERS OF ONAMIA, a Minnesota non-profit corporation, | |
| Debtor. | |
| In re: | Case No. 17-41683 |
| THE CROSIER COMMUNITY OF PHOENIX, an Arizona non-profit corporation, | |
| Debtor. | |

## DISCLOSURE STATEMENT TO ACCOMPANY JOINT PLAN OF REORGANIZATION DATED DECEMBER 22, 2017

# TABLE OF CONTENTS

I.   INTRODUCTION. ................................................................................................... 1

II.  INFORMATION ABOUT THE DISCLOSURE STATEMENT AND PLAN
CONFIRMATION PROCESS. ............................................................................... 2

   A.  Definitions and Plan Supremacy. .................................................................... 2

   B.  Limited Representations. ................................................................................. 2

   C.  Voting Procedures. .......................................................................................... 4

III. OVERVIEW OF PLAN. ......................................................................................... 6

IV.  THE DEBTORS. ..................................................................................................... 7

   A.  History of the Debtors and the PSO. ............................................................... 7

   B.  Mission and Ministry. ..................................................................................... 8

   C.  Structure and Business Operations. ................................................................. 8

   D.  The Debtors' Assets. ...................................................................................... 11

      1.  Real Property. ........................................................................................ 11

      2.  Cash and Investments. .......................................................................... 12

      3.  Personal Property. ................................................................................. 13

      4.  Inventory. .............................................................................................. 14

      5.  Onamia Assisted Living Non-Profit Membership. ............................... 14

      6.  Restricted Beneficial Interest In Hutzell Trust. ................................... 14

      7.  Restricted STTK Funds. ....................................................................... 14

      8.  Discussion of Avoidance Actions. ........................................................ 15

   E.  The Debtors' Liabilities. ................................................................................ 15

      1.  Tort Claims. ........................................................................................... 15

      2.  Annuities. .............................................................................................. 15

      3.  Robinson Secured Claim. ...................................................................... 15

      4.  Employee Claims. ................................................................................. 16

      5.  Trade Debt and Other Unsecured Claims. ............................................ 16

V.   SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASES. ...... 16

   A.  Abuse Perpetrated By Certain Crosiers. ....................................................... 16

   B.  PSO Response to Abuse. ................................................................................ 16

   C.  Tort Lawsuits. ................................................................................................ 18

   D.  Hartford Declaratory Judgment Action. ....................................................... 20

VI.  CHAPTER 11 FILINGS. ...................................................................................... 21

   A.  First Day Motions. ......................................................................................... 21

B.   Schedules & Statements.................................................................................... 23

C.   Proof of Claim Deadline and Notice............................................................... 23

D.   Formation of Official Committee of Unsecured Creditors............................. 24

E.   Executory Contracts........................................................................................ 24

F.   Sales of Property............................................................................................. 24

VII.  ANTICIPATED CHAPTER 11 EVENTS............................................................... 24

A.   Removal of State Court Cases. ...................................................................... 24

B.   Plan Confirmation........................................................................................... 25

C.   Fee Applications. ............................................................................................ 25

VIII. DESCRIPTION OF PLAN AND MEANS FOR EXECUTION. ......................... 25

A.   Claims Description and Treatment. ................................................................ 25

B.   Unclassified Claims........................................................................................ 26

C.   Classified Claims............................................................................................ 26

1.   Class 1 – Priority Employee Unsecured Claims. .................................. 26

2.   Class 2 – Prepetition Date Secured Tax Claims. .................................. 27

3.   Class 3 – Secured Claim of Robinsons. ................................................ 28

4.   Class 4 – General Unsecured Convenience Claims. ............................. 29

5.   Class 5 – General Unsecured Claims. ................................................... 29

6.   Class 6 – Other Tort and Employee Claims. ......................................... 30

7.   Class 7 – Annuity Claims. ..................................................................... 30

8.   Class 8 – Tort Claims. ........................................................................... 30

9.   Class 9 – Unknown Tort Claims. ........................................................... 32

10.  Class 10 – Co-Defendant, Diocese, and Parish Claims......................... 35

11.  Class 11 – Insurance and Benefit Claims.............................................. 35

12.  Class 12 – Penalty Claims. .................................................................... 35

13.  Class 13 – Intercompany Claims. .......................................................... 36

IX.   MEANS FOR PLAN IMPLEMENTATION............................................................ 36

A.   Establishment of Trust Account...................................................................... 36

1.   Debtors' Funding.................................................................................... 36

2.   Hartford Funding.................................................................................... 36

B.   Establishment of Disputed Claims Reserve.................................................... 36

C.   Establishment of Administrative Claims Reserve. ......................................... 36

D.   Payment and Treatment of Claims Other Than Tort Claims and Unknown Tort Claims. 37

E.   Retained Claims. ............................................................................................. 37

-ii-

F.    Hartford Agreement and 363 Sale. ................................................................. 37

X.    CONDITIONS PRECEDENT TO EFFECTIVE DATE. ..................................... 38

A.    Conditions Precedent. ...................................................................................... 38

B.    Waiver of Conditions. ...................................................................................... 39

C.    Closing. ............................................................................................................ 39

D.    Implications of Effective Date. ........................................................................ 39

E.    Non-Occurrence of Effective Date. .................................................................. 40

XI.    REORGANIZATION OF DEBTORS AND POST-CONFIRMATION MANAGEMENT 40

A.    Continuing Existence. ...................................................................................... 40

XII.    POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED
DEBTOR.................................................................................................................... 41

A.    Post-Effective Date Obligations. ..................................................................... 41

B.    Post-Effective Date Funding. ........................................................................... 41

C.    Dissolution of Committee. ............................................................................... 42

D.    Final Decree. .................................................................................................... 42

E.    United States Trustee Obligations. .................................................................. 42

F.    Non-Tort Claims Review, Allowance, and Payment. ....................................... 42

1.    Objections to Claims. ................................................................................ 43

2.    Disputed Claims. ....................................................................................... 43

3.    Treatment of Contingent Claims. .............................................................. 43

G.    Payments Effective Upon Tender. .................................................................... 43

H.    Preservation of Debtors' Claims, Demands, and Causes of Action. ................. 43

I.    Unimpaired Claims. .......................................................................................... 44

J.    Operative Documents........................................................................................ 44

K.    Return of Deposits. .......................................................................................... 44

L.    Delivery of Distributions (Except to Holders of Tort Claims and Unknown Tort Claims).  45

M.    Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants. ................ 45

N.    Absence of Address or Returned Mail.............................................................. 45

O.    Continuation of Current Insurance Policies....................................................... 45

P.    Abuse Prevention. ............................................................................................ 46

XIII.    THE TRUST AND LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT
CLAIMS. .................................................................................................................. 46

A.    Claim Payments. .............................................................................................. 46

B.    No Execution. ................................................................................................... 46

C.    Special Distribution Conditions........................................................................ 46

-iii-

     1.   Medicare-Related Provisions. ...................................................................... 46

     2.   Medicare-Related Obligations. ................................................................... 46

  D.  Indemnification. ................................................................................................. 48

  E.  Termination. ....................................................................................................... 48

  F.  No Liability for Costs. ....................................................................................... 48

XIV. INSURANCE MATTERS. .................................................................................... 48

  A.  No Direct Action Against Hartford. .................................................................. 48

  B.  Judgment Reduction. ......................................................................................... 48

  C.  No Right of Reimbursement. ............................................................................. 49

  D.  No Limitation on Hartford's Rights. .................................................................. 49

XV. TREATMENT OF EXECUTORY CONTRACTS. ................................................ 49

XVI. EFFECT OF CONFIRMATION. ........................................................................... 50

  A.  Discharge. .......................................................................................................... 50

  B.  Vesting. ............................................................................................................. 50

  C.  Exculpation and Limitation of Liability. .......................................................... 50

  D.  Limitation of Liability. ...................................................................................... 51

  E.  Channeled Claims. ............................................................................................ 51

  F.  Permanent Injunction Against Released and Channeled Claims. ...................... 52

  G.  Channeling Injunction as Mutual Release. ....................................................... 53

  H.  Supplemental Injunction Preventing Prosecution of Claims Against Hartford. ................ 53

  I.  Injunctions Deemed Issued and Permanent. ..................................................... 54

  J.  Retention of Jurisdiction. .................................................................................. 54

XVII. FEDERAL TAX CONSEQUENCES. ................................................................... 54

  A.  The Trust. .......................................................................................................... 54

  B.  Federal Income Tax Consequences to Holders of Claims. ................................ 56

XVIII. MODIFICATION OF PLAN. ................................................................................ 57

XIX. ACCEPTANCE AND CONFIRMATION. ............................................................ 57

  A.  Voting Procedures. ............................................................................................ 57

     1.   Generally. .................................................................................................... 57

     2.   Form of Ballots. .......................................................................................... 58

     3.   Ballot Tabulation. ....................................................................................... 58

     4.   Submission of Ballots. ................................................................................ 60

  B.  Feasibility. ......................................................................................................... 60

  C.  Best Interests of Creditors and Liquidation Analysis. ...................................... 60

D.   Confirmation over Dissenting Class. .................................................................... 61

E.   Risk Factors. ...................................................................................................... 63

F.   Effect of Non-Confirmation............................................................................... 63

XX. ALTERNATIVES TO THE PLAN. .................................................................... 63

A.   If The Plan Is Not Confirmed, Several Different Events Could Occur: ............................ 63

XXI. RECOMMENDATION OF THE PLAN PROPONENTS AND CONCLUSION. ............ 64

QB\155907.00003\50742628.1

## I.   <u>INTRODUCTION</u>.

The Crosier Fathers and Brothers Province, Inc., a Minnesota non-profit corporation (the "**Province**"), the Crosier Fathers of Onamia, a Minnesota non-profit corporation ("**Onamia**"), and The Crosier Community of Phoenix, an Arizona non-profit corporation ("**Phoenix**," and collectively with the Province and Onamia, the "**Debtors**"), each a debtor-in-possession in the above-captioned Chapter 11 reorganization cases (the "**Reorganization Cases**"), together with the Official Committee of Unsecured Creditors (the "**Committee**"), have prepared this Disclosure Statement (the "**Disclosure Statement**") in connection with their joint solicitation of acceptances of the Joint Plan of Reorganization (the "**Plan**"), a copy of which is being served contemporaneously herewith.  The purpose of the Disclosure Statement is to provide creditors with adequate information about the Plan as the Debtors and Committee (collectively sometimes referred to herein as the "**Plan Proponents**") solicit acceptances of the Plan.

Survivors of Abuse[1] are a focal point of the Plan.  It is impossible to overstate the tragedy of the Abuse that was inflicted in the past on various young people by certain Crosiers.  Such Abuse was perpetrated by men purporting to do the apostolic work of the Roman Catholic Church and the Canons Regular of the Holy Cross of the Province of St. Odilia ("**PSO**").  Instead of fulfilling this mission, such perpetrators inflicted harm and suffering on certain children and teenagers who were exposed to them, many of whom were Crosier seminary students.  This inexcusable Abuse impacted not only the survivors, but also the faithful among the Crosiers, and the communities in which the survivors live and the Crosiers serve.

Until recently, the Debtors were able to compensate survivors of Abuse on a one-by-one basis with the assistance of their insurer, Hartford.  However, the recent Minnesota "Child Victims Act" and the bankruptcies of a number of Wisconsin and Minnesota Archdioceses and Dioceses have devastated the Debtors' remaining insurance and other Assets.  The Debtors worked for many months before the Reorganization Cases were filed to obtain funding to pay their creditors, and ultimately determined that the Reorganization Cases would maximize the impact of the contribution they could receive from Hartford and the value they could realize from their other Assets.  To preserve and fairly distribute these limited resources among the numerous creditors who remain uncompensated, the Plan Proponents jointly propose the Plan.  Through the Debtors' efforts, sales of certain of their Assets as they consolidated operations, and primarily through their settlement with Hartford, the Debtors have assembled a cash fund that will be used to pay the creditors and perform the Debtors' obligations under the Plan.

Through the Plan, the Debtors will also restructure their financial affairs to continue their apostolic mission and ministry, which is critical to many—especially the elderly, poor, and incarcerated—in their communities.  In their works, the Debtors will also continue their already-strong programs intended to protect children and vulnerable adults, and will endeavor to address the spiritual needs of those who were harmed and their communities.

---

[1]      Capitalized terms not otherwise defined herein have the meaning given to them in the Plan.

In this Disclosure Statement, the Plan Proponents provide adequate information for creditors to evaluate the Plan and decide whether to vote to accept it. Information about the process by which creditors will vote to accept or reject the Plan, and the circumstances under which the Bankruptcy Court may approve the Plan even if some creditors do not vote to accept it, is also provided.

In addition to summarizing the confirmation process and the Plan itself, the Disclosure Statement contains information about the Debtors, their history, Assets, liabilities, events that have occurred prior to, and are expected to occur in, the Reorganization Cases, and business plans for future operations. The Disclosure Statement also provides information regarding the problem of Abuse perpetrated by individuals associated with the Crosiers, the steps taken by the Crosiers to address the injuries inflicted by those individuals, and steps taken to prevent such Abuse from occurring both now and in the future.

## II.    INFORMATION ABOUT THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCESS.

### A.    Definitions and Plan Supremacy.

The capitalized terms used in this Disclosure Statement have the same definitions given to them in the Plan, unless it is expressly stated that a capitalized term will have a different meaning when used in this Disclosure Statement. In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules of the Bankruptcy Court. Terms defined in this Disclosure Statement which are also defined in the Plan or the other sources described above, are solely for convenience when reading this Disclosure Statement; the Debtors do not intend to change the definitions of those terms from the Plan or from the otherwise applicable sources. Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control. The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.    Limited Representations.

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims. This Disclosure Statement has been approved by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtors, concerning the votes for acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.   THE PLAN IS THE OPERATIVE DOCUMENT.  THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, A COPY OF WHICH IS BEING SERVED CONTEMPORANEOUSLY HEREWITH, SHOULD BE READ COMPLETELY.  FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at the Debtors or from the books and records of the Debtors.  Financial information developed for purposes of this Disclosure Statement was developed by the Debtors' personnel working in conjunction with the Debtors' Professionals.  Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents.  While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents and only after a thorough review of the documents themselves.[2]

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THE DEBTORS' OPERATIONS, THE VALUE OF THE DEBTORS' ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTORS ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   UNLESS OTHERWISE EXPRESSLY STATED, PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING THE DEBTORS HAVE NOT BEEN SUBJECT TO A CERTIFIED AUDIT, BUT HAVE BEEN PREPARED FROM INFORMATION COMPILED BY THE DEBTORS FROM RECORDS MAINTAINED IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS.  EVERY EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE IN THE PREPARATION OF THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE PLAN PROPONENTS AND IT IS NOT A SOLICITATION BY THEIR ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY ANY OF THEM.  THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE PLAN PROPONENTS AND NOT OF THEIR ATTORNEYS OR ANY OTHER PROFESSIONAL.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTORS.  HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION, THE DEBTORS

---

[2]      Such documents include, but are not limited to, pleadings filed in the Minnesota state court system, the Bankruptcy Court cases of the Archdiocese of Minneapolis/St. Paul and various Minnesota Dioceses, public real property records, and corporate formation documents and records, among other things.

QB\155907.00003\50742628.1

ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

C.    **Voting Procedures.**

In accordance with Bankruptcy Code § 1122(a), the Plan classifies Claims into different Classes based on similarities and differences between the legal rights associated with the Claims and provides for how each Class of Claims will be treated.  Specifically, the Plan classifies Claims against the Debtors into the following Classes:

Class 1 – Priority Employee Unsecured Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept)

Class 2 – Prepetition Date Secured Tax Claims (Impaired; Entitled to Vote)

Class 3 – Secured Claim of Cindy and Michael Robinson (Impaired; Entitled to Vote)

Class 4 – General Unsecured Convenience Claims (Impaired; Entitled to Vote)

Class 5 – General Unsecured Claims (Impaired; Entitled to Vote)

Class 6 – Other Tort and Employee Claims (Impaired; Entitled to Vote)

Class 7 – Annuity Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept)

Class 8 – Tort Claims (Impaired; Entitled to Vote)

Class 9 – Unknown Tort Claims (Impaired; Entitled to Vote)

Class 10 – Co-Defendant, Diocese and Parish Claims (Impaired; Not Entitled to Vote—Deemed to Reject)

Class 11 – Insurance and Benefit Claims (Impaired; Entitled to Vote)

Class 12 – Penalty Claims (Impaired; Not Entitled to Vote—Deemed to Reject)

Class 13 – Intercompany Claims (Impaired; Entitled to Vote)

In order to confirm the Plan, at least one Class of Claims impaired by the Plan must vote to accept the Plan.  In order for a Class of Claims to vote to accept the Plan, votes representing at least two-thirds (2/3) in amount of the Claims in that Class that vote and more than one-half (1/2) in number of the Claims in that Class that vote must be cast in favor of accepting the Plan.  The Plan's treatment of a Class will either "impair" the Claims in that Class or leave them "unimpaired."  Claims are impaired if the Plan in any way alters the legal, equitable, or contractual rights associated with the Claims or if the Plan provides for paying less than the full amount of the

-4-

Allowed Claims.  Holders of Claims in Classes which are impaired under the Plan may vote to either accept or reject the Plan; however, unless specifically noted in the Plan with respect to a particular Class, the act of voting and the substance of the vote will not alter a creditor's treatment. As more fully described below, the Debtors are seeking acceptances from holders of Allowed Claims in the Classes designated above as "Impaired; Entitled to Vote."  If you are the holder of an impaired Claim, it is important that you vote.

The following Classes of Claims are not impaired under the Plan, or are deemed to vote in favor of or against the Plan, for the reason indicated:[3]

| Class | Description | Status |
|---|---|---|
| Unclassified[4] | Administrative Claims | Unimpaired—Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired—Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired—Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired—Deemed to Accept |
| Class 7 | Annuity Claims | Unimpaired—Deemed to Accept |
| Class 10 | Co-Defendant, Diocese, and Parish Claims | Receive $0.00—Deemed to Reject |
| Class 12 | Penalty Claims | Receive $0.00—Deemed to Reject |
| Class 13 | Intercompany Claims | Insiders—Votes do not count as Impaired Accepting Class |

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized in Article VIII of this Disclosure Statement.  It is possible that one or more Classes of Claims will have no creditors in that Class.  In that event, under the terms of the Plan, that Class will be deemed to be automatically deleted from the Plan.

Bankruptcy Code § 1129(b) provides that, if the Plan is rejected by one or more impaired Classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if:  (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each rejecting Class of Claims; and (ii) at least one Class of impaired Claims has voted to accept the Plan.

**THE DEBTORS AND THE COMMITTEE RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

---

[3]     Holders of Claims which are unimpaired, that is, their rights are not altered and they will be paid or satisfied in full, are deemed to have accepted the Plan without voting.  *See* Bankruptcy Code § 1126(f).  Conversely, holders of Claims who will receive nothing under the Plan are deemed to reject the Plan without voting.  *See* Bankruptcy Code § 1126(g).

[4]     The treatment of unclassified Claims is prescribed by the Bankruptcy Code and, accordingly, the holders of those Claims do not vote.

QB\155907.00003\50742628.1

## III.    <u>OVERVIEW OF PLAN.</u>

As discussed above, the Debtors filed these Reorganization Cases in order to resolve creditors' Claims for Abuse (known and unknown), and, while achieving that goal within the limits of the Debtors' Assets, to restructure their financial affairs to preserve their apostolic ministries and mission. These ministries and missions are critical to Catholics and non-Catholics alike in Arizona, Minnesota, and elsewhere. The Debtors have proposed the Plan to accomplish these ends. The Plan will be funded by the Debtors and Hartford, the Debtors' only known insurer with any obligation relating to Tort Claims.

The approximately $25.5 million cash fund to be established under the Plan represents significant efforts to liquidate Assets and downsize by the Debtors, and the significant contribution and support of Hartford. Of these funds, approximately $24 million will be used to fund the Trust that will pay the Tort Claimants pursuant to the Tort Claims Allocation Protocol attached to the Plan as Exhibit A and incorporated therein, and the Unknown Tort Claimants pursuant to the Unknown Tort Claims Allocation Protocol, attached to the Plan as Exhibit B and incorporated therein, from the Unknown Claims Reserve that will be established within the Trust. The Plan Proponents estimate that administrative fees will be equal to or less than the remaining $1.5 million.

The Debtors believe that the Plan provides greater compensation to the Tort Claimants and the Unknown Tort Claimants than they would likely receive outside Chapter 11 because of, among other things: (i) limited and, in some instances, disputed, insurance coverage for the period during which some of the Tort Claims arose; (ii) exhaustion of limits of insurance; and (iii) the limited resources of the Debtors to respond to judgments outside the Reorganization Cases.

**<u>The Plan incorporates a settlement agreement with Hartford through which the Debtors will obtain a significant amount of the money committed to the Plan. The terms of the settlement involves, among other things, a sale of certain Hartford Policies.</u>**

Additionally, to fund the Plan, the Debtors sold, pre-petition, certain real property that was not critical to the mission and ministry of the Debtors. The Debtors also sold and may sell mission-critical property in an effort to downsize, replacing larger properties with smaller, more economical properties that are still capable of serving the Crosiers' mission and ministry, in furtherance of Plan funding. To further generate funds for the Debtors' contribution to the Plan, the Debtors may sell additional real property or use it as collateral for a loan. Again, in certain cases, the Debtors will be utilizing property that is critical to their mission and ministry, but they are committed to being able to consummate a plan that is beneficial to the Tort Claimants and the other interested parties.

Under the Plan, a Trust will be created from which Tort Claims and Unknown Tort Claims will be paid. The Tort Claims and Unknown Tort Claims will receive distributions based on protocols or processes proposed by the Committee, which will be subject to Court approval as part of the Plan confirmation process. The Trust will be administered by a Trustee. The initial Trustee will be chosen by the Committee.

## IV.    THE DEBTORS.

### A.    History of the Debtors and the PSO.

The Debtors are the Province, Onamia, and Phoenix. The Province is the civil counterpart of the PSO. The PSO is part of the Roman Catholic religious Order known as the Canons Regular of the Holy Cross (the "**Order**," with individual members of the Order referred to herein as "**Crosiers**").

The Onamia community is located in Onamia, MN, and the Phoenix community is located in Phoenix, AZ. Both are separate from the Province and all three are civilly incorporated entities. The two communities are also separate entities under Canon Law—specifically, the proper law of the Order.

The PSO is the American division of the Order. Its territory encompasses the entire United States. The first Crosier community was founded in Belgium in 1210, and the Order derives its name from the French word croisés—signed with the cross. It is one of the oldest orders of religious men in the Roman Catholic Church.

In 1850, Crosier priests and brothers came to Wisconsin in the United States to work among immigrants who had settled in the Green Bay area. This initial attempt to establish the Order in the United States came to an end when the Crosiers who had been assigned to the United States returned to Europe. The Crosiers again returned to the United States in 1910 to accompany immigrants who settled in northern Minnesota. In 1922, the first permanent American priory and school (still in use today as the modern priory but no longer a school) were established in Onamia, Minnesota.

During this period, Crosiers began missions in the country now known as the Democratic Republic of the Congo in 1920; Indonesia in 1926; and Brazil in 1934. Since 1958, Crosiers have also worked in the Diocese of Agats in what is now known as Papua, Indonesia. Members of the PSO have also been sent to these areas over the years; the last Crosier who was a member of the PSO returned from Papua to the United States several years ago.

Today there are a total of about 350 Crosiers worldwide who live and minister in the United States, the Netherlands, Belgium, Germany, Indonesia, the Democratic Republic of the Congo, Brazil, and in Rome, where the Order's master general resides. The Order is divided into three Provinces, one proprovince, and one general delegation. The PSO is headquartered in Phoenix and has approximately forty-five (45) members. The other two Provinces are located at St. Agatha Monastery in the Netherlands and in Bandung, Indonesia. These other two Provinces are not debtors in these cases nor are they related or affiliated with the Debtors except that their members are also Crosiers. The Crosiers in the Democratic Republic of the Congo are organized as a proprovince, an interim stage toward becoming an independent Province. They are affiliated with the Province of Blessed Theodore de Celles headquartered in the Netherlands. The Crosiers in Brazil have the status of a general delegation under the direct authority of the Crosier master general in Europe.

-7-

B. **Mission and Ministry.**

Crosier lives are spent in service. Crosiers are involved in a wide range of ministries serving the Church and those in need, including parish assistance, retreat work, spiritual direction, elder care, veterans ministry, immigrant outreach, and jail ministry. Crosiers also assist their brothers in charity and unity, by prayer and daily activities.

The ministries of the Crosiers are important to the people in the geographic areas in which they serve; many depend on their services. The Crosiers support numerous urban and other programs that minister not only to the Catholic faithful, but also benefit all people in the communities where they serve through the Crosiers' charitable works and outreach.

Each Crosier takes a vow of poverty in exchange for which the relevant Province agrees to provide for the needs of their members of the particular Province throughout their lives. As part of the formation process, each Crosier relinquishes all his worldly goods and provides a power of attorney to the Province of which he is a member. In turn, the Province of which he is a member vows to provide for his needs and survival. Each Province is a fiduciary in the financial aspects of each Crosier's life. This means the Debtors hold certain Assets in trust for the individual Crosiers who are part of the PSO.

Any salary that a member receives from any employment is paid to the community or the Province. Rather than accumulating worldly goods, Crosiers share in conventual communal living which is provided and paid for by the Province or community of which he is a member. Crosiers are committed to live and work in community and to serve the people as a sign of hope and glory. The Crosiers follow the Rule of St. Augustine, promoting the common good while respecting each individual.

C. **Structure and Business Operations.**

The territory of the PSO is subject to the jurisdiction and administration of the Prior Provincial. Thomas Enneking, osc, has been the Prior Provincial since 2011. As the Prior Provincial, he is charged with carrying out his canonical duties in accordance with the Canon Law.

Father Enneking is also the civil law President of the Province. The other civil law officers of the Province are: Treasurer: Jeffrey Breer, osc; Secretary: Kermit M. Holl, osc; Directors: David Donnay, osc and Stephan E. Bauer, osc. The Province is the civil entity that, among other things, provides administrative services to the Onamia and Phoenix communities in accordance with Canon Law. In addition to being a separate civil law entity, the Province is also a separate entity under the religious law of the Order.

The Onamia community, located in central Minnesota, has been an important part of the Crosiers' presence in the United States since the Order began its mission in the United States more than 100 years ago. In addition to being a separate civil law entity, the Onamia community is also a separate entity under the religious law of the Order. Onamia's officers are: President: Kermit Holl, osc; Vice President: David Donnay, osc; Secretary: Thomas Carkhuff, osc; and Director: Jeffrey Breer, osc. Some Onamia Crosiers serve as parish priests as well as serving in a variety of ministries, working as retreat leaders, providing spiritual care to the elderly and hospitalized, and

-8-

functioning as jail ministers, among other charitable works.  Onamia also provides the home for senior retired Crosiers, the development office that serves all three Debtors, and the Crosiers in initial formation.

Onamia is also a non-profit member of a Minnesota non-profit corporation—Onamia Area Assisted Living—that owns and operates an elder care center sometimes known as Lake Song and defined in the Plan as Onamia Assisted Living.  As a member, Onamia is entitled to any distributions of profit from the operation of Onamia Assisted Living; however, Onamia Assisted Living has historically operated at a loss.  Onamia contributed $45,000 in each of 2015 and 2016 to help it continue operating.  Some of the elder members of the Onamia community are also residents of Onamia Assisted Living.

Onamia earns additional funds from leasing the Holy Cross Center to third parties.  The Holy Cross Center, discussed below, is a church and hall that Onamia and the Holy Cross Parish of the Diocese of St. Cloud jointly operate pursuant to a contract.  The facility is leased on a short-term basis for weddings, funerals, and other community events and proceeds that are generated by Onamia are retained by Onamia.

The Phoenix community is located in central Arizona.  In addition to being a separate civil law entity, the Phoenix community is also a separate entity under the religious law of the Order. Previously, the Crosier priests in Phoenix served as associate pastors and provided part-time assistance in the Diocese of Phoenix, but have limited their involvement to providing weekend assistance based on their availability. In addition, the members of the Phoenix community place their limited resources and focus on their other ministries, including spiritual ministry to veterans, immigration assistance, jail ministry, spiritual direction, visiting and serving memory care patients, and working in other ministries that serve the Church.  Father Enneking is the local Superior for the religious community in Phoenix and also serves in the civil capacity as Phoenix's President. Its officers also serve in the following roles:  Secretary:  Robert Rossi, osc; Treasurer:  Stephan E. Bauer, osc; and Vice President:  James Verley, osc.

All three of the Debtors generate income to provide for the needs of the communities and their members and to carry out their mission and ministry in several ways, including salaries and stipends for services provided by Crosiers and also various fundraising programs.  Funds are raised in several ways, including through the Crosier Apostolate (a group of donors who commit to give to the Debtors for a year, and renew their commitments annually), direct mail campaigns, charitable gift Annuities, and suggested offerings for religious and other articles through their website.

Many of these development functions are conducted by an administrative department—the Service Bureau.  These functions include maintenance of donor lists and contact information, donor mailings and related development matters.  Additionally, the Service Bureau fulfills orders placed through the website or through mail order forms and maintains the inventory of items offered on the website.

Charitable gift Annuities are another important form of funding for the Debtors.  The donor gives a charitable gift to the applicable Debtor in exchange for the commitment of the Debtor

recipient to make Annuity payments to the donor over time (usually for the life of the donor).  The Debtors maintain fully funded reserves/accounts from which the regular Annuity payments to the donors are made.

Several years ago, the Province commenced a capital campaign.  Beginning in 2013, the Province raised funds for the sole purpose of constructing a building that could be used as a priory and also as a center from which to operate the PSO's mission and ministry and expand the services, programs, and supportive benefits that the Province and Phoenix provide to their surrounds.  Each contribution to the capital campaign was restricted for this purpose.  If the funds were not used for that purpose, state law requires that they be returned to the donor of the funds.  In 2016, a separate Arizona non-profit corporation, the Crosier Village of Phoenix ("**Crosier Village**") was formed for the purpose of fulfilling the capital campaign and operating the new campus.  The remaining restricted funds that had been raised through the capital campaign but have not yet been deployed in construction were transferred to Crosier Village.  Significant progress has been made remodeling an existing complex.  A number of Crosiers moved both their residences and offices out of a building owned by the Phoenix community, which building was sold to obtain funds for the Plan and reorganization.  Those Crosiers moved into the Crosier Village campus and Phoenix leases their residences and office space from Crosier Village; the Province also leases administrative space from Crosier Village.

Additional information about the Debtors' income may be found in the Debtors' Schedules (as amended) and the Debtors' Monthly Operating Reports filed with the Bankruptcy Court.  Note, however, that the numbers reported include all income, some of which is restricted and may not be used for purposes other than the restricted purpose.  An example of this is seen on the Statement of Financial Affairs filed by the Province [Province Dkt. No. 42], which reports approximately $3,037,200 in income in 2015 and $1,718,826 in income for 2016.  Most of these funds were capital campaign funds that were restricted for the sole purpose of building the new Crosier campus in Phoenix.  Pursuant to law, restricted funds must be used for the sole purpose for which the donor has restricted their use; failing that, the funds must be returned to the donor(s).

Each of the Debtors is financially responsible for the members who belong to their respective communities; the Province provides support only for the Prior Provincial and two sons of the province.  Onamia is responsible for the approximately thirty (30) Crosiers assigned to its community; Phoenix is responsible for the approximately ten (10) Crosiers assigned to its community as well as the Prior Provincial, to the extent his expenses are not covered by the Province, because he is also the Superior of the Phoenix community.  Typically, the Crosiers reside in community houses known as priories unless they are residing in assisted living, nursing care or with or near family members because of unique circumstances.

The Province pays Social Security and Medicare taxes for each Crosier living and working in the Phoenix and Onamia communities which is reimbursed to the Province by Phoenix or Onamia, as the case may be.  In turn, the relevant Debtor receives the Social Security and Medicare payments for each of the members who has attained the age of 65, consistent with the vow of poverty taken by each member and the Debtors' obligations for care and support of their respective members.

D.     **The Debtors' Assets**.

A description of the Debtors' Assets follows.  A balance sheet summarizing the Debtors' Assets and liabilities is also attached to the Disclosure Statement as **Exhibit 1**.

1.     **Real Property**.

(a)     **Province**.

The Province owns one residence in Phoenix, Arizona, the Old Southern Building.  The house was purchased in 2017 from Cindy and Michael Robinson, who have provided seller carry-back financing to the Province that is classified as a Class 3 Secured Claim under the Plan, in the amount of approximately $88,000.  The Province then invested approximately $40,000 in remodeling the property pre-petition to make it suitable for its purposes.

Because this residence is essential to the mission and ministry of PSO, it will not be sold under the Plan.  In fact, it was purchased so that the Province and Phoenix could downsize to provide additional funding for the Reorganization Cases.  Prior to June, 2017, the Province and Phoenix shared administrative and residential space in a building owned by Phoenix.  The Province purchased the Old Southern Building to use for residential space, and now leases its administrative space from Crosier Village.  It accomplished the move with the intent to liquidate the Phoenix property to provide funding for the Plan and operations.  The Old Southern Building, a much smaller property, will also save money in the future on operating costs such as utilities and landscaping.

The Province also owns a small parcel in Crow Wing County, Minnesota, which is estimated to be worth approximately $5,900 by the local tax assessor.

(b)     **Onamia**.

Onamia owns certain real property that is not essential to its mission and ministries, which it may sell or otherwise monetize under the Plan.  This property includes some parcels of undeveloped vacant farm land in Benton County, Minnesota, and Hidalgo County, Texas, varying in size, in which Onamia holds a 1/5 Interest.  The family members of the donor hold the other 4/5 Interests.  Because of the minority nature of Onamia's Interest, it is believed this property will be difficult to market and sell if the other 4/5 Interest holders will not purchase Onamia's Interest.  Through the efforts of the 4/5 Interest holders and with Onamia's cooperation, two of the parcels in Benton County were sold post-petition with Bankruptcy Court approval, but the proceeds were relatively insignificant.

Onamia also has an Interest in an older lake house that is in relatively poor condition.  This building is located in Isle, Minnesota and the Debtors do not believe it has significant value.

Onamia also owns a portion of a large campus that is essential to its mission and ministry.  This campus includes Onamia Assisted Living and its hospital, the Holy Cross Center, and Onamia's priory church, priory, and administrative offices.  At one time, prior to the construction of Onamia Assisted Living, this complex was the location of the Crosier Seminary.  The former

-11-

Crosier Seminary building is now Onamia's priory and administrative offices. This was also the Province's headquarters before it moved to Phoenix. Because it is home to the Onamia community and is its administrative base, the priory and related church are essential to the Debtors' mission and ministry. Despite their importance, Onamia is considering downsizing, similar to what the Phoenix community and Province did. If Onamia is able to market and sell the priory, it would replace it with a smaller, more economical space, and use the net proceeds to fund its Plan contribution and its operations.

The Holy Cross Center, as briefly discussed above, consists of a church hall that sits on real estate owned by Onamia. In 2005, Onamia and the Holy Cross Parish entered into the Holy Cross Agreement that provided for Onamia to contribute 75% of the construction costs for the Holy Cross Center, and Holy Cross Parish to contribute 25% of the construction costs. Going forward, this Executory Contract requires Onamia to pay for 75% of the operating costs of the Holy Cross Center. The Holy Cross Parish must pay for 25% of the operating costs. Each party is entitled to the proceeds that it generates from its use of the Holy Cross Center; each has areas within the Holy Cross Center for its exclusive use, as well as common areas that both parties share. The Holy Cross Agreement contains other requirements, including the provision of insurance by both parties, and provides an option for each party to buy out the other's interest in the Holy Cross Center under certain circumstances. The contract is self-renewing from year to year. Given the executory and continuing nature of the obligations it creates, the Holy Cross Agreement is an Executory Contract that will be assumed.

The Holy Cross Center is central to Onamia's mission and ministry and will be retained under the Plan. In all events, Onamia does not believe that the Holy Cross Parish has sufficient funds to purchase its interest in the Holy Cross Center. Moreover, given the ownership interest of the Holy Cross Parish in the Holy Cross Center, it is unlikely that Onamia's Interest in the Holy Cross Center or the underlying real estate (which is owned by Onamia but underlies the Holy Cross Center that is <u>not</u> wholly owned by Onamia) is marketable (or at least, marketable at the price that a wholly owned building and land would command).

### (c)     <u>Phoenix.</u>

Phoenix owned a residential complex located at 2617 East Campbell Avenue, Phoenix, Arizona 85016. Previously, the complex served as Phoenix's and the Province's administrative offices and residences. Phoenix listed the property through a real estate broker (whose employment was approved by the Bankruptcy Court) and sold it (after the sale was approved by the Bankruptcy Court) for approximately $700,000. Phoenix is now leasing space from Crosier Village for its members' residences and administrative offices.

### 2.     <u>Cash and Investments.</u>

The Debtors maintain checking and savings accounts at national banks to use for operations. The Province had approximately $140,000 in its checking and savings accounts as of the Petition Date; Onamia had approximately $280,000; and Phoenix had approximately $140,000.

As of the Petition Date, the Debtors also had approximately $4,010,783 invested with various fund managers at J.R. Baird and Company ("**Baird**"). The investments are comprised of

-12-

approximately 66% stocks, 26% bonds, and 8% cash and other investments. The funds are invested in a mix of investments that are appropriate for a relatively conservative, mid-term portfolio. The Debtors have pooled their funds in the investment accounts in order to realize greater returns on the funds and to minimize administrative expenses; however, each of the Debtors' funds are accounted for separately and tracked. These funds will be used to fund the Debtors' obligations under the Plan in addition to operating and other expenses.

The Debtors also hold fully-funded reserves for their Annuity obligations at Baird. These funds are invested in approximately 54% stocks, 31% bonds, and 15% cash and other investments. As of the Petition Date, approximately $1,452,748.00 was held in the Annuity reserve.

Additionally, Onamia holds approximately $350,000 in Honeywell stock that was donated to it. Onamia also has an interest in certain oil or gas royalties, but the payments it receives from those are relatively minimal (less than $1,000 per year).

### 3.    **Personal Property.**

The Debtors own various personal property that is useful to them (i.e., desks, beds, chairs, kitchen implements, tables, dishes) and necessary to community life but that does not have significant value if re-sold. The Debtors do not anticipate liquidating these items.

They also maintain an archive of photographs, art work, religious articles, and souvenirs brought back from individual Crosiers' missions and other travels. This includes cultural items from Papua and Indonesia, such as carved wooden figures and other indigenous art, and traditional indigenous garments. These items are not believed to have significant monetary value but are important souvenirs of the Crosiers' mission, ministry, and work. The archive also includes a relic of the PSO's patron saint, St. Odilia. The relic is essential to the mission and ministry of the PSO. The Debtors do not anticipate liquidating these items.

The Debtors were also the beneficiary of a restricted gift from a European Crosier province, the European Province of the Blessed Theodore de Celles. That province provided the Debtors with its religious art and artifacts to display in their places of worship. By letter dated February 1, 2012, the province restricted its gift: "Prior, explicit and written permission of Prior Provincial and Councilors of the European Province Blessed Theodore de Celles or their successors is required if any of these pretiosa are ever to be sold or donated to third parties." They, and the Debtors, regard these items as essential to the Crosier mission, ministry, and heritage. A list of these items is found in the amended Schedules filed by Onamia.

The Debtors also own approximately twenty (20) Ford, Chevrolet, and Honda passenger vehicles and one pickup truck that are used by the individual Crosiers for mission and ministry-related transportation, and for operations. The make, model, and year of the vehicles is set forth in the Schedules. Onamia owns approximately thirteen (13) of the vehicles; the Province owns one; and the remainder are owned by Phoenix.

4.    **Inventory**.

Onamia maintains an inventory of small religious items, such as medals or rosaries, which are for offered on the Debtors' website as memorials a donor may request to receive from the Debtors after making a donation to the Debtors. These items will be distributed and replenished throughout the Reorganization Cases in the ordinary course of the Debtors' business.

5.    **Onamia Assisted Living Non-Profit Membership**.

As noted above, Onamia is a member of the Onamia Assisted Living non-profit. Onamia Assisted Living currently operates at a loss, has historically operated at a loss, and is not anticipated to turn a profit in the foreseeable future, so Onamia believes its membership interest in Onamia Assisted Living is essentially worthless. The rights are, however, important to the Debtors' mission and ministry. One way Onamia cares for the aged and sick, both physically and spiritually, is through its participation in Onamia Assisted Living. Therefore, Onamia intends to retain its membership rights under the Plan. The Debtors do not believe the Onamia Area Assisted Living Articles of Incorporation or Bylaws are an Executory Contract; but to the extent they may be deemed to be an Executory Contract, the Debtors will assume such Executory Contract under the Plan.

6.    **Restricted Beneficial Interest In Hutzell Trust**.

In 1964, a PSO community known as the "Crosier Fathers of Fort Wayne" and a variety of other religious organizations were made remainder beneficiaries of a trust known as the Hutzell Foundation. In 1992, because the "Crosier Fathers of Fort Wayne" Community no longer exists, litigation over whether the Province was entitled to the beneficial interest ensued. A stipulated judgment was ultimately entered that granted the Province a 10% interest in the Trust. The funds from the Trust are restricted under the terms of the Trust Agreement and may only be used for "educating young men for the priesthood."

7.    **Restricted STTK Funds**.

Freeport-McMoRan of New Orleans provided the Province with certain restricted funding for a school operated in Indonesia as part of the PSO's international missions. The school is known as STFT, the Interdiocesan School of Theology at Abepura, Irian Jaya, Indonesia. The funding was given to establish and maintain the Bishop Sowada Chair in Cultural Anthropology at STFT. The Province holds this money in trust under a "Statement of Understanding for the Proprovince STTK Fund." Under the terms of the Freeport-McMoRan grant, the net yearly proceeds of the principal funds, less 3% intended to remain in principal for growth purposes, shall be released yearly to the Proprovince Wahyu Salib, which will then pay the STFT's Board of Regents, known as the STTK. The Proprovince is in turn to submit a summary report and financial report relating to the funds. The Province then reports back to Freeport-McMoRan. The fund contains approximately $200,000.

-14-

8. **Discussion of Avoidance Actions.**

The Debtors have investigated their books and records and do not believe that any of them have any colorable avoidance actions.

E. **The Debtors' Liabilities.**

1. **Tort Claims.**

By far, the largest liabilities of the Debtors are the Tort Claims. Given the nature of the Debtors' insurance and the Hartford settlement, the Debtors will be providing funds for the payment of Tort Claims without regard to which Debtor they are or were asserted against. This is being done only for purposes of the Plan and does not constitute an agreement or admission of any of the Debtors for liability for any Tort Claims, including, but not limited to, those against whom a Tort Claim was filed, or those who were not named in any Proof of Claim or pre-petition Claim. Certain of the Co-Defendants have also filed Claims against the Debtors that relate to Tort Claims. These and the Tort Claims are discussed at length below.

2. **Annuities.**

As noted above, one way in which the Debtors raise funds is through charitable gift annuities, defined in the Plan as Annuities. These Annuities are often incorporated into retirement portfolios and many Annuitants rely on their Annuity payments as income. Such retirement income reliance is a reason that it is essential that Annuity payments continue to be made by the Debtors throughout the case. Apart from this basic responsibility, a business reason also exists: if the Debtors default on Annuity payments, they may be barred by various states (which regulate annuities by law) from continuing to raise funds in this manner. The Debtors maintain fully funded reserves/accounts, as discussed above, from which the regular Annuity payments to the Annuitants are made.

Each Annuity is evidenced by a contract, defined in the Plan as the Annuity Agreement, that dictates the payment the Debtors are required to make to the Annuitant. A list of Annuity obligations is attached to the Debtors' Schedules.

Although the exact amount of Annuity liability cannot be predicted (because it is predicated on the life of the donor), the Debtors have estimated the liability based on actuarial calculations and believe that the Province likely has approximately $50,000 in Annuity liability; Phoenix has approximately $80,000; and Onamia has approximately $805,000.

3. **Robinson Secured Claim.**

The Robinsons' financing of the Old Southern Building is evidenced by the Robinson Loan Documents, one of which is a deed of trust under which the Robinsons were granted a security interest in the Old Southern Building under Arizona law, enforceable through a non-judicial foreclosure process upon default under the Robinson Loan Documents.

    **4.**      **Employee Claims.**

The Debtors also owe various employees accrued sick or vacation time, or other benefits. Most of these amounts are subject to priority status; however, because most will likely be used as time off, the Debtors do not expect to pay out dollars on the majority of these Claims. If an employee terminates employment during the Reorganization Cases, he or she may be entitled to a cash payout under those circumstances. However, the Debtors do not anticipate any employee termination.

    **5.**      **Trade Debt and Other Unsecured Claims.**

The Debtors generally paid their trade debt in the ordinary course of business. However, some amounts remained unpaid as of the Petition Date. The Debtors estimate that these amounts are fairly minimal and will likely total less than $10,000.

## V.      SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASES.

    **A.**      **Abuse Perpetrated By Certain Crosiers.**

Prior to moving to Phoenix, Arizona, the Province was headquartered in St. Paul, Minnesota, for many years. After the establishment of the first American priory in 1922, the PSO grew significantly over many years, once having seminaries, schools, or communities in Minnesota (multiple cities), Illinois (multiple cities), Nebraska (multiple cities), Indiana (multiple cities), Maryland, New York (multiple cities), and Arizona. One of these was the Crosier Seminary in Onamia, which provided four years of high school education and two years of college education for young men who were considering a vocation of religious life or the priesthood.

The Province also sent Crosiers to minister outside of their communities to various states throughout the United States, and to many different countries throughout the world. However, due to declining enrollment and financial troubles, the Province closed many of its communities, schools, and seminaries (including the Crosier Seminary in 1989). Only Phoenix and Onamia, both of which are communities, remain in operation today.

In the early 2000's, the Debtors became aware of Claims of Abuse by priests, brothers, or other persons affiliated with the Debtors. While many of these Claims related to the Crosier Seminary and other seminaries operated by the Debtors, there are also several Claims that originated at various other places (including several dioceses and archdioceses) where Crosiers served as teachers or priests.

    **B.**      **PSO Response to Abuse.**

The PSO was deeply saddened and devastated in learning of the Abuse, and took proactive steps to deal with the crisis, including: (i) attempting to identify others who had been harmed, (ii) implementing policies and programs to prevent future Abuse; and (iii) assisting survivors. To discern a path for the future that would ensure safety of children and vulnerable people, compensate survivors, and ensure accountability going forward, the Debtors gathered information, including consulting with professionals in the field. Representatives of the Debtors attended a

gathering of the Conference of Major Superiors of Men that was specifically scheduled to address the response of religious men to the sex abuse crisis. In addition, the Debtors provided counseling and other services to survivors who came forward to them (in addition to compensation to survivors).

In June 2002, the Province hired the Minnesota-based law firm Faegre & Benson, LLP, to conduct an investigation of present and past allegations of Abuse by members. In conjunction with that investigation, it was discovered that the most recent allegation was of Abuse that had occurred in the early 1980's. In other words, there were no Claims or allegations of any current Abuse. The Prior Provincial at the time, Father Thomas Carkhuff, sent letters of apology to various groups and invited any unidentified survivors to come forward. These letters were also published in *Crossview*, a Province publication, as were the results of the Faegre & Benson audit. Much information regarding the results of that investigation remains on the Debtors' website today under the topic of "Safe Environment."

The audit identified eight Crosiers against whom credible Claims of Abuse of a minor existed; four remained living in 2002. For each individual named, the Debtors disclosed the following: (i) his name; (ii) his birth date, ordination date, and if deceased, the year of his death; (iii) his prior assignments; (iv) the date of removal from ecclesiastical ministry; and (v) his current location and status within the Debtors. The Debtors continued to investigate Claims of Abuse of minors after completion of the audit and have continued to disclose their findings. After the audit, the Debtors have since identified additional Crosiers against whom one or more credible allegations of Abuse of a minor exists, for which all of the same information is provided.

As mandated by the PSO's sexual misconduct policy, these Crosiers are living under the following restrictions:

- They have been permanently removed from public ministry.
- They cannot perform any work with minors, including volunteer work.
- They cannot be in the presence of a minor without adult supervision.
- They cannot leave the grounds of a Crosier community without the knowledge of their Crosier superior, or, in some instances, without an adult chaperone.

Some of these Crosiers have additional restrictions, based on their individual circumstances. Others must participate in ongoing psychological, spiritual, and behavioral recovery programs. There have been no reported incidents of Abuse of a minor by a Crosier after he has been placed on restriction.

The Debtors issue press releases when revising or updating the information on the list of credibly accused Crosiers, which has occurred in March 2014, May 2016, and January 2017, and will continue to do so if further revision or update becomes necessary.

As a result of their information gathering and the 2002 audit, the Debtors adopted a strengthened sexual misconduct policy, based upon the principles in the statement adopted by the Conference of Major Superiors of Men regarding abuse of minors. The intent of the policy is to

-17-

ensure the Crosiers are doing all they can to protect the people they serve and earn the trust of the public.  The policy, among other things:

- Mandates the notification of civil authorities if there is suspicion that a child or vulnerable adult has been Abused;
- Requires the Crosiers to conduct background investigations on those seeking membership in the Order;
- Provides ongoing education about sexual health and sexual misconduct to members, employees, and volunteers;
- Requires disclosure of incidents of sexual misconduct; and
- Defines clear procedures for dealing with a victim and the accused when an allegation is received.

The Debtors take the protection of minors very seriously.  They are committed to implementation not only of their sexual misconduct policy, but of other guidelines and procedures to deal proactively and diligently with the protection of minors and allegations of all types of misconduct.

To further ensure accountability, the Debtors took the following additional steps, among other things:

- Established the Personnel and Review Committee, which is responsible for the housing and ministry assignments of all Crosiers, was expanded to include non-Crosiers who have expertise in fields including psychology, sociology, and law. The committee also reviews and evaluate the results of all investigations of sexual misconduct and provides advice to the Prior Provincial.
- Created the First Contact Team, comprised of men and women, clergy and lay persons, who receive reports of sexual misconduct from survivors.
- Continues to work with the dioceses in the areas where they are located to discuss how they can ensure further accountability.

In 2009, the *Mille Lacs Messenger* ran an article about a person who had been Abused by a Crosier at the Crosier Seminary.  In response, Onamia and the Province purchased a paid advertisement that ran in the *Messenger* encouraging any other victims to reach out to the Province or the Diocese of St. Cloud for assistance, and providing contact information for their Victims' Assistance Coordinators.

## C.      Tort Lawsuits.

As noted above, numerous formal and informal Claims alleging Abuse by Crosier priests and brothers have been asserted against the Debtors.  As further detailed below, as of the filing of the Reorganization Cases, more than 40 complaints had been served on the Debtors.  Other Claims are not currently in litigation at this time, because:  (i) the survivor reported Abuse to the Crosiers, but was unwilling to pursue any formal Claim; (ii) the Crosiers have been advised of a potential Claim but no lawsuit has yet been filed; or (iii) the Crosiers settled the survivor's Claim/lawsuit previously.

-18-

Although previously the Debtors were able to deal with Claims on a case by case basis, they recently received Claims from more than forty (40) individuals all at once. This is because, in May, 2013, the Minnesota state legislature passed the Minnesota Child Victims' Act ("**MCVA**"), Minn. Stat. § 541.073. This Act extended the time for people who were abused before they reached the age of majority to file certain previously time-barred Claims relating to the Abuse. Such Claims considered to be timely if filed on or before May 25, 2016. The Hawaii legislature also instituted similar legislation.

After the enactment of the MCVA, personal injury attorneys, including Jeff Anderson & Associates, PA, the attorneys representing all but three of the Tort Claimants with pending lawsuits, ran statewide newspaper notifications which informed survivors about the statute of limitations extension. The Debtors understand that the Anderson firm also did limited radio notifications to survivors and limited outreach letters to former students who may have attended a school where one of the credibly accused perpetrators worked. The Debtors also sent letters to various groups, which included former students, inviting them to come forward if they had Claims. Therefore, there has already been a significant amount of publicity and notice to potential claimants as a result of the efforts of the Debtors as well as personal injury lawyers.

Since 2014, eight lawsuits have been filed against the Province. Of these, five were settled pre-petition, and another two complaints that were served but not filed as lawsuits were settled pre-petition. Another forty-two (42) complaints have been served against the Province and Onamia but the time for filing such suit in the courts has not yet run; forty-three (43) pre-petition claims therefore remain pending. Various Co-Defendants also filed cross-claims or third-party claims against the Province and/or Onamia in the eight pending lawsuits.

The various named Co-Defendants (including third-party plaintiffs) in the state court cases include:

- Diocese of St. Cloud
- Diocese of Honolulu
- Order of Preachers aka the Dominicans, Province of St. Albert the Great
- James Moeglein, osc
- Fr. Gerald Funcheon
- Thomas Lee Johnson
- The Church of St. Peter of St. Cloud, Minnesota a/k/a The Church of Saint Peter a/k/a The Church of St. Peter
- Holy Family Church, Moose Lake a/k/a Holy Family ("**Holy Family**")
- Holy Angels Catholic Church a/k/a Holy Angels ("**Holy Angels**")
- The Church of Saint Albert the Great of Minneapolis a/k/a St. Albert the Great a/k/a The Church of St. Albert the Great ("**St. Albert**")
- St. Odilia a/k/a The Church of St. Odilia, Shoreview, Minnesota a/k/a St. Odilia Catholic Church ("**St. Odilia**")
- Church of Epiphany a/k/a The Church of Epiphany of Coon Rapids, Minnesota ("**Epiphany**")
- Palma High School

-19-

- The Congregation of the Christian Brothers of Hawaii, Inc. t/a Damien Memorial School

The Debtors lack the financial ability to deal with the large number of contemporaneous Claims now pending against them. Moreover, certain of the Co-Defendants, including Parishes within the Archdiocese of Minneapolis/St. Paul ("**AM/SP**") are attempting to insulate themselves from cross-claims or counterclaims by the Debtors. Certain of the Debtors' Co-Defendants are proposed to have status as "protected parties" under the plan of reorganization proposed by AM/SP (to which the Debtors have objected), meaning all Claims against them will be channeled to a trust and the Debtors' Claims against them will be disallowed (although the Co-Defendants arguably retain their Claims against the Debtors). Specifically, St. Albert, St. Odilia, and Epiphany are all proposed to be protected parties under the proposed AM/SP plan, as are St. Stephen Catholic Church and the Church of St. Joseph of West Saint Paul, Minnesota ("**St. Joseph**"), two other potential AM/SP protected parties who may be implicated in various Tort Claims. Prior to the Proof of Claim Deadline, AM/SP, St. Albert, St. Joseph, and St. Odilia each filed Proofs of Claim against each of the Debtors for, among other things, contribution and indemnification. The Dominicans, Province of St. Albert the Great, U.S.A., also filed Proofs of Claim against each of the Debtors for, among other things, contribution and indemnification.

Holy Family and Holy Angels are both within the Diocese of Duluth, which has also filed for bankruptcy protection; they too may therefore become protected parties under a plan that the Diocese of Duluth may propose.

Additionally, the Debtors have limited ability to pay the Tort Claims because the Debtors have limited insurance. Their sole insurers, Twin City Fire Insurance Company, Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company (collectively defined as "**Hartford**" in the Plan and herein) paid numerous Claims in the past. They undertook defense of the Debtors with respect to the many recent Claims under a reservation of rights, and eventually became embroiled in a declaratory judgment action in which Hartford and the Province filed Claims against each other, as described further, below.

This concatenation of circumstances forced the Debtors to find a way to deal with the Claims all at once, rather than allowing them to deal with them on a one-on-one basis as they had in the past. They filed the Reorganization Cases in an effort to provide just compensation to all Abuse claimants and other creditors while preserving their ministry and mission.

## D.    Hartford Declaratory Judgment Action.

As noted above, the Debtors have depended for many years on their insurer, Hartford, in their efforts to provide compensation to the Abuse claimants. In recent years, as the number of Claims and litigation against the Debtors has mounted, disputes have arisen with respect to the amount and coverage that Hartford would provide under the policies. On December 21, 2015, Hartford filed a Complaint for Declaratory Relief in the District of Minnesota, commencing Case No. 0:15-cv-04437-MJD-BRT, seeking a declaratory judgment regarding Hartford's and the Province's respective rights and obligations under a number of insurance policies that Hartford either had issued to Province or which Province asserted had been issued. The Province answered the complaint and filed a counterclaim against Hartford seeking declaratory judgment in their

-20-

favor.  One of the numerous areas of dispute was whether the Abuse constituted multiple occurrences of bodily injury under the language of the Hartford policies, or a single occurrence.

As of the Debtors' Petition Date, the parties were facing impending fact and expert discovery cutoffs in the next several months and a trial date early the following year.  As a result, the Debtors were facing the necessity to expend substantial resources to litigate the issues with Hartford and run the risk of not only a decision that would severely limit insurance coverage but also that years of litigation through trial and possibly appeals would also delay the ultimate resolution of the remaining Abuse Claims and divert the Debtors' limited resources to litigation costs rather than in compensating survivors.

After extensive negotiations, the Province and Hartford have been able to settle the declaratory judgment action.  However, Hartford is only willing to settle if it can be assured of total finality, that is, if the Province and any party claiming through it will release Hartford in exchange for Hartford's settlement payment.  Without such finality, Hartford would not offer as significant a sum as it has.  Similarly, it is not in the Debtors' interests to give up future insurance coverage under the Hartford Policies if the Debtors cannot also obtain finality.  They must have assurance that Claims will not be brought in the future that would implicate coverage under the Hartford Policies to be released under the settlement.  The Debtors have therefore determined that the most prudent way to assure compensation to claimants and finality for both Hartford and the Debtors is to fund a Chapter 11 plan under which all Claims can be administered, and under which a fund may be set up for claimants whose injuries are presently unknown to them, to ensure they will receive compensation if and when they come to know of their injuries.  The funds to be contributed by Hartford are in a previously negotiated lump sum that was hard won after difficult negotiations.  Hartford has made clear that such funding is not subject to further increase or negotiation.

The Hartford litigation is currently stayed as a result of the Reorganization Cases.

**VI.    CHAPTER 11 FILINGS.**

    **A.    First Day Motions.**

Upon filing their Chapter 11 petitions, the Debtors filed certain "first day" motions.  The Court granted the following motions:

A motion to file certain documents and creditor lists under seal.  Because of the sensitive nature of the Tort Claims and the Debtors' desire to protect the privacy of the Tort Claimants, the Debtors requested that certain information regarding the Tort Claimants be filed and maintained under seal.  ["Notice of Hearing and Motion for an Order Under 11 U.S.C. § 107 and Fed. R. Bankr. P. 1007(j) and 9018 (I) Granting Expedited Relief, (II) Authorizing the Debtors to File Portions of Their Schedules F, Master Mailing Lists and Other Pleadings and Documents Under Seal, and (III) Requesting Related Relief."  Province Dkt. No. 18; Onamia Dkt. No. 18; Phoenix Dkt. No. 17.]

A motion to pay certain pre-petition wages, compensation and honor employee benefit plans and programs under 11 U.S.C. §§ 105, 363 and 507 in order to retain current employees.

["Notice of Hearing and Motion for an Order Under 11 U.S.C. §§ 105, 363, and 507 (I) Granting Expedited Relief, (II) Authorizing the Debtors to Pay Pre-Petition Wages (to the Extent Necessary), and (III) Authorizing the Debtors to Continue to Pay Wages and Honor Employee Benefit Plans and Programs Post-Petition." Province Dkt. No. 21; Onamia Dkt. No. 21; Phoenix Dkt. No. 20.]

An application to employ Quarles & Brady LLP as general reorganization and restructuring counsel for Debtors. ["Application for an Order Authorizing the Employment of Quarles & Brady LLP as General Reorganization and Restructuring Counsel for the Debtors and Debtors-in-Possession." Province Dkt. No. 10; Onamia Dkt. No. 10; Phoenix Dkt. No. 10.]

An application to employ Larkin Hoffman Daly & Lindgren Ltd. as local counsel for Debtors. ["Application for Order Authorizing Employment of Local Counsel for the Debtors." Province Dkt. No. 34; Onamia Dkt. No. 34; Phoenix Dkt. No. 33.]

An application to employ Keegan, Linscott & Kenon, P.C. as accountant and financial consultant for Debtors. ["Application for an Order Authorizing the Employment of Keegan, Linscott & Kenon, P.C. as Accountant and Financial Consultant for the Debtors and Debtors-in-Possession." Province Dkt. No. 11; Onamia Dkt. No. 11; Phoenix Dkt. No. 11.]

An application to employ the law firm of Gaskins Bennett Birrell Schupp LLP as special insurance counsel for Debtors. ["Debtors' Application for an Order Authorizing the Employment of Gaskins Bennett Birrell Schupp LLP as Special Insurance Counsel for the Debtor and Debtor-in-Possession." Province Dkt No. 12; Onamia Dkt. No. 12; Phoenix Dkt. No. 12.]

An application to employ the law firm of Larson King LLP as special litigation counsel for Debtors. ["Application for an Order Authorizing the Employment of Larson King LLP as Special Litigation Counsel for the Debtor and Debtor-in-Possession." Province Dkt. No. 13; Onamia Dkt. No. 13.]

An application to employ JND as noticing agent for the Debtors. ["Debtors' Application for an Order Authorizing Retention and Appointment of JND Corporate Restructuring as Noticing Agent for the Debtors and Debtors in Possession." Province Dkt. No. 14; Onamia Dkt. No. 14; Phoenix Dkt. No. 13.]

An application to appoint a legal representative for Unknown Tort Claimants and to employ The Hon. (Ret.) Michael R. Hogan as the Unknown Claims Representative. ["Notice of Hearing and Motion for an Order (I) Granting Expedited Relief and (II) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, Including Minors, in the Reorganization Cases; and (III) Granting the Application to Employ Michael R. Hogan as Unknown Claims Representative." Province Dkt. No. 20; Onamia Dkt. No. 20; Phoenix Dkt. No. 19.]

The Debtors filed two additional "first day" motions that warrant separate discussion. The first was a motion seeking to jointly administer the Debtors' cases, which was denied. ["Notice of Hearing and Motion for an Order (I) Granting Expedited Relief and (II) Authorizing Joint Administration." Province Dkt. No. 15; Onamia Dkt. No. 15; Phoenix Dkt. No. 14.]

-22-

The other was a motion that sought to excuse the Debtors from complying with certain United States Trustee obligations relating to the Debtors' bank accounts. Although this Motion was granted, Bank of America, which was the bank where most of Phoenix's and the Province's checking and savings accounts were held, unilaterally determined to close the Debtors' bank accounts. Although the Debtors attempted to work with Bank of America to keep the accounts there, ultimately they were unsuccessful. Therefore, Phoenix and the Province each opened new checking and saving accounts at Wells Fargo Bank, N.A., post-petition. ["Notice of Hearing and Motion for Order (I) Granting Expedited Relief and (II) Authorizing Continued Use of the Debtors' Cash Management System, and (III) Authorizing Maintenance of the Debtors' Existing Bank Accounts." Province Dkt. No. 16; Onamia Dkt. No. 16; Phoenix Dkt. No. 15.]

## B.      Schedules & Statements.

The Debtors filed their Schedules on June 15, 2017, and amended them on October 31, 2017. The information in these documents was drawn from the Debtors' books and records, and other sources. The Debtors did not include the Tort Claims on their publicly filed Schedules. Rather, the Debtors submitted confidential Schedules E/F to protect the privacy of the Tort Claimants.

## C.      Proof of Claim Deadline and Notice.

The Bankruptcy Court also entered the Proof of Claim Deadline Order, which the Debtors requested in an effort to further determine the universe of Claims that will be dealt with under the Plan. The Proof of Claim Deadline Order set December 15, 2017 as the last day to timely file a Proof of Claim. In the Proof of Claim Deadline Order, the Court also approved Proof of Claim forms, form of notices and an extensive publicity and publication campaign and other procedures for giving notice of the deadline to file Proofs of Claim. ["Order (I) Altering Time for Filing Proofs of Claim; (II) Approving Claim Forms; (III) Approving Manner and Form of Notice; and (IV) Approving Confidentiality Procedures." Province Dkt. No. 77; Onamia Dkt. No. 70; Phoenix Dkt. No. 67.]

After entry of the Proof of Claim Deadline Order, the Debtors engaged in the extensive publicity and publication campaign they had designed to reach the maximum number of potential Tort Claimants, which was approved by the Bankruptcy Court in the Proof of Claim Deadline Order. Information regarding the publicity and publications undertaken can be found in the Proof of Claim Deadline Order. This publicity supplemented the prior efforts undertaken by the PSO in 2002 and by various personal injury lawyers, including Jeff Anderson & Associates, PA, after the enactment of the MCVA. Approximately 68 separate individuals filed Proofs of Claim asserting Tort Claims against one or more of the Debtors on or before December 15, 2017.

### D.    Formation of Official Committee of Unsecured Creditors.

On June 22, 2017, the United States Trustee ("**UST**") formed an Official Committee of Unsecured Creditors that includes various holders of Tort Claims.  The Committee retained Stinson Leonard Street LLP as its reorganization counsel.  [Province Dkt. No. 59; Onamia Dkt. No. 54; Phoenix Dkt. No. 51.]  It has participated actively in the Reorganization Cases and is a joint proponent of the Plan.

### E.    Executory Contracts.

The Debtors have several Executory Contracts.  Perhaps the most significant are between the Province and Crosier Village, and between Phoenix and Crosier Village.  The Province leases space from Crosier Village for its administrative operations, and (as noted above) Phoenix leases space from Crosier Village for housing of its members.  The Holy Cross Center contract has been discussed above.  The Debtors also have unexpired leases of copiers, and Executory Contracts for cell phone and internet service, maintenance of major systems at the Onamia campus (i.e., elevators, heating, refrigeration, exhaust fans).  The Debtors have requested, and the Court has granted, an extension of time to assume or reject these contracts through confirmation of the Plan; however, the Debtors expect to assume most if not all of them.  None of the contracts is in default, so no cure payments are required.

### F.    Sales of Property.

As noted briefly above, Onamia was presented with the opportunity to monetize its 1/5 Interest in certain real property co-owned with four others.  It filed a motion to approve these transactions, which was granted.  [Onamia Dkt. No. 75.]  Also as noted above, Phoenix obtained court approval to employ Levrose Real Estate, LLC as its real estate broker to market its real property for sale.  The Court-approved sale of the property closed in January, 2018.

The Debtors anticipate that the sale of the Hartford Policies under 11 U.S.C. § 363 will be approved through the Confirmation Order and/or through an order granting a motion to approve the Hartford Agreement.

## VII.    ANTICIPATED CHAPTER 11 EVENTS.

In addition to the motions already filed, the Debtors anticipate that they will file certain motions described below, or that certain events described below are likely to occur in the Chapter 11 cases.

### A.    Removal of State Court Cases.

The Debtors may remove certain non-settled pending state court litigation to the Bankruptcy Court.  The Debtors have sought and obtained a stay of such litigation pending confirmation proceedings, but reserve the right to remove any cases in which the stay may lift or otherwise become ineffective.

-24-

### B.    Plan Confirmation.

The Debtors worked closely with the Committee throughout the Plan process in an attempt to jointly propose a plan that will be acceptable to their creditors.  The Plan Proponents obtained approval of the Disclosure Statement, balloting procedures, and scheduling of Plan confirmation proceedings.

The Bankruptcy Court granted the Debtors' motions to extend their exclusive periods to file a plan and solicit it so that the Proof of Claim Deadline could pass and the Debtors could obtain creditor constituency buy-in; the current exclusive period will expire on March 30, 2018.

### C.    Fee Applications.

All professional persons that the Debtors or the Committee have requested the Bankruptcy Court allow them to employ must have their Professional Charges approved by the Court prior to being paid.  The Debtors have budgeted approximately $1.5 million for total Professional Charges in the Reorganization Cases.  This is a "worst-case" estimate and the Debtors hope that fees will be lower than the budgeted projection.  Because final fee applications will not be approved until after the Trust has been funded, prior to the Confirmation Date the Debtors and Committee will stipulate to an amount for the Debtors to retain as a reserve for the payment of Allowed Administrative Claims, including Professional Charges.  Once all pending applications for such Claims are approved or denied by a Final Order and the Allowed Claims are paid, the Debtors will remit the balance of this Administrative Claims Reserve, if any, to the Trust.  To the extent the Administrative Claims Reserve proves insufficient in amount, the Debtors will pay Allowed Administrative Claims from other Assets.

## VIII.   DESCRIPTION OF PLAN AND MEANS FOR EXECUTION.

*THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF, WHICH CONTROL.*

As stated above, the Plan is premised on the contribution of approximately $25.5 million to fund the Plan and related expenses.  Hartford will contribute $19,788,000 to fund the Plan, pursuant to the Plan, and the Hartford Agreement (which is an exhibit to the Plan and should be reviewed in addition to this Disclosure Statement; further description is also provided below).  The Debtors' contribution will be $5,712,000.  These funds will be used for, among other things, payment of Claims, which will be treated as follows:

### A.    Claims Description and Treatment.

Treatment of different Classes of Claims and unclassified Claims is described below.  However, whether or not any payment is made on account of a Claim under the Plan depends on whether it is a Tort Claim (the definition of which includes Unknown Tort Claim for this purpose), or, if not, whether it is allowed by the Bankruptcy Court.  Tort Claim determination and distribution will be governed by the Allocation Protocols and Trust Agreement attached to and incorporated into the Plan as Exhibits A, B, and D.  A Claim that is not a Tort Claim may be Allowed in one of three ways:  (1) it was listed in the Debtors' Schedules as undisputed and in a

-25-

liquidated amount even if no Proof of Claim was filed by the holder of the Claim; (2) a timely Proof of Claim was filed by the holder of the Claim and no objection to the Proof of Claim was timely filed in accordance with the treatment the applicable Class of Claims; or (3) if an objection was filed to a Proof of Claim, then upon entry of a Final Order allowing the Claim.

As of the Confirmation Hearing, any Class of Claims which does not contain any creditor's Claims will be deemed deleted automatically from the Plan, and any Class of Claims which does not contain an Allowed Claim (or a Claim temporarily or provisionally Allowed by the Bankruptcy Court for voting purposes) will be deemed automatically deleted from the Plan with respect to voting on confirmation of the Plan only.

**B.**     **Unclassified Claims.**

The Plan identifies several types of Claims as unclassified and treats those Claims in accordance with the Bankruptcy Code and applicable law:  Administrative Claims, Priority Unsecured Claims, and Priority Tax Claims.

Administrative Claims include any actual and necessary costs or expenses of administration of the Estates under Bankruptcy Code § 503, post-petition operating expenses, certain post-petition property tax claims (of which the Debtors believe there are none), and charges assessed under Chapter 123 of Title 28, United States Code.  Administrative Claims also include Professional Charges (which, by definition, include only Allowed professional fees and expenses). Administrative Claims will be paid in full:  (i) on the Effective Date or Claim Payment Date, (ii) in the case of Professional Charges, within ten (10) Business Days of entry of a Final Order approving such charges, (iii) by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court, or (iv) in the case of post-petition operating expenses, in the ordinary course of the Debtors' businesses.

Priority Unsecured Claims include any Claim entitled to priority under Bankruptcy Code § 507 that is not an Administrative Claim, a Professional Charge, a Priority Tax Claim or a Priority Employee Unsecured Claim.  The Plan provides that Priority Unsecured Claims will be paid in Cash in full on the Claim Payment Date, or by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court.

Priority Tax Claims include all Unsecured Claims entitled to priority pursuant to Bankruptcy Code § 507(a)(8) and are provided the treatment authorized by Bankruptcy Code § 1129(a)(9)(C).

**C.**     **Classified Claims.**

**1.**     **Class 1 – Priority Employee Unsecured Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept).**

**(a)**     **Definition.**  This Class is defined to include the Claims of the Debtors' employees for vacation or sick leave pay which are entitled to priority under Bankruptcy Code § 507(a)(4)(A).

-26-

(b)    **Allowance and Treatment.**  Priority Employee Unsecured Claims will not be paid in Cash, but will instead be honored in the ordinary course in accordance with the Debtors' policies at the time the Claims mature.  These Claims are unimpaired and will be treated as Allowed; in other words, they will be paid in full under the Plan in accordance with the holders' existing contractual rights.

(c)    **Reservation of Rights.**  The Plan does not alter the Debtors' ability to review the policies and procedures regarding vacation and sick leave pay and to propose modifications to those policies and procedures to become a part of the Plan.  To the extent the Debtors propose any changes to such policies and procedures that would be retroactive, the Debtors will modify the Plan to include such changes and give notice to the holders of any Priority Employee Unsecured Claims at least ten (10) days before the Confirmation Hearing.  In that event, the holders of the Priority Employee Unsecured Claims will be impaired and the Plan will be modified to so state.

2.    **Class 2 – Prepetition Date Secured Tax Claims (Impaired; Entitled to Vote).**

(a)    **Definition.**  Class 2 is defined to include the prorated portion of a Secured Tax Claim arising before and up to the Petition Date. Secured Tax Claims include the Claims of any federal, state, or local governmental unit secured by Estate property by operation of applicable non-bankruptcy laws, including, but not limited to, unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes, but only to the extent of the validity, perfection, and enforceability of the claimed lien or security interest. As of the Petition Date, the Debtors are unaware of any Class 2 Claims.

(b)    **Allowance and Liquidation.**  Secured Tax Claims will be prorated depending on the date when the tax arises.  Taxes arising before the Petition Date will be treated under Class 2.  Secured Tax Claims arising after the Petition Date but before the Effective Date will be treated as unclassified Administrative Claims.  Secured Tax Claims that arise on or after the Effective Date will be paid in the ordinary course of business of the Reorganized Debtors.  Class 2 Claims may be determined by the Bankruptcy Court notwithstanding the existence of any appeals to state or local taxing authorities of property tax or assessment determinations on the Petition Date.

(c)    **Treatment.**  Allowed Class 2 Claims will bear interest from and after the Effective Date until they are paid in full at the rate of two percent (2%) per annum and will be paid in three (3) equal

installments, with the first installment paid on the first Business Day that is ninety (90) days after the Effective Date or the Claim Payment Date, the second installment paid on the first Business Day after the first anniversary of the Effective Date or the applicable Claim Payment Date, and the third and last installment paid on the first Business Day after the second anniversary of the Effective Date or the applicable Claim Payment Date. Each holder of an Allowed Class 2 Claim will retain its liens until its Claim is paid in accordance with the Plan.

3.    **Class 3 – Secured Claim of Robinsons (Impaired; Entitled to Vote).**

(a)    **Definition.**    This Class includes the Secured Claim of the Robinsons, which is secured by the Province building located at 720 E. Old Southern Avenue, Phoenix, Arizona 85042.

(b)    **Allowance and Treatment.**    The Class 3 Claim shall be Allowed and paid fully and in Cash. The Robinson Promissory Note will be amended to allow the Province, at its sole election, to extend the payment date of one or more of the payments due under the terms of the Robinson Promissory Note as follows:

(i)    The Province shall give written notice to the Robinsons no later than sixty (60) days prior to the payment date of the intent of the Province to extend the applicable payment date;

(ii)    The payment date may be extended for no more than sixty (60) days after the applicable payment date set forth in the Robinson Promissory Note;

(iii)    The extension notice shall be accompanied by an extension fee of $440, which is the amount equal to one percent (1%) of the payment of $44,000 that would then be due under the Robinson Promissory Note; and

(iv)    Pursuant to the prepetition terms of the Robinson Promissory Note, no interest will be payable and, so long as payments are made timely in accordance with the Plan, no default interest shall accrue or be Allowed.

-28-

(c)      **Further Modification of Robinson Loan Documents.**
Notwithstanding anything in the Robinson Loan Documents to the
contrary, such documents will be further modified to allow the
Province, as a Reorganized Debtor, to grant additional liens secured
by the Old Southern Building so long as such liens are junior and
subordinate to the Class 3 Claim. All other aspects of the Robinson
Loan Documents not expressly modified by the Plan will remain in
full force and effect.

(d)      **Retention of Liens.** The holders of the Class 3 Claim will retain
their lien(s) on their existing collateral to the extent of the Class 3
Claim until it is fully paid in accordance with the Plan.

4.      **Class 4 – General Unsecured Convenience Claims (Impaired; Entitled
to Vote).**

(a)      **Definition and Election.** This is Class includes all General
Unsecured Claims that are in an amount less than $500, inclusive of
interest; or into which holders of General Unsecured Claims in
excess of $500 may elect to reduce their Claims to $500. Any
general unsecured creditor may, through its Ballot, elect to waive its
General Unsecured Claim, and instead obtain payment as a General
Unsecured Convenience Claim holder.

(b)      **Treatment.** All Class 4 Claims that are in an amount less than $500,
inclusive of interest, will be paid in full. All Class 4 Claims that
resulted from the election of a holder of a General Unsecured Claim
to be paid as a General Unsecured Convenience Claim will receive
$500 total, without interest. Holders of Class 4 Claims, as and when
Allowed, will be paid on the first Business Day which is six (6)
months after the Effective Date or the Claim Payment Date.

5.      **Class 5 – General Unsecured Claims (Impaired; Entitled to Vote).**

(a)      **Definition.** Class 5 includes every Claim against the Debtors
(including, but not limited to, every Claim arising from the rejection
of an Executory Contract, every Claim which is the undersecured
portion of any Secured Claim, and every personal or bodily injury
Claim that is not a Tort Claim), which (1) is not an unclassified
Claim, and (2) is not classified in any other Class under the Plan.

(b)      **Treatment.** Each holder of a Class 5 General Unsecured Claim, as
and when such General Unsecured Claim is or becomes an Allowed
Claim, will be paid the principal amount of its Claim (without
interest or penalties) in Cash in two (2) installments with the first
installment to be paid on the first Business Day which is six (6)
months after the Effective Date or the Claim Payment Date, and the

-29-

next installment on the first Business Day that is twelve (12) months after the previous payment.

6.    **Class 6 – Other Tort and Employee Claims (Impaired; Entitled to Vote).**

(a)    **Definition.**  Class 6 includes any and all Unsecured Claims against the Debtors for property damage, liability or workers compensation, whether arising from tort, contract, or workers compensation, for which there is Insurance Coverage or a self-insured retention, but excluding Tort Claims and any Claims of employees entitled to priority pursuant to Bankruptcy Code § 507.  As of the Petition Date, the Debtors do not believe any Class 6 Claims exist.

(b)    **Treatment.**  Each holder of a Class 6 Claim, as and when such Claim becomes an Allowed Claim, will be paid solely (without interest or penalties) from any Insurance Coverage applicable to such Other Tort and Employee Claim.  To the extent that such Claims may not be satisfied in full by the foregoing, then such Other Tort and Employee Claims, to the extent not so satisfied, will receive no distribution under the Plan.

7.    **Class 7 – Annuity Claims (Unimpaired; Not Entitled to Vote).**

(a)    **Definition.**  Class 7 includes any and all Claims against the Debtors arising under any Annuity Agreements with the Debtors.

(b)    **Distribution.**  The legal, equitable, and contractual rights of each holder of a Class 7 Claim will be reinstated in full on the Effective Date.  The Reorganized Debtor who is the party to the Annuity Agreement will continue to pay the Annuity payments in accordance with the terms of the applicable Annuity Agreement.

8.    **Class 8 - Tort Claims (Impaired; Entitled to Vote).**

(a)    **Definition.**  Class 8 includes any and all Claims for damages, including punitive damages for attorneys' fees and other expenses, fees or costs for any equitable remedy asserted against the Debtors and any Protected Parties, related to bodily injuries or personal injuries arising from:

(i)    Acts of Abuse committed by any cleric, employee, volunteer or other Person associated with the Debtors, the PSO, or any affiliated Entity within the territory of the PSO;

(ii)    The failure of the Debtors or the PSO to properly hire, install and/or supervise any cleric, any volunteer, or any other employee of, or Person associated with, the Debtors, the

-30-

Debtors, the PSO, or any affiliated Entity within the territory of the PSO;

(iii)     The processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any Abuse or other Tort Claim asserted by a Tort Claimant; or

(iv)     The failure to warn, disclose or provide information concerning the Abuse or other misconduct of clergy, other employees or volunteers or persons associated with the Debtors, the PSO, or any affiliated entities within the territory of the PSO.

**(b)     Treatment.**  On the Effective Date, the Trust shall assume all liability for and will pay all Class 8 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Tort Claims Allocation Protocol, and Trust Documents.  The Tort Claimants shall have their Class 8 Claims treated pursuant to the Tort Claims Allocation Protocol attached to the Plan as Exhibit A and incorporated therein.

Nothing in the Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party, but solely with respect to any direct liability of such Co-Defendant or joint tortfeasor.  Under no circumstances will the reservation of such Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party impair the releases, discharge or injunctions with respect to any Protected Party and the Reorganized Debtors against whom all such rights and/or Claims shall be released and enjoined as provided in in Sections 26.5-26.9 of the Plan.  The rights of Tort Claimants against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party who remain severally liable on any Class 8 Claims, are expressly preserved under the Plan.

The right of any Tort Claimant to a trial by jury or otherwise against the Reorganized Debtors and any of the Protected Parties is waived and released upon the occurrence of the Effective Date, and the Tort Claim of a Tort Claimant will be solely determined by the Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.

The Trustee shall pay Class 8 Claims in accordance with the terms of the Plan, Plan Documents, Confirmation Order, Tort Claims Allocation Protocol, and Trust Documents.  Notwithstanding the foregoing, no Tort Claimant shall receive any payment on any Award unless and until the Tort

-31-

Claimant has executed a written release of any and all past, present, and future Claims against all of the Protected Parties, the Reorganized Debtors, all of Hartford's reinsurers or retrocessionaires; and made the certifications set forth in the Class 8 Ballot.  The release and certifications included in the Class 8 Ballot for voting on the Plan are sufficient for this purpose.  A Tort Claimant who does not timely submit a Ballot must personally execute the release and certifications required by Article 13.5 of the Plan.  Notwithstanding the foregoing, nothing in Article 13 of the Plan requires any Tort Claimant to release any Claims against any Co-Defendants or joint tortfeasor who is not otherwise a Protected Party, and such Claims are reserved, except as expressly provided in Article 13 of the Plan.  The eventual release of these Class 8 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).  The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

If a Tort Claim is denied payment pursuant to the Tort Claims Allocation Protocol, the holder of such Tort Claim will nevertheless have no further rights against the Protected Parties, the Trust, the Trustee, or the Reorganized Debtors arising out of, relating to, or in connection with such Tort Claim and such Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunction as provided in the Plan.

None of the Protected Parties or the Reorganized Debtors will have any liability for any fees and expenses of attorneys representing any of the Tort Claimants.

Except for any payment that may be provided from the Trust as part of the Tort Claims Allocation Protocol, Penalty Claims relating to Tort Claims will receive no distribution and will be Disallowed Claims.

If a Tort Claim is withdrawn, it may not be reasserted against the Protected Parties or the Reorganized Debtors, including as an Unknown Tort Claim.  All other procedures and implications relating to withdrawal of a Tort Claim are set forth in the Tort Claims Allocation Protocol.

9.      **Class 9 – Unknown Tort Claims (Impaired; Entitled to Vote).**

(a)     **Definition.**  Class 9 includes any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Proof of Claim Deadline by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Proof of Claim Deadline if the Person asserting the Tort Claim:

-32-

(i)     Has a Tort Claim that was barred by the applicable statute of limitations as of the Proof of Claim Deadline but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such previously time-barred Tort Claims; or

(ii)    Turns 18 on or after the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases; or

(iii)   As to which the applicable Arizona or Minnesota statute of limitations for Abuse Claims, for any reason, has not expired or has been tolled as of the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases, as determined under applicable Arizona or Minnesota federal law, but without regard to federal bankruptcy law; and

(iv)    Submits a Proof of Claim in accordance with the procedures set forth in the Plan.

**(b)**  __Treatment.__  On the Effective Date, the Trust shall establish the Unknown Claims Reserve, assume all liability for and the Trust will pay all Unknown Tort Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, the Unknown Tort Claims Allocation Protocol, and Trust Documents.  Unknown Tort Claimants shall have their Class 9 Claims treated pursuant to the Unknown Tort Claims Allocation Protocol, including review of such Claims by the Abuse Claims Reviewer in accordance with the Unknown Tort Claims Allocation Protocol attached to the Plan as Exhibit B and incorporated therein.

Nothing in the Plan is intended to affect, diminish or impair any Unknown Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party, but solely with respect to any direct liability of such Co-Defendant or joint tortfeasor.  Under no circumstances will the reservation of such Unknown Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party impair the releases, discharge or injunctions with respect to any Protected Party and the Reorganized Debtors against whom all such rights and/or Claims shall be and are hereby released and enjoined as provided in Sections 26.5-26.9 of the Plan.  The rights of Unknown Tort Claimants against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party who remain severally liable on any Class 9 Claims, are expressly preserved under the Plan.

-33-

The right of any Unknown Tort Claimant to a trial by jury or otherwise against the Reorganized Debtors and any of the Protected Parties is waived and released upon the occurrence of the Effective Date, and the Class 9 Claim of an Unknown Tort Claimant will be solely determined in accordance with the Unknown Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.

No Unknown Tort Claimant shall receive any payment from the Trust unless and until the Unknown Tort Claimant has personally executed a written release of any and all past, present, and future Claims against all of the Protected Parties, the Reorganized Debtors, and all of Hartford's reinsurers or retrocessionaires; and made the same certifications set forth in the Class 8 Ballot. The release and certifications included in the Class 8 Ballot for voting on the Plan are sufficient for this purpose. Notwithstanding the foregoing, nothing in Article 14 of the Plan requires any Tort Claimant to release any Claims against any Co-Defendants or joint tortfeasor who is not otherwise a Protected Party except as expressly provided in that Article. The eventual release of these Class 9 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Trust shall be obligated to provide copies of the Unknown Tort Claimants' releases and certifications to any of the Protected Parties upon request.

In the event all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Tort Claims Allocation Protocol are less than the amount of the Unknown Claims Reserve, in the aggregate, the Unknown Tort Claims Allocation Protocol shall govern the distribution of any funds remaining in the Unknown Claims Reserve. If all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Tort Claims Allocation Protocol are greater than the amount of the Unknown Claims Reserve, no further payment or compensation will be paid to the Trust or to the Unknown Tort Claimants by the Debtors, the Reorganized Debtors or any other Protected Parties.

If a Class 9 Claim is disallowed or denied payment pursuant to the Unknown Tort Claims Allocation Protocol, the holder of such Unknown Tort Claim will have no further rights against the Protected Parties, the Reorganized Debtors, the Trust, or the Trustee arising out of, relating to, or in connection with such Unknown Tort Claim and such Unknown Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunction as provided in the Plan.

None of the Protected Parties or the Reorganized Debtors will have any liability for any fees and expenses of attorneys representing any of the Unknown Tort Claimants.

-34-

Except for any payment that may be provided from the Trust as part of the Unknown Tort Claims Allocation Protocol, Penalty Claims relating to Unknown Tort Claims will receive no distribution and will be Disallowed Claims.

If an Unknown Tort Claim is withdrawn, it may not be reasserted against the Protected Parties or the Reorganized Debtors. All other procedures and implications relating to withdrawal of an Unknown Tort Claim are set forth in the Unknown Tort Claims Allocation Protocol.

10. **Class 10 – Co-Defendant, Diocese, and Parish Claims (Impaired; Not Entitled to Vote—Deemed to Reject).**

    (a) **Definition.** Class 10 includes any Claims of any Co-Defendants, which the Plan defines to include Entities that have brought third-party claims or cross-claims against any of the Debtors or who are otherwise alleged to be fully or partially responsible for a Tort Claim, including an Unknown Tort Claim asserted, or which may be asserted in the future, against such Entity. Class 10 also includes any Claims of any Dioceses and/or Parishes against the Debtors. This Class includes the Claims asserted against the Debtors by AM/SP, St. Albert, St. Odilia, St. Joseph, and the Dominicans, Province of St. Albert the Great, U.S.A.

    (b) **Treatment.** All Class 10 Claims will be Disallowed Claims and there will be no distribution to the holders of any Class 10 Claims.

11. **Class 11 - Insurance and Benefit Claims (Unimpaired; Not Entitled to Vote).**

The Class 11 Claims will be treated and satisfied by the Reorganized Debtors in accordance with the past practices and policies of the Debtors. Unless otherwise provided or required pursuant to the practices and policies of the Debtors, no interest will accrue or be paid on any Insurance and Benefit Claims.

12. **Class 12 – Penalty Claims (Impaired; Not Entitled to Vote—Deemed to Reject).**

    (a) **Definition.** Class 12 includes any Claims for any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including, but not limited to, any such Claims not meant to compensate the claimant for actual pecuniary loss, and including, but not limited to, any Claims created by the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq., and related regulations.

-35-

(b) **Treatment.** No Penalty Claims will be Allowed. All Penalty Claims will be Disallowed Claims, and there will be no distribution to the holders of any Penalty Claims.

13. **Class 13 - Intercompany Claims (Impaired; Entitled to Vote—Insiders).**

(a) **Definition.** The Class 13 Claims are pre-petition Claims the Debtors have against one another for various operating expenses or reimbursements incurred in the ordinary course of their businesses.

(b) **Treatment.** No payments shall be made on account of the Class 13 Claims until the Trust has been funded in accordance with the Plan and Confirmation Order and until all Claims in Classes 1, 2, 3, 4, 5, and 6 are paid in accordance with the Plan and Confirmation Order.

## IX. **MEANS FOR PLAN IMPLEMENTATION.**

### A. **Establishment of Trust Account.**

After the Confirmation Date, the Trustee will establish the Trust Account, which will be held and administered in accordance with the Plan, the Hartford Agreement, and the Confirmation Order. The Trust Account will include the following:

1. **Debtors' Funding.** The Debtors will transfer $5,712,000, less the agreed amount of the Administrative Claims Reserve, to the Trust Account. Within ten (10) days after full payment of all Allowed Administrative Claims, including Professional Charges, the Debtors will transfer the balance of the Administrative Claims Reserve, if any, to the Trust Account.

2. **Hartford Funding.** Pursuant and subject to the Hartford Agreement between the Debtors and Hartford, Hartford will transfer $19,788,000 to the Trust Account.

### B. **Establishment of Disputed Claims Reserve.**

The Debtors shall establish and fund the Disputed Claims Reserve, if required, as of the Effective Date.

### C. **Establishment of Administrative Claims Reserve.**

The Debtors shall establish the Administrative Claims Reserve, in the amount agreed with the Committee or otherwise ordered by the Court. The Administrative Claims Reserve may be held in any of the Debtors' existing bank accounts, or a new account, in the Debtors' sole discretion, and will be treated as restricted funds.

D.     **Payment and Treatment of Claims Other Than Tort Claims and
Unknown Tort Claims**.

Payments due to creditors on account of Allowed Claims other than Tort Claims or
Unknown Tort Claims will be paid pursuant to the terms of the Plan from the Reorganized Debtors'
Revested Assets and ongoing operations.  Payments for Allowed Professional Charges will be paid
as Final Orders are entered allowing them from the Administrative Claims Reserve, and, if
necessary, other Assets.

E.     **Retained Claims**.

On or before the Effective Date, all Retained Claims will be assigned by the Debtors to the
Reorganized Debtors.  Each Reorganized Debtor may pursue any Retained Claims at its discretion
and will retain the proceeds of all such Retained Claims pursued, if any.

F.     **Hartford Agreement and 363 Sale**.

The Hartford Agreement the Debtors reached with Hartford is an integral part of the Plan.
As described elsewhere, disputes existed between the Debtors and Hartford, including the extent
of the Debtors' coverage.  Hartford contends, for a variety of reasons, that the settlement amount
it has agreed to provide pursuant to the Plan exceeds the amounts it could be deemed obligated to
pay pursuant to the Hartford Policies in connection with the Tort Claims, including any Unknown
Tort Claims that might be asserted against the Debtors.  Given the substantial time and financial
resources it would take for the parties to litigate these issues to completion, the limited financial
resources of the Debtors, the risks of litigation, and the potential for appeals to further delay
recoveries to the Estates and the Tort Claimants, it is in all constituencies' best interests to resolve
the Claims and disputes consensually.  The negotiated resolution of the insurance issues results in
a substantial recovery for the Estates, which money will be available to fund the Plan pursuant to
the negotiated settlement and the terms of the Plan, including providing recovery for Tort
Claimants.  Therefore, the Debtors will be filing a motion requesting the Court approve the
Hartford Agreement, or the Debtors will request that the Court approve the Hartford Agreement
as part of the Confirmation Order.

Principal terms of the Hartford Agreement include:

Settlement Amount/Purchase Price.  Hartford will pay the settlement amount/purchase
price of $19,788,000 to the Trust Account.  The Trust will then become the Entity to which all
Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the
Debtors and Hartford.

Releases.  The Debtors, on the one hand, and Hartford, on the other, will grant complete
mutual releases as to, among other things, any and all past, present, or future Claims in connection
with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the Hartford Policies
and the Reorganization Cases, as set forth in the Hartford Agreement.

Sale and Buyback of Policies.  The Debtors will sell all of their Interests in the released
Hartford Policies to Hartford, free and clear of all liens, Claims, encumbrances and other Interests

-37-

pursuant to 11 U.S.C. § 363. Such sale will be approved, along with the settlement itself, as part of the Confirmation Order.

Supplemental Injunction. Hartford will be entitled to receive the benefit of a supplemental injunction under the Plan and Confirmation Order pursuant to 11 U.S.C. §§ 105(a) and 363. Any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Hartford Agreement) against Hartford which, directly or indirectly, relate to, any of the released Hartford Policies, any Tort Claims or any Related Insurance Claims, will be permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against Hartford.

Conditions to Hartford's payment. Hartford's payment is conditioned on, among other things, entry of the Confirmation Order or separate orders approving the Hartford Agreement and Section 363 sales and purchaser protections required thereby, and each such order(s) becoming a Final Order. The Plan must be in all aspects consistent with the Hartford Agreement and contain no provisions that diminish or impair the benefits to which Hartford is entitled under the Hartford Agreement. If there is any conflict between the Hartford Agreement and the Plan (including the foregoing release), the terms of the Hartford Agreement shall prevail.

## X.    **CONDITIONS PRECEDENT TO EFFECTIVE DATE.**

### A.    **Conditions Precedent.**

The Effective Date will occur when each of the following conditions have been satisfied or waived by the Debtors in accordance with Article 25 of the Plan:

      **1.** The Bankruptcy Court shall have entered a Final Order (which may be the Confirmation Order) approving the Hartford Agreement and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to Hartford and consistent with the requirements of the Hartford Agreement, and no stay of such order(s) is in effect;

      **2.** The Bankruptcy Court shall have entered a Final Order (which may be the Confirmation Order) approving the sale under Bankruptcy Code § 363 of the Insurance Policies to be purchased by Hartford pursuant to the requirements of the Hartford Agreement and shall have granted Hartford, the purchaser, the protections available under Bankruptcy Code § 363(m);

      **3.** The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and Hartford;

      **4.** The Confirmation Order is a Final Order and no stay of the Confirmation Order is in effect;

5. The Trustee and the Reorganized Debtors have executed the Trust Agreement, which will, among other things, establish the protocols for fiduciary management of the Trust and the amount to be set aside within the Trust for the Unknown Claims Reserve;

6. The Trustee has opened the Trust Account;

7. Hartford has have transferred the amounts set forth in Article 19 of the Plan to the Trust Account; and

8. The Debtor has segregated the Administrative Claims Reserve and transferred the balance of the amount set forth in Article 19 of the Plan to the Trust Account.

**B.    Waiver of Conditions.**

Any condition set forth in Article 25 of the Plan may be waived by the mutual written consent of the Debtors, and, with respect to any conditions affecting Hartford's obligations, Hartford.

**C.    Closing.**

Closing will be conducted at such location designated by the Debtors and the Committee, as soon as reasonably practicable following the Effective Date for the purpose of the Reorganized Debtor executing and delivering the Plan Documents and completing those actions necessary for the Reorganized Debtors to establish and fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date and in accordance with the terms of the Hartford Agreement. As soon as practicable after conditions set forth in Section 25.1 of the Plan have been satisfied or waived in accordance with Section 25.2 of the Plan, the Trustee shall file notice of the Closing and the Reorganized Debtors will file notice of the occurrence of the Effective Date.

**D.    Implications of Effective Date.**

The Effective Date will occur on the first Business Day after the conditions to effectiveness stated in the Plan have been satisfied, unless the Confirmation Order is stayed by an order of the Bankruptcy Court, the District Court, or another appellate court. Nothing in the Plan precludes the date by which the Effective Date has to occur from being extended by agreement between the Committee and the Debtors, although there is no requirement that either the Committee or the Debtors agree to any such extension.

The Effective Date triggers certain injunctions and releases under the Plan, and also the Debtors' discharges, which are explained in detail in Article XVI below. As of the Effective Date, the Trust will have assumed all liability for Tort Claims and Unknown Tort Claims consistent with the provisions of the Plan and Trust Agreement. The Effective Date also triggers many of the obligations of the parties under the Plan, including funding the Plan and payment of certain Claims. However, the Effective Date may occur before all Claims have been allowed by the Bankruptcy

-39-

Court and may occur before all Tort Claims have been determined under the Tort Claims Allocation Protocol. Accordingly, in the description of the treatment of Claims in this Disclosure Statement and in the Plan, the payment of Claims is, in some cases, triggered by the Claim Payment Date, which is defined in the Plan as the later of the Effective Date or the first Business Day ten (10) days after a Claim becomes an Allowed Claim by a Final Order. Payment of Tort Claims and Unknown Tort Claims shall be governed by the Allocation Protocols attached to the Plan as Exhibits A and B and incorporated therein.

### E.      **Non-Occurrence of Effective Date.**

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of the Confirmation Order (as a Final Order) or the Final Order approving the Hartford Agreement (as the case may be), the Plan shall become null and void unless agreed otherwise by the Debtors and Hartford. A statement shall be filed with the Court within three (3) Business Days after the occurrence of any event that renders the Plan null and void.

### XI.     **REORGANIZATION      OF      DEBTORS      AND      POST-CONFIRMATION MANAGEMENT.**

### A.      **Continuing Existence.**

The Debtors will each, as Reorganized Debtors, continue to exist after the Effective Date as separate legal entities, with all powers of a non-profit corporation under the laws of the state where each resides (Arizona as to Phoenix; Minnesota as to Onamia and the Province), and without prejudice to any right to alter or terminate such existence under applicable state law but subject to applicable Canon Law.

On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and carry on the ministry and the mission of the PSO and the Crosiers and may use, acquire, or dispose of property, and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

The Reorganized Debtors will continue to be managed in accordance with the principles of Canon Law and applicable state law. Father Enneking will continue in his role as President of the Province, and the pre-petition directors of the Debtors will continue in their roles as directors of the Reorganized Debtors.

The Committee designated Roger L. Kramer as the person who shall serve as the Abuse Claims Reviewer and will designate the person who will serve as the Trustee. The Abuse Claims Reviewer's and proposed Trustee's curricula vitae will be filed with the Court, along with a proposal from the Abuse Claims Reviewer and Trustee with respect to his or her service as the Abuse Claims Reviewer or Trustee, respectively, including proposed fees with respect to his or her service, and, as to the Abuse Claims Reviewer, the proposed Allocation Protocols.

-40-

## XII.   POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED DEBTOR.

### A.   Post-Effective Date Obligations.

Post-Effective Date, the Reorganized Debtors will:

1.   In the exercise of their respective business judgment, review all Claims filed against the Estates except for Tort Claims and Unknown Tort Claims and, if advisable, object to such Claims;

2.   Within ten (10) days after payment of all Allowed Administrative Claims, including all Allowed Professional Charges, transfer to the Trust Account all funds remaining in the Administrative Claims Reserve;

3.   Honor the Debtors' obligations arising under the Hartford Agreement and any other agreement that has been approved by the Bankruptcy Court as part of the Plan; and

4.   Perform all of their obligations under the Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

### B.   Post-Effective Date Funding.

The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from:

1.   Liquidation or financing of any and all Revested Assets;

2.   Cash generated by the post-Effective Date operations of the Reorganized Debtors; and

3.   Any reserves established by the Debtors or the Reorganized Debtors; provided, however, that no part of the Trust may be used to pay creditors other than Tort Claimants, Unknown Tort Claimants, and any Trust expenses designated under the Trust Agreement or Plan, and only those Assets to be paid or contributed to the Trust, pursuant to the Plan, will be used to pay the Allowed Claims of Tort Claimants and Unknown Tort Claimants and Trust expenses designated under the Trust Agreement.

The projections showing the ability of the Reorganized Debtors to meet their post-Effective Date obligations under the Plan are attached hereto as **Exhibit 2**.

QB\155907.00003\50742628.1

### C.    **Dissolution of Committee.**

The Committee will be dissolved upon occurrence of the Effective Date; provided, however, that the Committee may continue to exist after the Effective Date with respect to any and all applications for Professional Charges, but not for any other purpose.

### D.    **Final Decree.**

As soon as practicable after the Effective Date, when the Reorganized Debtors deem appropriate, the Reorganized Debtors will seek authority from the Bankruptcy Court to close the Reorganization Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Reorganization Cases shall, whether or not specified therein, be without prejudice to the rights of the Reorganized Debtors, the Trustee, or any other party in interest to reopen the Reorganization Cases for any matter over which the Bankruptcy Court or the U.S. District Court for the District of Minnesota has retained jurisdiction under the Plan.  Any order closing these Reorganization Cases will provide that the Bankruptcy Court or the U.S. District Court for the District of Minnesota, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Reorganization Cases, and the obligations created by the Plan and the Plan Documents; (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents; and (c) provide that the Trust may be terminated and the Trustee discharged as ordered by the Bankruptcy Court without reopening any the Reorganization Cases.

### E.    **United States Trustee Obligations.**

All fees payable pursuant to 28 U.S.C. § 1930 as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law.  All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

### F.    **Non-Tort Claims Review, Allowance, and Payment.**

Except for Tort Claimants and Unknown Tort Claimants, any person to whom the Debtors have incurred an obligation (whether on account of the provision of goods, services or otherwise), or who has received goods or services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (i) such Person or Entity has filed a Proof of Claim against the Debtors in these Reorganization Cases; (ii) such Person's or Entity's Proof of Claim has been objected to; (iii) such Person's or Entity's Claim was included in the Schedules; or (iv) such Person's or Entity's scheduled Claims have been objected to or have been identified as disputed, Contingent, or unliquidated.

The following procedures will be used for purposes of allowance and disallowance of creditors' Claims that are Non-Tort Claims:

-42-

1.    **Objections to Claims.**  Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date, the Debtors or Reorganized Debtors must file all objections to Claims by the Claim Objection Deadline, provided, however, that nothing contained in the Plan will affect the right of the Debtors to seek estimation of any Non-Tort Claims, on any grounds permitted by the Bankruptcy Code at any time.

2.    **Disputed Claims.**  No payments or other distributions will be made to the holders of Disputed Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.  If a Disputed Claim is not an Allowed Claim by the Effective Date, or when payment is otherwise due under the Plan, payment on the Allowed Claim (plus interest, if any is provided for in the Plan) will commence on the Claim Payment Date.

3.    **Treatment of Contingent Claims.**  Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.  The holder of a Contingent Claim will only be entitled to a distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim, subject, however, to the provisions of Bankruptcy Code § 502(e), and, provided that if such Contingent Claim is for reimbursement, indemnification or contribution at the time of allowance or disallowance, it will be disallowed pursuant to Bankruptcy Code § 502(e)(1)(B).

## G.    Payments Effective Upon Tender.

Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Trustee, Debtors, or the Reorganized Debtors to the creditor to whom payment is due.  If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtors or the Reorganized Debtors (as applicable) for the benefit of that creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, Debtors or the Reorganized Debtors failed to pay the tendered payment.

## H.    Preservation of Debtors' Claims, Demands, and Causes of Action.

Except as otherwise provided in the Plan, all Claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtors and/or the Estates against any other Entity, including but not limited to, the Retained Claims arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, will be preserved. The Debtors or the Reorganized Debtors shall have the exclusive right, authority and discretion to enforce the Claims, demands, and causes of action of any kind or nature, including the Retained

-43-

Claims, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in these Reorganization Cases. The Debtors or the Reorganized Debtors shall also have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, demands, and causes of action of any kind or nature, including the Retained Claims, without obtaining Bankruptcy Court approval.   To the extent necessary, the Reorganized Debtors are hereby designated as the representatives of the Estates pursuant to, and in accordance with, Bankruptcy Code § 1123(b)(3)(B).  The Debtors and the Reorganized Debtors will also be entitled to assign their rights under the Plan (except to as to any Claims, causes of action, cross-claims and counterclaims against Hartford which are to be released pursuant to the Hartford Agreement and the Plan).   On the Effective Date, and except as otherwise specifically provided in the Plan, including but not limited to with respect to Retained Claims which are specifically retained by the Debtors and assigned to the Reorganized Debtors, the Trustee is hereby designated as the representative of the Estates, pursuant to and in accordance with, Bankruptcy Code § 1123(b)(3)(B) with respect to any and all Claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtors or their Estates with respect to Tort Claims and Unknown Tort Claims but excluding Claims, defenses, counterclaims, setoffs, and recoupments against Hartford (if any).

## I.      **Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses with respect to any unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, such unimpaired Claims.

## J.      **Operative Documents.**

The Debtors will prepare any documents which they deem necessary or appropriate to execute the Plan or are provided for under the Plan, including, but not limited to, the Plan Documents.   If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts by the Debtors to negotiate and obtain approval of the documents by the other affected Entity, any such dispute will be presented to the Bankruptcy Court for determination, at or in conjunction with the Confirmation Hearing.

## K.      **Return of Deposits.**

To the extent that the Debtors were required to and did pay deposits to any creditors after the Petition Date, as a condition of or as security for continued service after the Petition Date, including, but not limited to, deposits paid to utility companies for adequate assurance pursuant to Bankruptcy Code § 366, then, upon satisfaction of the Claims of such creditor pursuant to the Plan or if such creditor did not have any Claims against the Debtors, the Plan requires that any such deposits, together with any interest or other income earned thereon, if any, will be refunded to the applicable Reorganized Debtor within fifteen (15) days of demand by such Reorganized Debtor for return of such deposit.

-44-

L.    **Delivery of Distributions (Except to Holders of Tort Claims and Unknown Tort Claims).**

Distributions will be made by the Debtors or the Reorganized Debtors to holders of Non-Tort Claims as follows:

1.    At the addresses set forth in the Proofs of Claim (and if both a claimant's address and a claimant's counsel are listed on the Proof of Claim then to counsel's address) filed by holders of Claims or the last known addresses of such holders if no Proof of Claim is filed or if the Debtors or the Reorganized Debtors have not been notified of a change of address;

2.    At the addresses set forth in written notices of address change delivered to the Debtors or the Reorganized Debtors after the date of any related Proof of Claim; or

3.    At the addresses reflected in the Schedules filed in the Reorganization Cases if no Proof of Claim has been filed, and the Debtors or the Reorganized Debtors (as applicable) have not received a written notice of change of address.

M.    **Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants.**

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to Tort Claimants and Unknown Tort Claimants will be made by the Trustee in accordance with the Trust Documents.

N.    **Absence of Address or Returned Mail.**

If a claimant's distribution is not mailed or is mailed but returned to the Reorganized Debtors or Trustee because of the absence of a proper mailing address, the Reorganized Debtors or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such claimant from information generally available to the public and from such party's own records, but shall not be liable to such claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Tort Claimant on account of distributions made to the client trust account of a Tort Claimant's attorney.

O.    **Continuation of Current Insurance Policies.**

Except as expressly set forth in the Hartford Agreement, the Plan and Confirmation Order have no effect on any Insurance Coverage under any certificates or policies of insurance issued to the Debtors that are not otherwise released or sold pursuant to the Hartford Agreement.

-45-

P.      **Abuse Prevention**.

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the PSO in the future, the Reorganized Debtors will continue their commitment to enforce their child and vulnerable adult protection policies, and will continue to review and revise these policies when appropriate.

## XIII. THE TRUST AND LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS.

A.      **Claim Payments**.

Tort Claims and Unknown Tort Claims shall be liquidated and paid in accordance with the Plan, the Confirmation Order, the Plan Documents, the Trust Documents and the applicable Allocation Protocol.

The Plan Proponents intend that any payment on a Tort Claim or Unknown Tort Claim shall constitute damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, amended.

B.      **No Execution**.

All property transferred to the Trust will remain property of the Trust until such time as the property actually has been paid to and received by an Entity entitled to receive payment pursuant to the terms of the Plan, Plan Documents, Confirmation Order and Trust Documents. Except as expressly provided in the Plan, Plan Documents, Confirmation Order and the Trust Documents, the Trust shall not be responsible for administration of payment of any Claims against the Debtors other than Tort Claims or Unknown Tort Claims.

C.      **Special Distribution Conditions**.

1.      **Medicare-Related Provisions**. Pursuant to Section 111 of the MMSEA (42 U.S.C.A. § 1395y(b)(8)), the Trust shall be the applicable plan from which any Tort Claimants who might also be Medicare beneficiaries receive payment on account of their Tort Claims. All payment obligations to a Tort Claimant will be funded from the assets of the Trust, and the Trustee, in his capacity as trustee, shall be the fiduciary and/or administrator as that term is defined in 42 U.S.C.A. § 1395y(b)(8)(F).

2.      **Medicare-Related Obligations**. In addition to the foregoing obligations, the Trustee shall be the RRE with responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any, pursuant to the MSPA and Section 111 of the MMSEA and any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith.

-46-

(a)     On or after the date that the Confirmation Order becomes a Final Order, the Trustee shall determine, for any Tort Claimant whose Claim, including a Proof of Claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "**Post-1980 Claimant**"), by query to CMS:  (i) whether that Post-1980 Claimant is Medicare Eligible (as defined in the Plan) and, if so, (ii) whether he or she has received any Conditional Payment arising from or relating to treatment for Abuse.  The Trustee shall initiate such queries as soon as practicable, including prior to the Effective Date.  The Trust shall also, reasonably contemporaneously with initiating such queries, provide to Hartford all information necessary to perform the same queries, although Hartford is under no obligation to conduct such queries.

(b)     If the Trustee does not receive a response from CMS (including a response from a query that Hartford or Tort Claimant's counsel has initiated, so long as Hartford receives a copy of any such query initiated by Tort Claimant's counsel) within seventy-five (75) days as to whether a Post-1980 Claimant is Medicare Eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response, certify in writing to the Trustee that he or she (i) is not Medicare Eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSPA.

(c)     Prior to issuing a payment to any Post-1980 Claimant who is Medicare Eligible, the Trust and Trustee shall require that Tort Claimant's counsel to hold in escrow an amount equal to the lesser of (1) the amount of the potential payment to the Tort Claimant or (2) the amount of any Medicare Conditional Payments, including Conditional Payments issued by any MAO.  Such amount shall be held in escrow until such time that Tort Claimant's counsel has provided written documentation from Medicare, including any MAO, demonstrating that such Conditional Payments have been satisfied, waived or otherwise released.

(d)     If a portion of the settlement amount is paid to any Post-1980 Claimant who is identified as Medicare Eligible, the Trust will report such payments to Medicare in accordance with the MMSEA. The Trust will also provide to the Hartford Parties all information necessary for the Hartford Parties to report such payments to Medicare although Hartford is under no obligation to make such reports.

-47-

### D. __Indemnification.__

The Trust shall defend, indemnify and hold harmless the Reorganized Debtors and the Protected Parties from any Claims related to Medicare Claims reporting and payment obligations, whether relating to past Conditional Payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents.  The Trust shall not create a reserve for this potential obligation.

### E. __Termination.__

The Trust shall terminate as provided in the Trust Agreement, and the Trustee shall have no further obligations under the Plan or the Trust Agreement upon termination.

### F. __No Liability for Costs.__

Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estates, the Reorganized Debtors, or Hartford relating to the treatment of Tort Claims or (ii) otherwise modify the rights or obligations of the Estates, the Reorganized Debtors, or Hartford as otherwise set forth in the Hartford Agreement, Plan or a Plan Document.

## XIV.  __INSURANCE MATTERS.__

### A. __No Direct Action Against Hartford.__

Nothing in the Plan, in the Confirmation Order or in any Plan Document shall grant to any Person any right to sue Hartford directly in connection with a Tort Claim, Unknown Tort Claim or any Hartford Policies.  To the extent that a Hartford Policy or any part thereof continues in effect after the Effective Date, the Hartford Agreement, the terms of the Hartford Policy and applicable non-bankruptcy law will govern the rights and obligations of the Persons with respect to the applicable Hartford Policy; provided, however, that pursuant to the Plan and the Hartford Agreement, no Person shall have any right to sue Hartford directly or indirectly in connection with a Tort Claim, Unknown Tort Claim, any Claim for coverage or benefits under the Hartford Non-Excluded Policies, or any Claims for which the Debtors have received a discharge pursuant to the Plan, the Confirmation Order, or Bankruptcy Code §§ 524 and 1141.

### B. __Judgment Reduction.__

If any Person obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Hartford Parties as a result of a Claim for contribution, subrogation or indemnification for any of the Hartford Parties' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation for any Claims or reimbursement obligations for any Medicare Claims released or resolved pursuant to the Hartford Agreement, the Plan or the Trust, then the Debtors, Reorganized Debtors or the Trust, as applicable, shall voluntarily reduce their/its judgment or Claim against, or settlement with, such other Person to the extent necessary to satisfy such contribution, subrogation or

-48-

indemnification Claims against the Hartford Parties.   To ensure that such a reduction is accomplished, the Hartford Parties shall be entitled to assert Section 23.2 of the Plan and the provisions of the Hartford Agreement as a defense to any action against them brought by any other Person for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Hartford Parties from any liability for the judgment or Claim.

### C.        No Right of Reimbursement.

The Hartford Parties shall not seek reimbursement for any payments they make under the Hartford Agreement or the Plan under theories of contribution, subrogation, indemnification, or similar relief from any Insurer unless such Insurer first seeks contribution, subrogation, indemnification, or similar relief from any of the Hartford Parties.  Notwithstanding the foregoing, nothing herein shall be construed as prohibiting any of the Hartford Parties from seeking recovery from their reinsurers.

### D.        No Limitation on Hartford's Rights.

Notwithstanding any other provision of the Plan, nothing in Article 23 of the Plan shall (i) affect or be construed to restrict or limit the scope or application of the Channeling Injunction or the Supplemental Insurance Injunction or (ii) alter, impair, or diminish any of the protections afforded to Hartford under the Plan, the Confirmation Order, the Hartford Agreement, or the order approving the Hartford Agreement.

## XV.    TREATMENT OF EXECUTORY CONTRACTS.

In accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, all Executory Contracts of each Debtor will be assumed on the Effective Date, and assigned to the corresponding Reorganized Debtor (other than those Executory Contracts that have already been rejected by order of the Bankruptcy Court or are subject to a motion to reject Executory Contracts that is pending on the Confirmation Date).  Each Executory Contract assumed pursuant to this Section will vest or revest in, and be fully enforceable by, such Reorganized Debtor in accordance with its terms.

With respect to any indemnification obligations of any of the Debtors to any Person serving at any time on or prior to the Effective Date as one of its officers, employees, council members or volunteers, to the extent provided in any of such Debtor's constituent documents or by a written agreement with such Debtor or under the state laws pertaining to such Debtor, those obligations will be deemed and treated as Executory Contracts that are assumed by the corresponding Reorganized Debtor, pursuant to the Plan and Bankruptcy Code § 365 as of the Effective Date; provided, however, that under no circumstances will the Reorganized Debtors assume or be responsible for any alleged indemnification obligations of any non-Crosier brothers, priests, or others against whom the Debtors have determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person(s) or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtors from providing any indemnification to such Person.

-49-

Every Claim asserted by a creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection if such Final Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated as a Class 5 General Unsecured Claim. Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged.

## XVI.   EFFECT OF CONFIRMATION.

### A.   Discharge.

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Debtors will be discharged and their liability will be extinguished completely in respect of any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, Contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose from any agreement the Debtors entered into or obligation of the Debtors incurred before the Confirmation Date, or from any conduct of the Debtors prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, including all Claims and debt of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the Plan.**

### B.   Vesting.

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtors will be vested with all of the Assets of each of their corresponding Debtors, including all property of the Estates free and clear of all Claims, liens, encumbrances, charges and other Interests of creditors, and the Reorganized Debtors will, thereafter, hold, use, dispose or otherwise deal with such property, operate their business and conduct their and the PSO's ministry and mission free of any restrictions imposed by the Bankruptcy Code or by the Court. All Retained Claims are preserved under the Plan for the benefit of the Reorganized Debtors. Any Claims, causes of action or demands transferred to the Trust are preserved for the benefit of the Trustee under the Trust.**

### C.   Exculpation and Limitation of Liability.

**Except as expressly provided in the Plan, none of the Protected Parties will have or incur any liability to, or be subject to any right of action by, any claimant, any other party in interest, or any of their respective Representatives, financial advisors, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Cases, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of**

-50-

confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or the Trust created thereunder, except for their willful misconduct or gross negligence (provided, however, the Debtors, Reorganized Debtors, the Committee, and its members will be discharged from any such liability for such acts or omissions occurring prior to the Effective Date) and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the Reorganization Cases.  Without limiting the generality of the foregoing, the Debtors and their financial advisors and other professionals shall be entitled to and granted the benefits of Bankruptcy Code § 1125(e).

> D.      **Limitation of Liability**.

The Protected Parties, the Trust, the Trustee, and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental Entity or Insurer, on account of payments made to a Tort Claimant, including any liability under the MSPA.

> E.      **Channeled Claims**.

Channeled Claims are defined in the Plan as (i) Tort Claims, (ii) Unknown Tort Claims, (iii) Extra-Contractual Claims, and/or (iv) Claims against any of the Crosier Fathers Parties or the Hartford Parties only, with respect to any Claim that is not a Tort Claim, to the extent such Claim against an Entity insured by Hartford arises under a Hartford Non-Excluded Policy.  The definition of Channeled Claims includes all such Claims whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including without limitation all Claims by way of direct action, subrogation, allocation of fault, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy; provided however, "Channeled Claim" does not mean any Tort Claim, Unknown Tort Claim, Extra-Contractual Claim, and/or Claim or any part of any such Claim, that is not related to the Hartford Policies.

In consideration of the undertakings of the Protected Parties under the Plan, and other consideration, and to further preserve and promote the agreements between and among the Debtors and Hartford which also benefit the Tort Claimants and Unknown Tort Claimants and the protections afforded the Protected Parties under the Bankruptcy Code, including Bankruptcy Code § 105, the Plan causes any and all Channeled Claims to be channeled into the Trust and they shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan, the Allocation Protocols and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims.

The channeling provisions are an integral part of the Plan and are essential to its implementation.

F.    **Permanent Injunction Against Released and Channeled Claims**.

All Persons who have held, hold, or may hold Channeled Claims or Claims against the Protected Parties, whether known or unknown, and their respective civil law and Canon Law officers, directors, officials, Representatives, council members, employees, accountants, agents, attorneys, and all others acting for or on their behalf, will be permanently enjoined on and after the Effective Date from:

1.    Commencing or continuing in any manner any action or any other proceeding of any kind with respect to any Claim, including, but not limited to, any Tort Claim, any Unknown Tort Claim or any Channeled Claim against the Protected Parties or the property of the Protected Parties;

2.    Asserting a Claim against any Person if as a result of such Claim such Person has or may have a Claim against one or more of the Protected Parties;

3.    Seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Protected Parties or the property of the Protected Parties, with respect to any discharged Claim or Channeled Claim;

4.    Creating, perfecting or enforcing any lien or encumbrance of any kind against any Protected Parties, or the property of any Protected Parties with respect to any discharged Claim or Channeled Claim;

5.    Asserting, implementing or effectuating any discharged Claim or Channeled Claim of any kind against:

(a)    Any obligation due any of the Protected Parties;

(b)    Any Protected Party; or

(c)    The property of any Protected Party;

6.    Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties or the property of any of the Protected Parties with respect to any discharged Claim or Channeled Claim; and

7.    Taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or the Plan Documents, including the Trust Agreement.

G.    **Channeling Injunction as Mutual Release**.

Subject to the Hartford Agreement, the provisions of Section 26.5 of the Plan will further operate, as between all Protected Parties, as a mutual release of all Claims relating to the Debtors, the Claims against the Debtors and the Hartford Policies, which any Protected Party may have against another Protected Party except as may be specifically reserved or set forth in the Hartford Agreement or the Plan.

H.    **Supplemental Injunction Preventing Prosecution of Claims Against Hartford**.

Pursuant to Bankruptcy Code §§ 105(a) and 363 and in consideration of the undertakings of Hartford pursuant to the Hartford Agreement, including Hartford's purchase of the Hartford Policies free and clear of all Interests pursuant to Bankruptcy Code § 363(f), any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Hartford Agreement) against any of the Protected Parties, which, directly or indirectly, relate to any of the Hartford Policies, any Tort Claims or any Unknown Tort Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against Hartford, the Hartford Parties, the Crosier Fathers Parties and/or the Hartford Policies, except as set forth in the Hartford Agreement, including:

1.    Commencing or continuing in any manner any action or other proceeding against Hartford, the Hartford Parties, the Crosier Fathers Parties or the property of Hartford or the Crosier Fathers Parties;

2.    Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against Hartford, the Hartford Parties, the Crosier Fathers Parties or the property of Hartford, the Hartford Parties or the Crosier Fathers Parties;

3.    Creating, perfecting, or enforcing any lien of any kind against Hartford, the Hartford Parties, the Crosier Fathers Parties;

4.    Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to Hartford, the Hartford Parties, the Crosier Fathers Parties; and

5.    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

-53-

### I.    Injunctions Deemed Issued and Permanent.

**On the Effective Date, the injunctions provided for in the Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.  All injunctions and/or stays provided for in the Plan, the injunctive provisions of Bankruptcy Code §§ 524 and 1141, and all injunctions or stays protecting Hartford are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.**

**Any and all currently pending court and other proceedings, the continuation of which would violate the provisions of Article 26 of the Plan, shall be deemed dismissed with prejudice on the Effective Date.**

### J.    Retention of Jurisdiction.

After the Effective Date, the Bankruptcy Court will retain jurisdiction for the purposes expressly set forth in Article 28 of the Plan, which generally relate to enforcement and implementation of the Plan, including without limitation, allowance or disallowance of Claims, matters relating to Tort Claims and Unknown Tort Claims so long as such jurisdiction is consistent with the terms of the Trust, and other matters set forth in the Plan.

## XVII.  FEDERAL TAX CONSEQUENCES.

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTORS NOR THE DEBTORS' COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTORS OR ANY CREDITOR.  THE FOLLOWING IS ONLY PROVIDED AS A GENERAL DISCUSSION OF POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT MEANT AS AN ANALYSIS OF HOW ANY PARTICULAR CREDITOR OR PARTY IN INTEREST MAY BE AFFECTED BY ANY TAX IMPLICATIONS OF THE PLAN.

Under the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in the Reorganization Cases.

### A.    The Trust.

On the Confirmation Date, the Trust shall be established in accordance with the Trust Documents.  The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" ("**QSF**") pursuant to Section 468B of the Tax Code and the Treasury Regulations promulgated thereunder.  The Debtors are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1).  The Trustee shall be classified as the "administrator" within the meaning of

-54-

Treasury Regulation Section 1.468B-2(k)(3).   The Trust Documents, including the Trust Agreement, are incorporated herein by reference.  The Trust is intended to be classified as a QSF because:

1. The Trust is established pursuant to an order of, or is approved by, the United States, any state, territory, possession or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2. The Trust is established to resolve or satisfy one or more contested or uncontested Claims that has resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one Claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to Abuse (but excluding non-tort obligations of the Debtors to make payments to its general trade creditors or debt holders that relate to a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

3. The Trust is a trust under applicable state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1. The Trust must use a calendar taxable year and the accrual method of accounting.

2. If the Debtors fund the Trust with appreciated property, the Debtors are deemed to sell the property to the Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtors.

3. The Trust takes a fair market value basis in property contributed to it by the Debtors.

4. The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%).  The Debtors' funding of the Trust with Cash and other property is not reported by the Trust as taxable income.  However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5. The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

6. The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law).  The Trust will also be required

to comply with a number of other administrative tax rules including filing informational returns (generally IRS Form 1099) when approved payments are made to claimants and, where applicable, certain withholding requirements.

### B.     Federal Income Tax Consequences to Holders of Claims.

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects it for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. Distributions to Tort Claimants may or may not be taxable depending on whether the payment may be considered compensation for personal physical injuries.

The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, it is possible that the receipt of the distribution may not result in additional income to the claimant but may, as discussed below, result in a loss. Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant may be required to include the amount of the distribution in income when received.

In general, a claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the Cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. It is possible that the income or loss may be a capital gain or loss if the Claim is a capital asset in the claimant's hands.

-56-

The Debtors and Committee intend that any payment on a Tort Claim or Unknown Tort Claim shall constitute damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Tax Code.

## XVIII. MODIFICATION OF PLAN.

The Plan may be modified by the Plan Proponents, the Reorganized Debtors, and the Trustee (as applicable) from time to time in accordance with, and pursuant to, Bankruptcy Code §§ 1125 and 1127. The Plan may be modified by the Plan Proponents at any time before the Confirmation Date, provided that the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123, the Hartford Agreement, and the Plan Proponents have complied with Bankruptcy Code § 1125. Each holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such holder. Each holder of a Claim that votes in favor of the Plan authorizes the Plan Proponents to modify, at any time prior to the Effective Date and without the requirement of further solicitation, the treatment provided to the Class of Claims such Claims are classified in, provided that the Bankruptcy Court determines that such modification is not material.

From and after the Effective Date, the Trustee, the Reorganized Debtors and Hartford shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan and Plan Documents without further order of the Bankruptcy Court. Additionally, the Trustee, the Reorganized Debtors, and Hartford may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement previously approved by the Bankruptcy Court.

A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented hereunder, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Article 27 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

## XIX. ACCEPTANCE AND CONFIRMATION.

### A. Voting Procedures.

#### 1. Generally.

(a) Only those Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan. The Debtors reserve the right to supplement this Disclosure Statement (if necessary) and to solicit any of those Classes which may later prove to be impaired or if circumstances so warrant.

(b)    Ballots will be sent to the known holders of Claims who are entitled to vote.  For voting purposes only, Tort Claims will be estimated at $1.00.  Such estimation has no impact on any amount the holder of the Tort Claim may be entitled to receive, but merely equalizes each Tort Claim for purposes of voting on the Plan.

(c)    The holder of a Claim to which an objection has been filed, including any Tort Claims that are the subject of a pending objection as of the date of approval of this Disclosure Statement, is not entitled to vote on the Plan unless they request on or before March 1, 2018, that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the Claim in an appropriate amount solely for the purpose of enabling the holder of such Disputed Claim to vote on the Plan, and the Bankruptcy Court does so.

2.    **Form of Ballots.**

(a)    Ballots for Class 8 Claims include certain releases and certifications that are required to be executed before a Class 8 Claimant may receive funds from the Trust.  Any Class 8 Ballot received after the voting deadline, while it may not be counted as a vote for or against the Plan, shall be effective as to the releases, certifications, and elections contained in such Ballot.

(b)    Ballots for Class 5 General Unsecured Claims include two separate elections to opt into the General Unsecured Convenience Class and to waive the holder's Claim against the Debtors, which are, as noted, non-profit organizations.  A timely-submitted Ballot will be counted in accordance with the procedures and limitations herein, regardless whether the holder of the Claim makes either election.  Any Class 5 Ballot received after the voting deadline but before commencement of payment on the Claim to which the Ballot pertains, while it may not be counted as a vote for or against the Plan, shall be effective as to the elections contained in such Ballot.

3.    **Ballot Tabulation.**

(a)    Any Ballot that is properly completed, executed and timely returned to counsel to the Debtors but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall not be counted.

(b)    If no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote, such Class shall be deemed to have voted to accept the Plan.

(c)    If a creditor, or any Person acting on behalf of a creditor under applicable law, casts more than one Ballot voting the same Claim or

-58-

Interest before the voting deadline, the latest dated Ballot received before the voting deadline shall be deemed to reflect the voter's intent and thus to supersede any prior Ballots.

(d)    Creditors must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes within a particular Class.

(e)    The Person signing the creditor's Proof of Claim may complete and sign the creditor's Ballot, except that a creditor holding a Class 8 Claim is required to sign his or her own Ballot, provided, however, that a legal guardian or executor may sign on behalf of the claimant if proof of legal standing to do so is provided.

(f)    Any Class 8 Ballot that indicates either acceptance or rejection of the Plan shall be counted as a vote to accept or reject the Plan regardless of whether the releases and certification portions of the Ballot are completed.

(g)    The following Ballots shall not be counted or considered in determining whether the Plan has been accepted or rejected:

(i)    any Ballot received after the voting deadline unless the Debtors shall have granted in writing an extension of the voting deadline with respect to such Ballot;

(ii)    any Ballot that is illegible or contains insufficient information to permit the identification of the creditor;

(iii)    any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

(iv)    any Ballot cast for a Claim scheduled at zero or as unliquidated, Contingent, or disputed for which no Proof of Claim was timely filed;

(v)    any unsigned Ballot;

(vi)    any Ballot that does not indicate an acceptance or rejection or indicates both; and

(vii)    any Ballot transmitted to counsel to the Debtors by facsimile, e-mail or other electronic means unless the Debtor has previously authorized such means in writing.

(h)    The Debtors shall be permitted to contact creditors in an attempt to cure the deficiencies specified herein.

-59-

4.     **Submission of Ballots.**

(a)     A form of Ballot will be sent to all creditors entitled to vote on the Plan, along with a copy of this Disclosure Statement and a copy of the Plan.  Holders of Class 5 General Unsecured Claims, and holders of Class 8 Tort Claims will receive forms of Ballot that are different from those sent to other creditors.

Creditors should read the Ballot carefully.  The Bankruptcy Court approved the form of Ballot prior to its mailing, and the Ballot contains specific instructions as to the deadline for its submission and the place where it must be submitted.  If any creditor has any questions concerning voting procedures, it may contact:

QUARLES & BRADY LLP
One South Church Avenue, Suite 1700
Tucson, AZ 85701-1621
Attention:  Brad Terry
Telephone:  (520) 770-8766
E-mail:  brad.terry@quarles.com

B.     **Feasibility.**

The Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that liquidation of the Debtors, or the need for future reorganization, is not likely to follow after confirmation.  For the purpose of determining whether the Plan meets this requirement, the Reorganized Debtors' ability to meet their obligations under the Plan has been analyzed.  The Debtors have prepared projections of the cash flow for the ministries and operations of the PSO and the Debtors.  The projections were prepared by management and are attached as Exhibit 2 to this Disclosure Statement.  The Debtors reasonably believe that they will be able to fund the Plan on the Effective Date, and the Reorganized Debtors will be able to make all payments required pursuant to the Plan.

C.     **Best Interests of Creditors and Liquidation Analysis.**

Under Bankruptcy Code § 1129(a)(7), the Plan must provide that creditors receive no less under the Plan than they would receive in a Chapter 7 liquidation of the Debtors.  Such liquidation analysis excludes property that is not property of the Debtors' Estates, including property the Debtors hold in trust or that is held in trust for them, such as the Hutzell and STTK funds and other restricted and custodial funds.  Such property is excluded from the liquidation analysis.  The liquidation analysis also excludes other property which is property of the Estate, but which is not "capable of liquidation under Chapter 7" pursuant to the Religious Freedom Restoration Act and other reasons, including the Old Southern Building, the Onamia priory and campus, the Holy Cross Center, and related personal property.  In a Chapter 7 liquidation, the more than $19,000,000 in funding from Hartford would be unavailable.  Therefore, creditors will do far better under the Plan than they would in a Chapter 7 liquidation.

-60-

Additionally, Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.   The Plan incorporates the Allocation Protocols.  There is likelihood that a Chapter 7 Trustee will be unable to implement the Allocation Protocols or a similar process in the absence of a confirmed Chapter 11 Plan.  As such, substantial resources of the Estates would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2.   A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtors, pursuant to 11 U.S.C. § 326.  Any such payment would dilute the amount of funds available to pay creditors.

3.   Hartford would not obtain a channeling or supplemental injunction or the releases provided under the Plan, and therefore would not make the substantial contributions it is making under the Plan.

**D.     Confirmation over Dissenting Class.**

1.   In the event that any impaired Class of Claims does not accept the Plan (or simply does not vote), the Bankruptcy Court may nevertheless confirm the Plan at the request of the Debtors if all other requirements under Bankruptcy Code § 1129(a) are satisfied, and if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Classes.  Each of these requirements is discussed below.

2.   No Unfair Discrimination.

   (a)    The Plan "does not discriminate unfairly" if:

      (i)    The legal rights of a dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class; and

      (ii)   No Class receives payments in excess of those which it is legally entitled to receive for its Claims.  Under the Plan:

         (A)    all Classes of impaired Claims are treated in a manner that is consistent with the treatment of other similar Classes of Claims; and

         (B)    no Class of Claims will receive payments or property with an aggregate value greater than the aggregate of the Allowed Claims in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims.

-61-

**3.**     Fair and Equitable Test.

   **(a)**     The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and holders of equity Interests, as follows:

   (i)     <u>Secured Creditors</u>.  Either:

   (A)     each impaired Secured Creditor retains its liens securing a Secured Claim and receives on account of its Secured Claim deferred Cash payments having a present value equal to the amount of its Allowed Secured Claim;

   (B)     each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim; or

   (C)     the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with the first two clauses of this subparagraph.

   (ii)     <u>Unsecured Creditors</u>.  Each impaired Unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim.  There is no absolute priority rule issue in the Reorganization Cases because there are no equity Interests or junior creditors; or the holders of Claims and equity Interests that are junior to the Claims of the non-accepting Class do not receive any property under the Plan on account of such Claims and equity Interests.

   (iii)     <u>Equity Interests</u>.  Either:

   (A)     each holder will receive or retain under the Plan property of a value equal to or greater than (I) the fixed liquidation preference or redemption price, if any, of such Interest or (II) the value of such Interest; or

   (B)     the holders of Interests that are junior to the non-accepting Class will not receive any property under the Plan.

**4.**     As with the best interests of creditors test, the fair and equitable test is applied differently in the Reorganization Cases than in most reorganization cases because the Debtors are not moneyed corporations.  This is the

-62-

situation because the members of a non-profit have no personal Interest in the property of the corporation. Accordingly, there is effectively no equity interest in the Debtors. Therefore, what is commonly referred to as the "absolute priority rule" embodied by Bankruptcy Code § 1129(b)(2)(B) is not relevant here.

The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all impaired Classes.

### E.   Risk Factors.

Perhaps the most significant risk factor to creditors' receipt of payment under the Plan is an appeal. The Effective Date of the Plan is triggered by, among other things, the final status of the Confirmation Order and certain other orders essential to the Hartford Agreement. To the extent an appeal is pending and that condition to the Effective Date is not waived, creditors' receipt of payment and performance under the Plan may be delayed and ultimately confirmation may be overturned. For a discussion of what may happen should the Confirmation Order be overturned, please refer to Article XX below.

The other risk to creditor payment is non-confirmation of the Plan. Please refer to Article XX below for a discussion of risks to creditors if the Plan is not confirmed.

### F.   Effect of Non-Confirmation.

In the event the Plan is not confirmed, it will not be binding on the Debtors, Hartford, or any other Person. In such event, the Plan and Disclosure Statement shall be treated as non-binding settlement communications subject to the protections of Federal Rule of Evidence 408 and may not be used as evidence.

## XX.   ALTERNATIVES TO THE PLAN.

### A.   If The Plan Is Not Confirmed, Several Different Events Could Occur:

1.  The Debtors could propose another plan providing for different treatment of certain creditors; the Committee might propose a plan; or the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Reorganization Cases if the Debtors are unable to confirm an alternative plan in a reasonable period of time.

2.  Under the second scenario, creditors of the Debtors would recover significantly less (and perhaps nothing) than they will under the Debtors' Plan. Without the protections, including the Channeling Injunction, available under a confirmed Plan, Hartford has little or no incentive to provide funding for the Debtors to pay creditors. Rather, the Hartford litigation would likely continue, further depleting the resources the Debtors would otherwise use to pay creditors under the Plan. Currently, those resources consist of, at most, $5.7 million, approximately $1.5 million of

-63-

which would pay for the Professional Charges incurred in the Debtors' Reorganization Cases.  This would leave approximately $3.2 million with which to compensate all creditors, both Tort Claimants and others.  In contrast, approximately $24 million will be available to creditors if the Plan is confirmed.  Dismissal is therefore a poor alternative for creditors.

In the reorganization case filed by AM/SP, the official committee of unsecured creditors filed its own plan of reorganization at the same time that AM/SP had filed its own plan.  If that were to happen in this case, the explanation above relating to dismissal would likely occur.  Hartford would again have little or no incentive to provide the significant funding it will provide under the Plan, and the creditors would be left with the Debtors' much lesser Assets rather than having access to the funds Hartford would otherwise contribute under the Hartford Agreement.

For a discussion of liquidation in Chapter 7 and its unavailability, please refer to Article XIX, above.  Therefore, the Plan Proponents strongly recommend that creditors vote to accept the Plan, as set forth below.

## XXI.   **RECOMMENDATION OF THE PLAN PROPONENTS AND CONCLUSION**.

**THE DEBTORS AND COMMITTEE RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RETURN TO CREDITORS UNDER THE CIRCUMSTANCES.**

QB\155907.00003\50742628.1

Dated and respectfully submitted this 13th day of February, 2018.

CROSIER FATHERS AND BROTHERS
PROVINCE, INC., a Minnesota non-profit
corporation,
-and-
THE CROSIER COMMUNITY OF PHOENIX,
and Arizona non-profit corporation,


By _____
THOMAS ENNEKING, osc, President



CROSIER FATHERS OF ONAMIA, a Minnesota
non-profit corporation,


By _____
KERMIT HOLL, osc, President

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By _____

Ben Januschka, Committee Chairperson

Prepared and Submitted By:


| | |
|---|---|
| */s/ Susan G. Boswell* | */s/ Robert T. Kugler* |
| Susan G. Boswell (AZ Bar No. 004791) | Robert T. Kugler (Bar No. 194116) |
| Lori L. Winkelman (AZ Bar No. 021400) | Edwin H. Caldie (Bar No. 388930) |
| Elizabeth S. Fella (AZ Bar No. 025236) | Phillip J. Ashfield (Bar No. 388990) |
| *Admitted Pro Hac Vice* | STINSON LEONARD STREET LLP |
| QUARLES & BRADY LLP | 50 South Sixth Street |
| One S. Church Ave., Suite 1700 | Suite 2600 |
| Tucson, Arizona 85701 | Minneapolis, Minnesota 55402 |
| -and- | |
| Thomas J. Flynn (MN Bar No. 0030570) | *Counsel for the Official Committee of* |
| LARKIN HOFFMAN | *Unsecured Creditors* |
| 8300 Norman Center Drive | |
| Suite 1000 | |
| Minneapolis, Minnesota 55437 | |

*Counsel for the Debtors*

-67-

# EXHIBIT 1

**Crosier Province Operations**
## Balance Sheet by Class
**As of October 31, 2017**

Accrual Basis

| | Permanently Restricted[1] | Temporarily Restricted[2] | Annuities | Unrestricted | TOTAL PROVINCE | Custodial |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| **Checking/Savings** | | | | | | |
| **1XX01 · CHECKING** | | | | | | |
| 111000 · Regular Checking-Unrestricted | - | - | - | 227,234.73 | 227,234.73 | - |
| 113000 · Restricted Funds Checking | - | 5,000.00 | - | - | 5,000.00 | - |
| 11xx00 - New Mexico Account | - | - | - | 3,877.03 | 3,877.03 | - |
| 117000 · Province Development Account | - | - | - | 12,029.74 | 12,029.74 | - |
| 119500 · Service Bureau Checking | - | - | - | 3,986.82 | 3,986.82 | - |
| Total 1XX01 · CHECKING | - | 5,000.00 | - | 247,128.32 | 252,128.32 | - |
| 121000 · Petty Cash | - | - | - | 3,000.00 | 3,000.00 | - |
| 131000 · Regular Savings | - | - | - | - | - | - |
| **Total Checking/Savings** | - | 5,000.00 | - | 250,128.32 | 255,128.32 | - |
| **Accounts Receivable** | | | | | | |
| 141100 · Regular Receivables | - | - | - | 551.24 | 551.24 | - |
| **Total Accounts Receivable** | - | - | - | 551.24 | 551.24 | - |
| **Other Current Assets** | | | | | | |
| [3] 1xxx25 - Due To/From Restricted/Unrestricted | - | (28,916.56) | - | 28,916.56 | - | - |
| [3] 1xxx26 - Due To/From Custodial | - | - | - | (61,026.63) | (61,026.63) | 61,026.63 |
| 151000 · General Prepaids | - | - | - | 230,503.00 | 230,503.00 | - |
| 153000 · Postage Prepaids | - | - | - | 217.08 | 217.08 | - |
| **Total Other Current Assets** | - | (28,916.56) | - | 198,610.01 | 169,693.45 | 61,026.63 |
| **Total Current Assets** | - | (23,916.56) | - | 449,289.57 | 425,373.01 | 61,026.63 |
| **Other Assets** | | | | | | |
| **1XX30 · INVESTMENTS** | | | | | | |
| **1XX33 · INVESTMENT FIRM** | | | | | | |
| 161100 · General Investments-Unrestricte | - | - | - | 25,033.93 | 25,033.93 | - |
| 161200 · Scholarships-Restricted-P & T | 1,342,287.76 | 893,479.02 | - | - | 2,235,766.78 | - |
| 161300 · Mass Aggreements-Restricted-T | - | 30,265.86 | - | 1,125.49 | 31,391.35 | - |
| 161700 · Annuity Funds | - | - | 130,946.40 | - | 130,946.40 | - |
| 161900 · Other Funds-Restricted-P & T | 200,000.00 | 102,912.45 | - | - | 302,912.45 | - |
| Total 1XX33 · INVESTMENT FIRM | 1,542,287.76 | 1,026,657.33 | 130,946.40 | 26,159.42 | 2,726,050.91 | - |
| **1XX36 · OTHER INVESTMENTS HELD** | | | | | | |
| 162200 · Other Retirement Plans | - | - | - | - | - | - |
| Total 1XX36 · OTHER INVESTMENTS HELD | - | - | - | - | - | - |
| **Total 1XX30 · INVESTMENTS** | 1,542,287.76 | 1,026,657.33 | 130,946.40 | 26,159.42 | 2,726,050.91 | - |
| **1XX40 · BENEFICIAL INTERESTS** | | | | | | |
| 165100 · Continuing Care Trust | - | - | - | - | - | - |
| 165200 · Hutzel Trust | 1,896,708.00 | 45,548.47 | - | - | 1,942,256.47 | - |
| **Total 1XX40 · BENEFICIAL INTERESTS** | 1,896,708.00 | 45,548.47 | - | - | 1,942,256.47 | - |
| [4] **1XX50 · PROPERTY** | | | | | | |
| 171200 · Buildings | - | - | - | 230,399.94 | 230,399.94 | - |
| 171300 · Furniture/Fixtures/Equipment | - | - | - | - | - | - |
| 171390 · Accum Depreciation-F/F/E | - | - | - | (149,309.94) | (149,309.94) | - |
| 171300 · Furnitire/Fixtures/Equipment - Other | - | - | - | 203,904.81 | 203,904.81 | - |
| Total 171300 · Furniture/Fixtures/Equipment | - | - | - | 54,594.87 | 54,594.87 | - |
| 171600 · Vehicles | | | | | | |
| 171690 · Accum Depreciation-Vehicles | - | - | - | (0.07) | (0.07) | - |
| 171600 · Vehicles - Other | - | - | - | 0.13 | 0.13 | - |
| Total 171600 · Vehicles | - | - | - | 0.06 | 0.06 | - |
| [4] **Total 1XX50 · PROPERTY** | - | - | - | 284,994.87 | 284,994.87 | - |

**Crosier Province Operations**
## Balance Sheet by Class
**As of October 31, 2017**                                                                                          **Accrual Basis**

| | Permanently Restricted[1] | Temporarily Restricted[2] | Annuities | Unrestricted | TOTAL PROVINCE | Custodial |
|---|---|---|---|---|---|---|
| **1XXX90 · OTHER ASSETS** | | | | | | |
| 191100 · Non Operating Land | - | - | - | 3,000.00 | 3,000.00 | - |
| Total 1XXX90 · OTHER ASSETS | - | - | - | 3,000.00 | 3,000.00 | - |
| Total Other Assets | 3,438,995.76 | 1,072,205.80 | 130,946.40 | 314,154.29 | 4,956,302.25 | - |
| **TOTAL ASSETS** | **3,438,995.76** | **1,048,289.24** | **130,946.40** | **763,443.86** | **5,381,675.26** | **61,026.63** |
| **LIABILITIES & EQUITY** | | | | | | |
| Liabilities | | | | | | |
| Current Liabilities | | | | | | |
| Accounts Payable | | | | | | |
| 211100 · Regular Accounts Payable | - | 1,233.70 | - | 10,916.38 | 12,150.08 | 61,026.63 |
| 211110 · Accounts Payable-Prefiling | - | - | - | 9,776.13 | 9,776.13 | - |
| 211200 · Intercompany Payables | - | - | - | 3,986.82 | 3,986.82 | - |
| 211900 · Other Payables | - | - | - | 100,253.00 | 100,253.00 | - |
| Total Accounts Payable | - | 1,233.70 | - | 124,932.33 | 126,166.03 | 61,026.63 |
| Other Current Liabilities | | | | | | |
| 2XXX05 · OTHER LIABILITIES | | | | | | |
| 219x00 - Accrued Employee Benefits - Prefi | - | - | - | 37,174.47 | 37,174.47 | - |
| 219650 · Accrued-Credit Card Gifts | - | - | - | 8,278.15 | 8,278.15 | - |
| Total 2XXX05 · OTHER LIABILITIES | - | - | - | 45,452.62 | 45,452.62 | - |
| Total Other Current Liabilities | - | - | - | 45,452.62 | 45,452.62 | - |
| Total Current Liabilities | - | 1,233.70 | - | 170,384.95 | 171,618.65 | 61,026.63 |
| Long Term Liabilities | | | | | | |
| 2XXX10 · ANNUITY FUNDS | | | | | | |
| 231100 · Annuities-Crosiers | - | - | 130,946.40 | - | 130,946.40 | - |
| 231200 · Annuities-PV Adjustmnt | - | - | (79,225.98) | - | (79,225.98) | - |
| Total 2XXX10 · ANNUITY FUNDS | - | - | 51,720.42 | - | 51,720.42 | - |
| 2XXX20 · LOANS | | | | | | |
| 241400 · Mortgage Payable | - | - | - | 88,000.00 | 88,000.00 | - |
| Total 2XXX20 · LOANS | - | - | - | 88,000.00 | 88,000.00 | - |
| Total Long Term Liabilities | - | - | 51,720.42 | 88,000.00 | 139,720.42 | - |
| Total Liabilities | - | 1,233.70 | 51,720.42 | 258,384.95 | 311,339.07 | 61,026.63 |
| Equity | | | | | | |
| Total 2XXX90 · NET ASSETS | 3,408,670.76 | 902,862.64 | 79,225.98 | 1,234,486.84 | 5,625,246.22 | - |
| Net Income | 30,325.00 | 144,192.90 | - | (729,427.93) | (554,910.03) | - |
| Total Equity | 3,438,995.76 | 1,047,055.54 | 79,225.98 | 505,058.91 | 5,070,336.19 | - |
| **TOTAL LIABILITIES & EQUITY** | **3,438,995.76** | **1,048,289.24** | **130,946.40** | **763,443.86** | **5,381,675.26** | **61,026.63** |

**Crosier Onamia**
**Balance Sheet by Class**
As of October 31, 2017

Accrual Basis

| | Permanently Restricted[1] | Temporarily Restricted[2] | Annuities | Unrestricted | TOTAL ONAMIA | Custodial |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| **Checking/Savings** | | | | | | |
| **1XXX01 · CHECKING** | | | | | | |
| 111000 · Regular Checking-Unrestricted | - | - | - | 65,110.39 | 65,110.39 | - |
| 113000 · Restricted Funds Checking | - | 32,858.55 | - | - | 32,858.55 | - |
| 115000 · Annuity Checking | - | - | 46.16 | - | 46.16 | - |
| 121000 · Petty Cash | - | - | - | 1,500.00 | 1,500.00 | - |
| 131000 · Regular Savings | - | - | - | 1,290.48 | 1,290.48 | - |
| **Total Checking/Savings** | - | 32,858.55 | 46.16 | 67,900.87 | 100,805.58 | - |
| **Accounts Receivable** | | | | | | |
| 141100 · Regular Receivables | - | - | - | 29,626.40 | 29,626.40 | - |
| 141900 · Other Receivables | - | - | - | 14,000.00 | 14,000.00 | - |
| **Total Accounts Receivable** | - | - | - | 43,626.40 | 43,626.40 | - |
| **Other Current Assets** | | | | | | |
| 150000 · Inventory | - | - | - | 97,204.46 | 97,204.46 | - |
| [3] 1xxx25 - Due To/From Restricted/Unrestricted | (126.72) | (14,857.20) | 21,566.80 | (6,582.98) | (0.10) | - |
| 1xxx26 - Due To/From Custodial | - | - | - | (8,057.41) | (8,057.41) | 8,057.41 |
| 151000 · General Prepaids | - | - | - | 22,500.00 | 22,500.00 | - |
| 153000 · Postage Prepaids | - | - | - | 2,036.02 | 2,036.02 | - |
| **Total Other Current Assets** | (126.72) | (14,857.20) | 21,566.80 | 107,100.09 | 113,682.97 | 8,057.41 |
| **Total Current Assets** | (126.72) | 18,001.35 | 21,612.96 | 218,627.36 | 258,114.95 | 8,057.41 |
| **Other Assets** | | | | | | |
| **1XXX30 · INVESTMENTS** | | | | | | |
| **1XXX33 · INVESTMENT FIRM** | | | | | | |
| 161100 · General Investments-Unrestricted | - | - | - | 5,163,585.61 | 5,163,585.61 | - |
| 161300 · Mass Agreements-Restricted-T | 1,150.00 | 29,526.06 | - | - | 30,676.06 | - |
| 161700 · Annuity Funds | - | - | 1,433,586.56 | - | 1,433,586.56 | - |
| 161900 · Other Funds-Restricted-P & T | 10,436.72 | - | - | - | 10,436.72 | - |
| **Total 1XXX33 · INVESTMENT FIRM** | 11,586.72 | 29,526.06 | 1,433,586.56 | 5,163,585.61 | 6,638,284.95 | - |
| **1XXX36 · OTHER INVESTMENTS HELD** | | | | | | |
| 119000 · Other Checking | - | 13,625.19 | - | (13,625.19) | - | - |
| 162100 · Stocks & Bonds | - | - | - | 351,025.50 | 351,025.50 | - |
| **Total 1XXX36 · OTHER INVESTMENTS HELD** | - | 13,625.19 | - | 337,400.31 | 351,025.50 | - |
| [4] **Total 1XXX30 · INVESTMENTS** | 11,586.72 | 43,151.25 | 1,433,586.56 | 5,500,985.92 | 6,989,310.45 | - |
| **1XXX50 · PROPERTY** | | | | | | |
| 171100 · Land | - | - | - | 77,165.93 | 77,165.93 | - |
| 171200 · Buildings | | | | | | |
| 171290 · Accum Depreciation-Buildings | - | - | - | (2,796,604.53) | (2,796,604.53) | - |
| 171200 · Buildings - Other | - | - | - | 7,198,405.74 | 7,198,405.74 | - |
| **Total 171200 · Buildings** | - | - | - | 4,401,801.21 | 4,401,801.21 | - |
| 171300 · Furniture/Fixtures/Equipment | | | | | | |
| 171390 · Accum Depreciation-F/F/E | - | - | - | (444,162.19) | (444,162.19) | - |
| 171300 · Furniture/Fixtures/Equipment - Other | - | - | - | 479,578.21 | 479,578.21 | - |
| **Total 171300 · Furniture/Fixtures/Equipment** | - | - | - | 35,416.02 | 35,416.02 | - |
| 171600 · Vehicles | | | | | | |
| 171690 · Accum Depreciation-Vehicles | - | - | - | (150,370.01) | (150,370.01) | - |
| 171600 · Vehicles - Other | - | - | - | 245,731.35 | 245,731.35 | - |
| [4] **Total 171600 · Vehicles** | - | - | - | 95,361.34 | 95,361.34 | - |
| **Total 1XXX50 · PROPERTY** | - | - | - | 4,609,744.50 | 4,609,744.50 | - |
| **1XXX90 · OTHER ASSETS** | | | | | | |
| 191000 · Inter House Borrowing | - | - | - | - | - | - |
| 191100 · Non Operating Land | - | - | - | 177,856.00 | 177,856.00 | - |
| **Total 1XXX90 · OTHER ASSETS** | - | - | - | 177,856.00 | 177,856.00 | - |
| TO' **Total Other Assets** | 11,586.72 | 43,151.25 | 1,433,586.56 | 10,288,586.42 | 11,776,910.95 | - |

**Crosier Onamia**
**Balance Sheet by Class**
As of October 31, 2017                                                                                                              Accrual Basis

| | Permanently Restricted[1] | Temporarily Restricted[2] | Annuities | Unrestricted | TOTAL ONAMIA | Custodial |
|---|---|---|---|---|---|---|
| **LIABILITIES & EQUITY** | 11,460.00 | 61,152.60 | 1,455,199.52 | 10,507,213.78 | 12,035,025.90 | 8,057.41 |
| | | | | | | |
| Liabilities | | | | | | |
| Current Liabilities | | | | | | |
| Accounts Payable | | | | | | |
| 211100 · Regular Accounts Payable | - | - | - | 521.55 | 521.55 | 8,057.41 |
| 211110 · Accounts Payable-Prefiling | - | - | - | 3,196.68 | 3,196.68 | |
| 211900 · Other Payables | - | - | - | 83,200.50 | 83,200.50 | - |
| **Total Accounts Payable** | - | - | - | 86,918.73 | 86,918.73 | 8,057.41 |
| Other Current Liabilities | | | | | | |
| 2XXX05 · OTHER LIABILITIES | - | - | - | - | - | - |
| 219x00 - Accrued Employee Benefits - Prepetition | - | - | - | 43,616.32 | 43,616.32 | - |
| 219200 · Mass Stipends | - | - | - | - | - | - |
| 219600 · Due to Others | - | 2,836.00 | - | 15,775.51 | 18,611.51 | - |
| 219650 · Accrued-Credit Card Gifts | - | - | - | 11,216.01 | 11,216.01 | - |
| Total 2XXX05 · OTHER LIABILITIES | - | 2,836.00 | - | 70,607.84 | 73,443.84 | - |
| **Total Other Current Liabilities** | - | 2,836.00 | - | 70,607.84 | 73,443.84 | - |
| **Total Current Liabilities** | - | 2,836.00 | - | 157,526.57 | 160,362.57 | 8,057.41 |
| Long Term Liabilities | | | | | | |
| 2XXX10 · ANNUITY FUNDS | - | - | - | - | - | |
| 231100 · Annuities-Crosiers | - | - | 1,433,586.57 | - | 1,433,586.57 | - |
| 231200 · Annuities-PV Adjustmnt | - | - | (558,930.01) | - | (558,930.01) | |
| Total 2XXX10 · ANNUITY FUNDS | - | - | 874,656.56 | - | 874,656.56 | - |
| 2XXX50 · OTHER LT FUNDS & LIABILITIES | | | | | | |
| 261200 · Holy Cross Center | - | - | - | - | - | - |
| Total 2XXX50 · OTHER LT FUNDS & LIABILITIES | - | - | - | - | - | - |
| **Total Long Term Liabilities** | - | - | 874,656.56 | - | 874,656.56 | - |
| **Total Liabilities** | - | 2,836.00 | 874,656.56 | 157,526.57 | 1,035,019.13 | 8,057.41 |
| Equity | | | | | | |
| 2XXX90 · NET ASSETS | | | | | | |
| 291200 · Unrestricted-Undesignated | - | - | - | 9,270,104.74 | 9,270,104.74 | - |
| 292100 · Restricted-Temporarily | - | 27,907.33 | 580,542.96 | 364,347.50 | 972,797.79 | - |
| 294100 - Custodial | - | - | - | - | - | - |
| 293100 · Restricted-Permanently | 8,068.12 | - | - | - | 8,068.12 | - |
| Total 2XXX90 · NET ASSETS | 8,068.12 | 27,907.33 | 580,542.96 | 9,634,452.24 | 10,250,970.65 | - |
| Net Income | 3,391.88 | 30,409.27 | - | 715,234.97 | 749,036.12 | - |
| **Total Equity** | 11,460.00 | 58,316.60 | 580,542.96 | 10,349,687.21 | 11,000,006.77 | - |
| **TOTAL LIABILITIES & EQUITY** | 11,460.00 | 61,152.60 | 1,455,199.52 | 10,507,213.78 | 12,035,025.90 | 8,057.41 |

### Crosier Phoenix
# Balance Sheet by Class
### As of October, 2017

**Accrual Basis**

| | Temporarily Restricted[1] | Annuities | Unrestricted | TOTAL PHOENIX |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Checking/Savings** | | | | |
| **1XXX01 · CHECKING** | | | | |
| 111000 · Regular Checking-Unrestricted | - | - | 147,234.06 | 147,234.06 |
| 113000 · Restricted Funds Checking | 58,194.07 | - | - | 58,194.07 |
| **Total 1XXX01 · CHECKING** | 58,194.07 | - | 147,234.06 | 205,428.13 |
| 121000 · Petty Cash | - | - | 4,000.00 | 4,000.00 |
| **Total Checking/Savings** | 58,194.07 | - | 151,234.06 | 209,428.13 |
| **Accounts Receivable** | | | | |
| 141100 · Regular Receivables | - | - | 6,530.80 | 6,530.80 |
| **Total Accounts Receivable** | - | - | 6,530.80 | 6,530.80 |
| **Other Current Assets** | | | | |
| 149999 · Undeposited Funds | | | | |
| 151000 · General Prepaids | - | - | - | - |
| [2] 100025 - Due To/From Restricted/Unrestricted | (18,286.58) | - | 18,286.58 | - |
| **Total Other Current Assets** | (18,286.58) | - | 18,286.58 | - |
| **Total Current Assets** | 39,907.49 | - | 176,051.44 | 215,958.93 |
| **Other Assets** | | | | |
| **1XXX30 · INVESTMENTS** | | | | |
| **1XXX33 · INVESTMENT FIRM** | | | | |
| 161100 · General Investments-Unrestricted | - | - | - | - |
| 161700 · Annuity Funds | - | 193,317.65 | - | 193,317.65 |
| **Total 1XXX33 · INVESTMENT FIRM** | - | 193,317.65 | - | 193,317.65 |
| [3] **1XXX50 · PROPERTY** | | | | |
| **171200 · Buildings** | | | | |
| 171290 · Accum Depreciation-Buildings | - | - | (329,249.38) | (329,249.38) |
| 171200 · Buildings - Other | - | - | 441,078.34 | 441,078.34 |
| **Total 171200 · Buildings** | - | - | 111,828.96 | 111,828.96 |
| **171300 · Furniture/Fixtures/Equipment** | | | | |
| 171390 · Accum Depreciation-F/F/E | - | - | (13,048.31) | (13,048.31) |
| 171300 · Furniture/Fixtures/Equipment - Other | - | - | 18,623.19 | 18,623.19 |
| **Total 171300 · Furniture/Fixtures/Equipment** | - | - | 5,574.88 | 5,574.88 |
| **171600 · Vehicles** | | | | |
| 171690 · Accum Depreciation-Vehicles | - | - | (183,302.60) | (183,302.60) |
| 171600 · Vehicles - Other | - | - | 188,602.68 | 188,602.68 |
| **Total 171600 · Vehicles** | - | - | 5,300.08 | 5,300.08 |
| [3] **Total 1XXX50 · PROPERTY** | - | - | 122,703.92 | 122,703.92 |
| **Total Other Assets** | - | 193,317.65 | 122,703.92 | 316,021.57 |
| **TOTAL ASSETS** | 39,907.49 | 193,317.65 | 298,755.36 | 531,980.50 |
| **LIABILITIES & EQUITY** | | | | |

### Crosier Phoenix
## Balance Sheet by Class
### As of October, 2017

**Accrual Basis**

| | Temporarily Restricted[1] | Annuities | Unrestricted | TOTAL PHOENIX |
|---|---|---|---|---|
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| **Accounts Payable** | | | | |
| 211100 · Regular Accounts Payable | - | - | 10,315.04 | 10,315.04 |
| 211110 · Accounts Payable-Prefiling | - | - | 522.93 | 522.93 |
| 211900 · Other Payables | - | - | 47,476.00 | 47,476.00 |
| **Total Accounts Payable** | - | - | 58,313.97 | 58,313.97 |
| **2XXX05 · OTHER CURRENT LIABILITIES** | | | | |
| 219x00 - Accrued Employee Benefits | - | - | 15,146.16 | 15,146.16 |
| **Total 2XXX05 · OTHER CURRENT LIABILITIES** | - | - | 15,146.16 | 15,146.16 |
| **Total Current Liabilities** | - | - | 73,460.13 | 73,460.13 |
| **Long Term Liabilities** | | | | |
| **2XXX10 · ANNUITY FUNDS** | | | | |
| 231100 · Annuities-Crosiers | - | 193,317.65 | - | 193,317.65 |
| 231200 · Annuities-PV Adjustmnt | - | (111,119.90) | - | (111,119.90) |
| **Total 2XXX10 · ANNUITY FUNDS** | - | 82,197.75 | - | 82,197.75 |
| **2XXX20 · LOANS** | | | | |
| 241100 · Inter House Borrowing | - | - | - | - |
| **Total 2XXX20 · LOANS** | - | - | - | - |
| **Total Long Term Liabilities** | - | 82,197.75 | - | 82,197.75 |
| **Total Liabilities** | - | 82,197.75 | 73,460.13 | 155,657.88 |
| **Equity** | | | | |
| **Total 2XXX90 · NET ASSETS** | 1,837.02 | 111,119.90 | 305,048.24 | 418,005.16 |
| Net Income | 38,070.47 | - | (79,753.01) | (41,682.54) |
| **Total Equity** | 39,907.49 | 111,119.90 | 225,295.23 | 376,322.62 |
| **TOTAL LIABILITIES & EQUITY** | **39,907.49** | **193,317.65** | **298,755.36** | **531,980.50** |
| **UNBALANCED CLASSES** | - | - | - | - |

# EXHIBIT 2

## Crosier Debtors
## Unrestricted Cash Flow Projections & Plan Payments
### Plan Years 1 & 2

| | Onamia | Phoenix | Province | Combined - Yr 1 | Combined - Yr 2 |
|---|---|---|---|---|---|
| **Income** | | | | | |
| Investment income | 10,000 | 10,000 | - | 20,000 | 20,000 |
| Member Retirement Income | 468,530 | 296,792 | 66,578 | 831,900 | 831,900 |
| Miscellaneous Other Income | 94,390 | 21,500 | 35,000 | 150,890 | 150,890 |
| Rental Income-Auxiliary Services | 51,041 | - | - | 51,041 | 51,041 |
| Parish and Other Ministerial Outreach Income | 143,045 | 56,500 | - | 199,545 | 199,545 |
| Fund-Raising: | - | | - | - | - |
| Apostalate Income - Memberships and Other | 285,000 | 85,000 | - | 370,000 | 370,000 |
| Direct Mail Appeals | 679,433 | 5,000 | - | 684,433 | 684,433 |
| Planned Giving-Wills, Matured Annuities | 350,000 | 30,000 | 50,000 | 430,000 | 430,000 |
| General Donations | 1,000 | 75,900 | - | 76,900 | 81,900 |
| **Total Fund-Raising Income** | 1,315,433 | 195,900 | 50,000 | 1,561,333 | 1,566,333 |
| **Total Income** | 2,082,439 | 580,692 | 151,578 | 2,814,709 | 2,814,709 |
| **Expenses** | | | | | |
| Salaries | 207,674 | 94,605 | 90,149 | 392,428 | 392,428 |
| Benefits | 68,014 | 29,920 | 25,855 | 123,789 | 123,789 |
| Contract Labor | - | 3,000 | 48,000 | 51,000 | 51,000 |
| Office Supplies and Equipment | 12,150 | 16,650 | 25,600 | 54,400 | 54,400 |
| Repairs and Maintenance | 38,500 | 5,300 | 13,000 | 56,800 | 56,800 |
| Professional Services | 29,000 | - | 76,500 | 105,500 | 105,500 |
| Meetings, Education, Travel Costs | 2,500 | 2,350 | 45,500 | 50,350 | 50,350 |
| Other Administrative Costs | 63,855 | 55,180 | 51,441 | 170,476 | 170,476 |
| Utilities | 70,000 | 7,000 | 150 | 77,150 | 77,150 |
| Rooming and Other Living Costs | 64,697 | 208,258 | 47,836 | 320,791 | 320,791 |
| Property & Casualty Insurance | 52,650 | 15,000 | 8,600 | 76,250 | 76,250 |
| Health Insurance | 97,745 | 55,306 | 29,292 | 182,343 | 182,343 |
| International Office (Generalate) and Program Support | 82,850 | 34,656 | 58,664 | 176,170 | 176,170 |
| Fund-Raising Costs | 680,969 | 10,500 | 11,892 | 703,361 | 703,361 |
| Recruitment, Formation, Public Relations | 41,479 | 20,478 | 102,063 | 164,020 | 164,020 |
| Auxiliary Services-Holy Cross Center, other | 48,150 | - | - | 48,150 | 48,150 |
| Intercompany Overhead Allocation | 474,767 | 10,756 | (485,523) | - | - |
| **Total Expenses** | 2,035,000 | 568,959 | 149,019 | 2,752,978 | 2,752,978 |
| | | | | | |
| **Net Cash Income (Loss)** | 47,439 | 11,733 | 2,559 | 61,731 | 61,731 |
| | | | | | |
| **Beginning Cash and Investments-Unrestricted** | | | | 6,399,778 | 698,387 |
| | | | | | |
| **Ending Cash and Investments-Unrestricted-Before Plan Payments** | | | | 6,461,509 | 760,118 |
| | | | | | |
| **Cash Inflows and Related Outflows** | | | | | |
| Debtor | | | | | |
| Investments Liquidation | | | | - | - |
| Loan Proceeds | | | | - | - |
| Sale of Property | | | | - | - |
| Insurance Proceeds-Hartford Insurance-Transfer to Trust Account [1] | | | | 19,788,000 | - |
| Total Cash Inflows | | | | 19,788,000 | - |

**Crosier Debtors**

**Unrestricted Cash Flow Projections & Plan Payments**

**Plan Years 1 & 2**

| | Onamia | Phoenix | Province | Combined - Yr 1 | Combined - Yr 2 |
|---|---|---|---|---|---|
| **Plan Payments** | | | | | |
| Administrative Claims and Administrative Claims Reserve (Estimated) | | | | 1,500,000 | - |
| Priority Unsecured Claims | | | | | |
| Priority Tax Claims | | | | - | - |
| Class 1-Priority Employee Unsecured Claims | | | | - | - |
| Class 2-Prepetition Date Secured Tax Claims | | | | - | - |
| Class 3-Secured Claim of Robinsons | | | | 44,000 | 44,000 |
| Class 4-General Unsecured Convenience Claims | | | | 1,073 | - |
| Class 5-General Unsecured Claims | | | | 6,049 | 6,049 |
| Class 6-Other Tort and Employee Claims | | | | - | - |
| Class 7-Annuity Claims-Included in operating results | | | | - | - |
| Class 8/9- Class 8-Tort Claims to Trust Account / Class 9-Unknown Tort Claims [2] | | | | 24,000,000 | - |
| Class 10-Co-Defendant Claims - Disallowed | | | | - | - |
| Class 11-Insurance and Benefit Claims | | | | - | - |
| Class 12-Penalty Claims - Disallowed | | | | - | - |
| Class 13-Inter-Debtor Claims | | | | - | - |
| Total Plan Payments | | | | 25,551,122 | 50,049 |
| **Ending Cash-Unrestricted** | | | | 698,387 | 710,069 |

[1] Paid directly to Plan Trust Account

[2] Paid directly from Plan Trust Account.

**Crosier Debtors**

**Support for Plan - Unrestricted Cash & Admin Claim Amounts**

Beginning Cash & Investments-Unrestricted

| Debtor | Cash | Investments | Total | Adjustments | | TOTAL |
|---|---|---|---|---|---|---|
| | | As of 10/31/17 | | | | |
| Onamia | 100,806 | 5,490,358 | 5,591,164 | 90,000 | (1) | 5,681,164 |
| Phoenix | 209,428 | | 209,428 | | | 209,428 |
| Province | 254,152 | 25,034 | 279,186 | 230,000 | (2) | 509,186 |
| Total | 564,386 | 5,515,392 | 6,079,778 | 320,000 | | 6,399,778 |

Administrative Claims

| Firm | Onamia | Phoenix | Province | Total | |
|---|---|---|---|---|---|
| Attorneys & Other Professionals | | Retained & Billed Thru October 2017 | | | |
| Quarles & Brady | | | 250,709 | 250,709 | (1) |
| Committee Counsel fees | | | 68,000 | 68,000 | |
| Larkin Hoffman | | | 25,000 | 25,000 | (1) |
| UpShot Services-Noticing agent | | | 44,275 | 44,275 | (1) |
| Larson King | | | 4,527 | 4,527 | |
| Gaskins Bennett Birrell Schupp-Insurance | | | 17,271 | 17,271 | |
| KLK | 83,201 | 47,476 | 84,678 | 215,355 | |
| Total | 83,201 | 47,476 | 494,460 | 625,136 | (3) |

(1) Estimated market value increase for Honeywell stock held. Onamia has not adjusted this value in 2017 through 11/13/17.

(2) Retainers paid in May, added back to cash & investments balance to allow the full administrative cost claim amount to be reflected with Plan payments.

(3) Estimated Adminstrative Claims from November through Confirmation are expected to be less than $1,500,000.