# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| CROSIER FATHERS AND BROTHERS PROVINCE, INC., a Minnesota non-profit corporation, | Case No. 17-41681 |
| Debtor. | |

---

| | |
|---|---|
| In re: | Case No. 17-41682 |
| CROSIER FATHERS OF ONAMIA, a Minnesota non-profit corporation, | |
| Debtor. | |

---

| | |
|---|---|
| In re: | Case No. 17-41683 |
| THE CROSIER COMMUNITY OF PHOENIX, an Arizona non-profit corporation, | |
| Debtor. | |

---

## JOINT PLAN OF REORGANIZATION AS MODIFIED ON MARCH 22, 2018

---

## INTRODUCTION

This Joint Plan of Reorganization is submitted by the Crosier Fathers and Brothers Province, Inc., a Minnesota non-profit corporation (the "**Province**"), the Crosier Fathers of Onamia, a Minnesota non-profit corporation ("**Onamia**"), and The Crosier Community of Phoenix ("**Phoenix**"), an Arizona non-profit corporation, the debtors and debtors-in-possession in the Reorganization Cases (defined below) which are sometimes referred to herein collectively as the "**Debtors**."

ALL CREDITORS ARE ENCOURAGED TO CONSULT THE DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. AMONG OTHER INFORMATION, THE DISCLOSURE STATEMENT CONTAINS DISCUSSIONS OF THE DEBTORS, THE HISTORICAL BACKGROUND OF THE REORGANIZATION CASES AND THE PREPETITION PERIOD, THE PROJECTIONS AND SETTLEMENTS GERMANE TO THE PLAN AND THE PROJECTED POST-CONFIRMATION OPERATIONS OF THE REORGANIZED DEBTORS, AND A SUMMARY AND ANALYSIS OF THE PLAN. NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND

- 1 -

RELATED MATERIALS TRANSMITTED THEREWITH HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT OR BY THE BANKRUPTCY CODE FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.

## ARTICLE 1

## RULES OF INTERPRETATION

1.1     The rules of construction in Bankruptcy Code § 102 apply to the Plan to the extent not inconsistent with any other provision in this Article 1.  All definitions in the Bankruptcy Code and below will be subject to the rules of construction set forth in Bankruptcy Code § 102.  A term that is used in the Plan and that is not defined in the Plan has the meaning attributed to that term in the Disclosure Statement, the Confirmation Order, the Trust Agreement, the Bankruptcy Code or the Bankruptcy Rules.  In addition, the use of the words "includes" or "including" is not limiting, and means "including but not limited to" and "including without limitation," "and/or" means either or both, and the words "related to" or "relating to" mean with regard to, by reason of, based on, arising out of, or in any way connected with.

1.2     In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any act under the Plan is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

1.3     The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement or the Trust Agreement.  In the event of any conflict between a definition of a term or provision in a Plan Document and the Plan, the definition or provision in the Plan will control unless otherwise provided in the Plan or a Plan Document.

1.4     Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.  In addition, the singular and plural uses of such defined terms and the conjunctive and disjunctive uses thereof will be fungible and interchangeable (unless the context otherwise requires); and the defined terms will include masculine, feminine, and neuter genders.

1.5     Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  Any specific references to promissory notes, deeds of trust or other debt instruments or security documents include any amendments, modifications and extensions thereto, and any reference to an existing document means the document as it has been, or may be, amended or supplemented.

1.6     Unless otherwise indicated, the phrases "pursuant to the Plan," "under the Plan" and the words "herein," "hereunder" and "hereto" and similar words or phrases refer to the Plan

in its entirety rather than to only a particular portion of the Plan. Unless otherwise specified, all references to Articles, Sections, clauses or exhibits (whether capitalized or lower case) are references to the Plan's Articles, Sections, clauses or exhibits. In addition, Section or Article captions and headings are used only as convenient references and do not affect or limit the Plan's meaning or provisions.

1.7     Nothing contained in the Plan, including any exhibits or attachments thereto, constitutes an admission or denial by any party of liability for, or the allowance, validity, priority, amount, or extent of any Claim, lien, or security interest asserted against the Debtors or against any third party.

## ARTICLE 2

## DEFINITIONS

2.1     Scope of Definitions. For purposes of the Plan, and except as expressly provided otherwise herein or unless the context otherwise requires, all of the defined terms stated in Article 2 will have the meanings hereinafter stated. The defined terms stated in Article 2 are also substantive terms of the Plan, and Article 2 will be deemed incorporated throughout the rest of the Plan to convey the substantive provisions included in the defined terms. Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to the Plan, as the same may be amended, waived, or modified from time to time.

2.2     "Abuse" means any (a) act of sexual conduct, misconduct, abuse, or molestation; any other sexually related act, contact, or interaction; indecent assault and/or battery; rape; lascivious behavior; undue familiarity; pedophilia; or ephebophilia; (b) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (c) assault; battery; corporal punishment; or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation; or (d) fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, or any other tort relating to the acts and/or omissions listed in subparts (a)-(c) of this sentence. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the Person.

2.3     "Abuse Claims Reviewer" means Roger L. Kramer, including any designee of Roger L. Kramer, who will assess Tort Claims and any Unknown Tort Claims in accordance with the Plan and the Allocation Protocols.

2.4     "Administrative Claim" means (a) every cost or expense of administration of the Reorganization Cases which is allowable pursuant to Bankruptcy Code § 503, including any actual and necessary post-petition expenses of preserving the Estates; (b) any actual and necessary post-petition expenses of operating the Debtors; (c) all Professional Charges approved by the Bankruptcy Court pursuant to interim and final allowances in accordance with Bankruptcy Code §§ 330, 331, 503(b) and the terms of the Plan; (d) every Property Tax Administrative

- 3 -

Claim; and (e) all fees and charges assessed against the Estates under Chapter 123 of Title 28, United States Code.

2.5  "Administrative Claim Deadline" means the date that will be established by the Court in the Disclosure Statement Order as the date (except as to Administrative Claims for Professional Charges) by which an Administrative Claim (except an Administrative Claim for Professional Charges) must be evidenced by the filing of a Proof of Claim with the Bankruptcy Court.

2.6  "Administrative Claims Reserve" means the portion of the Debtors' Plan funding that shall be held back by the Debtors at the time the Debtors transfer their portion of the Plan funding into the Trust Account as required by Sections 19.1(a), 19.3, and 25.1(h) of the Plan. The amount of the Administrative Claims Reserve shall equal the estimated amount of all unpaid Administrative Claims that are predicted to become Allowed on and after the Effective Date, which amount shall be fixed by stipulation of the Committee and the Debtors; or, if the Committee and the Debtors cannot agree, by the Bankruptcy Court.

2.7  "Allocation Protocols" means, collectively, the Tort Claims Allocation Protocol and the Unknown Tort Claims Allocation Protocol that provide for distribution of funds to Tort Claimants and Unknown Tort Claimants, respectively, pursuant to the terms of the Plan and the Allocation Protocols, copies of which are attached hereto as **Exhibits <u>A</u>** and **<u>B</u>**, respectively, and incorporated herein as part of the Plan for all purposes.

2.8  "Allowed" means (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or Contingent and for which no contrary Proof of Claim has been filed, (ii) any timely filed Proof of Claim as to which no objection to allowance has been interposed in accordance with Section 19.9 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (iii) any Claim expressly allowed by a Final Order or hereunder.

2.9  "Annuitant" means the person named by the donor of the charitable gift to receive the Annuity payments.

2.10  "Annuity" means the charitable gift made to one or more of the Debtors by various individual donors in exchange for an agreement with the applicable Debtor to receive certain fixed payments during their lives, or the life of another person, which payments were fixed at the date of the gift based on actuarial tables of the donor's life expectancy and uniform gift annuity rates.

2.11  "Annuity Agreement" means the agreement between the relevant Debtor and the donor evidencing the Annuity and providing for payment of the Annuity to the Annuitant.

2.12  "Assets" means each and every item of property and Interest of the Debtors therein, as of the Effective Date, that is property of one or more of the Estates under Bankruptcy Code § 541, whether tangible or intangible, legal or equitable, liquidated or unliquidated, and includes without limitation:  (a) all Cash; (b) all Retained Claims; (c) any and all amounts owed

to the Debtors, including accounts receivable and contract rights, whether due prior or subsequent to the Petition Date; (d) any other right, Claim, cause of action, or defense, whether arising by statute or common law, and whether arising under the laws of the United States, other countries, or applicable state or local law, including, but not limited to, all insurance Claims; (e) all of the Debtors' books, records, and privileges; (f) all contracts, agreements, appraisals, permits, licenses, and leases; and (g) any other property of the Debtors whether the Debtors hold a legal or equitable interest or both.

2.13   "Avoidance Actions" means all actions pursuant to Bankruptcy Code §§ 544, 547, 548, 549 and 550 and any other actions provided for under applicable bankruptcy or state law, that allow a debtor, a trustee or a debtor-in-possession to, among other things, avoid certain transfers.

2.14   "Award" means the amount payable to a Tort Claimant or an Unknown Tort Claimant as determined in accordance with the terms of the Plan, the Confirmation Order and the applicable Allocation Protocol.

2.15   "Ballot" means each of the ballots for each Class of Claims entitled to vote on the Plan sent to all creditors entitled to vote on the Plan, on which such creditors will indicate their vote on their applicable ballot to accept or reject the Plan and which have been approved by the Bankruptcy Court.

2.16   "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., including any amendments thereto, which are in effect during the Reorganization Cases.

2.17   "Bankruptcy Court" or "Court" each means the United States Bankruptcy Court for the District of Minnesota, or such other court of competent jurisdiction which properly exercises jurisdiction over part or all of the Reorganization Cases, to the extent that the reference of part or all of the Reorganization Cases is withdrawn.

2.18   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under Title 28 of the United States Code, § 2075, including any amendments thereto, and the local rules and general orders of the Bankruptcy Court, as applicable to Chapter 11 cases, together with all amendments and modifications thereto.

2.19   "Business Day" means any day except Saturday, Sunday, federal holidays, or a "legal holiday," as that term is defined in Bankruptcy Rule 9006(a).

2.20   "Canon Law" means and refers to the 1983 Code of Canon Law applicable to the Roman Catholic Church, the Constitutions and General Statutes of the Order, and the Provincial Statutes specific to the PSO.

2.21   "Cash" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

2.22   "Channeled Claim" means any Tort Claim, Unknown Tort Claim, Extra-Contractual Claim, and/or Claim against any of the Crosier Fathers Parties or the Hartford Parties and, with respect to any Claim that is not a Tort Claim, to the extent such Claim against

- 5 -

an Entity insured by Hartford arises under a Hartford Non-Excluded Policy.  Each Claim described in this definition shall include all such Claims whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including without limitation all Claims by way of direct action, subrogation, allocation of fault, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy, provided, however, that "Channeled Claim" does not include any Tort Claim, Unknown Tort Claim, Extra-Contractual Claim and/or Claim against a Hartford Party to the extent that such Claim relates to coverage for a Person other than a Crosier Fathers Party under a policy that Hartford issued that (i) is not a Hartford Policy or (ii) was not issued to a Crosier Fathers Party.  For avoidance of doubt, a Hartford Policy is issued to a Crosier Fathers Party where a Crosier Fathers Party is identified as the insured on the declarations page or is otherwise identified as a named insured in that Hartford Policy.

2.23   "Channeling Injunction" means the injunction to be issued pursuant to Section 26.5 of the Plan.

2.24   "Chapter 11 Professionals" means the Debtors' Professionals, the Committee's Professionals and the Unknown Claims Representative, collectively.

2.25   "Claim" means any past, present or future claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or Contingent, which has been or may be asserted by or on behalf of any Entity (including without limitation a Direct Action Claim), whether seeking damages (including compensatory, punitive, or exemplary damages) including Tort Claims or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights causes of action or orders, and any Claim within the definition of Bankruptcy Code § 101(5).

2.26   "Claim Objection Deadline" means the date by which any objections to Non-Tort Claims must be filed.  Unless an earlier time is fixed by order of the Bankruptcy Court, the Claim Objection Deadline will be on or before the first Business Day which is one hundred eighty (180) days after the Effective Date.

2.27   "Claim Payment Date" means the date which is ten (10) Business Days after a Non-Tort Claim becomes an Allowed Claim by a Final Order if such Claim is not an Allowed Claim on the Effective Date.  Payment of Tort Claims and Unknown Tort Claims shall be governed by the terms of the Allocation Protocols and the Trust Agreement.

2.28   "Class" means each of the classifications of Claims described in Article 5 of the Plan.

2.29   "Class 8 Ballot" means the Ballot that the holders of Class 8 Tort Claims will use to accept or reject the Plan and includes the releases and certifications required pursuant to the Plan, the Confirmation Order, and the Trust.

2.30    "Closing" means the date the payments and transfers to the Trust of those Assets required to be paid and transferred in accordance with Section 19.1 of the Plan are paid and transferred.

2.31    "Co-Defendant" means an Entity that is (i) named as a defendant in a lawsuit in which one or more of the Debtors is also named as a defendant, (ii) initiated a third-party claim against one or more of the Debtors in a lawsuit, (iii) initiated a cross-claim against one or more of the Debtors in a lawsuit, and/or (iv) alleged to be fully or partially responsible for a Tort Claim, including an Unknown Tort Claim asserted, or which may be asserted in the future, against such Entity, including co-debtors as described in Bankruptcy Code § 509.

2.32    "Committee" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Reorganization Cases.

2.33    "Committee's Professionals" means the law firm of Stinson Leonard Street LLP.

2.34    "Conditional Payment" means any payment made to a Tort Claimant under the MMSEA, including any payment by a MAO under the MSPA.

2.35    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the Court's dockets.

2.36    "Confirmation Hearing" means the hearing held by the Bankruptcy Court regarding confirmation of the Plan in the Reorganization Cases, as such may be continued from time to time.

2.37    "Confirmation Order" means the Final Order confirming the Plan that is acceptable in form to the Debtors, Hartford, and the Committee.

2.38    "Contingent" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

2.39    "Contribution Claim" means any Claim by any Insurer against any other Insurer or any of the Hartford Parties seeking contribution, equitable contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, "other insurance" clauses rights, or pursuant to any other theory under law or in equity relating to the defense or payment by such paying Insurer of all or any part of any Claim (a) asserted against the Crosier Fathers Parties; (b) relating to the Hartford Policies; or (c) channeled to or paid, in whole or in part, by the Trust.

2.40    "Crosier" means an individual member of the PSO.

2.41    "Crosier Fathers" means, collectively, the religious entity, Canons Regular of the Order of the Holy Cross of St. Odilia, its civil counterparts, the Province, Phoenix and Onamia, each as now constituted or may previously have been constituted, and their respective Estates.

2.42    "Crosier Fathers Parties" means, collectively, Crosier Fathers and: (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired

- 7 -

companies, affiliates, related companies and entities of Crosier Fathers; (ii) any and all named insureds, insureds, and additional insureds under the Hartford Policies; (iii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions and acquired companies, affiliates, related companies and entities; (iv) each of the foregoing Persons' respective predecessors, successors and assigns; and (v) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iv), in their capacity as such.  Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Crosier Fathers or subject to its control.  An individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Crosier Fathers Party with respect to that Tort Claim.

2.43   "Debtors" means, collectively, Onamia, Phoenix, and the Province.

2.44   "Debtors' Professionals" means:

2.44.1  The law firm of Quarles & Brady LLP;

2.44.2  The law firm of Larkin Hoffman Daly & Lindgren LTD;

2.44.3  The law firm of Gaskins Bennett Birrell Schupp LLP;

2.44.4  The law firm of Larson King LLP;

2.44.5  The accounting and financial consulting firm of Keegan, Linscott & Kenon, P.C.;

2.44.6  The legal administrative firm of JND Corporation Restructuring; and

2.44.7  Any and all other professionals which the Debtors retained or may retain to assist in the conduct of the Reorganization Cases or to provide professional services for a specified purpose, all in accordance with Bankruptcy Code §§ 327(a) and 327(e).

2.45   "Diocese" means a territory established by the Holy See under the trust of the duly appointed bishop and for purposes of the Plan, the civil entity which conducts the civil business of a diocese.  This definition of "Diocese" also includes the civil entity which conducts the civil business of an Archdiocese.

2.46   "Direct Action Claim" means any Claim by any Entity against Hartford identical or similar to, or relating to, any Tort Claim, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurance company.

2.47   "Disallowed Claim" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as Contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed or

deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

2.48   "Disclosure Statement" means the joint Disclosure Statement relating to the Plan submitted by the Debtors in the Reorganization Cases, as it may be amended from time to time and approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.

2.49   "Disclosure Statement Order" means that certain order entered by the Bankruptcy Court in the Reorganization Cases approving the Disclosure Statement.

2.50   "Disputed Claim" means every Claim, or portion thereof, which is subject to any defense, setoff, counterclaim, recoupment, or other adverse Claim of any kind of the Debtors or the Reorganized Debtors, or to which an objection (formal or informal) has been made and which has not yet become an Allowed Claim pursuant to a Final Order.  All Disputed Non-Tort Claims may be estimated by the Debtors or the Reorganized Debtors, as the case may be, at an amount equal to (a) such lesser amount that is agreed to by the holder of such Non-Tort Claim, (b) the amount claimed if the Court has not made an estimation of such Non-Tort Claim or the holder of such Non-Tort Claim has not agreed to a lesser amount, or (c) the amount, if any, determined by the Court by Final Order pursuant to Bankruptcy Code § 502(c), as an estimate for distribution purposes.  In any event, the Estimated Amount will be the maximum amount of the Non-Tort Claim for distribution purposes under the Plan.  All Tort Claims and Unknown Tort Claims may be estimated by stipulation of the Debtors and the Committee, solely for voting purposes under the Plan.

2.51   "Disputed Claims Reserve" means the reserve to be established by the Reorganized Debtors on the Effective Date, if necessary (and, thereafter, to be maintained as necessary) to hold in one or more segregated accounts, Cash or other Assets equal to the aggregate amounts that would have been distributed on an applicable Claim Payment Date on account of a Disputed Claim other than a Tort Claim or Unknown Tort Claim.  If the Disputed Claims (other than Tort Claims and Unknown Tort Claims) are less than $50,000, the Reorganized Debtors need not establish the Disputed Claims Reserve.  If the Disputed Claims Reserve is required to be established under the Plan, the Disputed Claims Reserve may be adjusted from time to time after the Effective Date by the Reorganized Debtors, after taking into account the anticipated recovery fraction which has been or is anticipated to be paid to the holders of Allowed Claims, after giving effect to the amount of the Disputed Claims as determined pursuant to Section 2.50 above.  The Disputed Claims Reserve will not apply to the Trust, Tort Claims or Unknown Tort Claims, each of which will be governed by the terms of the Trust Agreement and the Allocation Protocols.

2.52   "Effective Date" means the fifteenth day following the Confirmation Date on which (i) all conditions to effectiveness specified in Section 25.1 of the Plan have been satisfied or waived, and (ii) the Confirmation Order is a Final Order.

2.53   "Entity" means an individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated

association, joint venture, trust, estate, executor, legal representative, or any other organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "person" within the definition of Bankruptcy Code § 101(41), any other "entity" within the definition of Bankruptcy Code § 101(15) and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of the foregoing.

2.54    "Estates" means, collectively, the bankruptcy estates of each of the Debtors created under Bankruptcy Code § 541.

2.55    "Estimated Amount" means the maximum amount at which the Court or the district court, pursuant to Bankruptcy Code § 502(c), at the request of either of the Debtors, or any other party with standing, estimates any Claim or Class of Claims against the Debtors that is Contingent, unliquidated or disputed for the purpose of:  (a) allowance (for estimation purposes only); (b) distribution; (c) confirming the Plan pursuant to Bankruptcy Code § 1129; (d) voting to accept or reject the Plan pursuant to Bankruptcy Code § 1126 and Bankruptcy Rule 3018(a); or (e) any other proper purpose.

2.56    "Exculpated Parties" means the Committee and each of its members; the Debtors, the Crosier Fathers Parties, Hartford, the Hartford Parties, the Debtors' Professionals, the Committee's Professionals, the Unknown Claims Representative, and all of the respective present or former members, managers, officers, directors, employees, Representatives, attorneys, and agents acting in such capacity with respect to the Debtors' Professionals, the Committee, the Committee's Professionals and the Unknown Claims Representative.

2.57    "Executory Contract" means every unexpired lease and other contract which is subject to being assumed or rejected by the Debtors under Bankruptcy Code § 365, pursuant to unequitable interest as trustee.

2.58    "Extra-Contractual Claim" means any Claim against any of the Hartford Parties based, in whole or in part, on allegations that any of the Hartford Parties acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; failure to act in good faith; violation of any express or implied duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of any of the Hartford Parties of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance.  Extra-Contractual Claims include:  (i) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Hartford Parties' handling of any Claim or any request for insurance coverage, including any request for coverage for any Claim, including any Tort Claim; (ii) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Hartford Policies or any contractual duties arising therefrom, including any contractual duty to defend any of the Crosier Fathers Parties against any Claim, including any Tort Claims; and (iii) the conduct of the Hartford Parties with respect to the Reorganization Cases and/or the negotiation of the Hartford Agreement; provided that "Extra-Contractual Claim" does not include any Claim against a Hartford Party to the extent that such Claim relates to coverage for a Person other than a Crosier Fathers Party under a policy that Hartford issued that (i) is not a Hartford Policy or (ii)

- 10 -

was not issued to a Crosier Fathers Party. For avoidance of doubt, a Hartford Policy is issued to a Crosier Fathers Party where a Crosier Fathers Party is identified as the insured on the declarations page or is otherwise identified as a named insured in that Hartford Policy.

2.59    "Final Order" means any judgment or order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing will then be pending, or as to which any right to appeal, petition for certiorari, re-argue or rehear will have been waived in writing, in form and substance satisfactory to the Debtors, or, on and after the Effective Date, in form and substance satisfactory to the Reorganized Debtors and as to the Trust, the Trustee, or in the event that an appeal, writ of certiorari, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction will have been determined by the highest court to which such order was appealed, or certiorari, re-argument or rehearing will have been denied, and the time to take any further appeal, petition for certiorari or move for re-argument or rehearing will have expired, or (ii) the Debtors and Hartford (and the Committee if the Plan has been accepted by the Tort Claimants) have all mutually agreed in writing that the order from which such appeal or review has been taken should be deemed to be a Final Order.

2.60    "General Unsecured Claim" means every Unsecured Claim against any of the Debtors (including, but not limited to, every such Claim arising from the rejection of an Executory Contract and every Claim which is the undersecured portion of any Secured Claim), but which is not an Administrative Claim, a Priority Unsecured Claim, a Priority Tax Claim, a General Unsecured Convenience Claim, an Other Tort and Employee Claim, an Annuity Claim, a Tort Claim, an Unknown Tort Claim, an Insurance and Benefit Claim, a Penalty Claim, or an Intercompany Claim, and which is classified and treated as the Plan provides for Class 5 Claims. This Class includes Claims related to bodily injuries or personal injuries that are not Tort Claims.

2.61    "General Unsecured Convenience Claim" means a General Unsecured Claim in an amount of $500.00 or less, inclusive of interest accrued thereon, after the Petition Date through the later to occur on the Effective Date or the Claim Payment Date; provided that, if the holder of an Unsecured Claim in an amount greater than $500.00 makes an election to reduce such Claim to $500.00, such Claim will be treated as a General Unsecured Convenience Claim for all purposes. Such election will be made on the Ballot, completed and returned within the time fixed by order of the Court. Making this election will be deemed to be a waiver by such electing holder of any right to participate in Class 5, as to any and all Claims held by such holder.

2.62    "General Unsecured Convenience Claim Payment" means the lesser of $500.00 or the amount of the Allowed General Unsecured Claim if the amount of the Allowed General Unsecured Claim is less than $500.00.

2.63    "Hartford" means, collectively, Hartford Accident and Indemnity Company, Hartford Casualty and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company, Hartford Underwriters Insurance Company, and Twin City Fire Insurance Company.

- 11 -

2.64    "Hartford Agreement" means the Settlement Agreement, Release, And Policy Buyback Agreement between Hartford and the Debtors, a copy of which is attached hereto as **Exhibit C**.

2.65    "Hartford Non-Excluded Policies" means any and all Hartford Policies that do not contain exclusions for liability arising from, relating to or in connection with Abuse by a Crosier Fathers Party whether known or unknown, including the Hartford Policies identified in the Hartford Agreement.

2.66    "Hartford Parties" means Hartford; each of Hartford's past, present and future parents, subsidiaries, affiliates, and divisions; each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies; each of the foregoing Persons' respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, Representatives, and claims handling administrators; and each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them.

2.67    "Hartford Policies" means any and all policies of insurance that were issued by any Hartford Party to Crosier Fathers, whether known or unknown, under which Crosier Fathers are an insured, named insured or additional insured or under which Crosier Fathers otherwise contends it is entitled to coverage or benefits.

2.68    "Holy Cross Agreement" means that certain Executory Contract under which Onamia and Holy Cross Parish own and operate the Holy Cross Center.

2.69    "Holy Cross Center" means those certain improvements consisting of, among other things, a chapel and parish hall located on real property owned by Onamia, such improvements being owned and operated 75% by Onamia and 25% by Holy Cross Parish under the Holy Cross Agreement.

2.70    "Holy Cross Parish" means the civil counterpart of the Holy Cross Parish located within the geographic territory of the Diocese of St. Cloud, the party to the Holy Cross Agreement with the Debtors.

2.71    "Insurance and Benefit Claim" means any Unsecured Claim arising from or related to obligations, contributions or benefits of the Debtors pursuant to any pension or other benefit plan sponsored by any of the Debtors or for which any of the Debtors is otherwise obligated.

2.72    "Insurance Coverage" means insurance that is available under any Insurance Policy, whether known or unknown to the Debtors, which provides insurance for any portion of a Tort Claim or Unknown Tort Claim asserted against the Debtors; provided, however, that Insurance Coverage excludes any agreement or contract providing reinsurance to Hartford.

2.73    "Insurance Policy" means a policy for Insurance Coverage issued to any Debtor by an Insurer other than Hartford or any of the Hartford Parties.

- 12 -

2.74    "Insurer" means (a) any Entity that during any period of time either (i) provided Insurance Coverage to any Debtor, its predecessors, successors, or assigns, or (ii) issued an Insurance Policy to any Debtor, its predecessors, successors, or assigns; and (b) any Entity owing a duty to defend and/or indemnify any Debtor under any Insurance Policy but excluding Hartford and the Hartford Parties.

2.75    "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

2.76    "Intercompany Claims" means any Claims by or against one of the Debtors by one of the other Debtors.

2.77    "MAO" means Medicare Advantage Organizations under parts C & D of the MMSEA.

2.78    "Medicare Claims" means Claims for benefits paid, received or accrued to a Tort Claimant or Unknown Tort Claimant pursuant to the MMSEA or the MSPA.

2.79    "Medicare Eligible" means a Tort Claimant or Unknown Tort Claimant who has received, applied for, or is eligible to receive MMSEA and MSPA benefits, and is asserting a Tort Claim or Unknown Tort Claim against the Debtors.

2.80    "MMSEA" means the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-117).

2.81    "MSPA" means the Medicare Secondary Payer Act codified at 42 U.S.C. § 1395y, and the regulations promulgated thereunder, found at 42 C.F.R. § 411.1 et seq.

2.82    "Non-Settling Insurer" means any Insurer that is not Hartford, if any.

2.83    "Non-Tort Claims" means all Claims other than Tort Claims and Unknown Tort Claims.

2.84    "Old Southern Building" means 720 E. Old Southern Avenue, Phoenix, Arizona 85042.

2.85    "Onamia" means, unless the context requires otherwise, Crosier Fathers of Onamia, a Minnesota non-profit corporation, the Debtor in the Onamia Reorganization Case and a co-proponent of the Plan.

2.86    "Onamia Assisted Living" means Onamia Area Assisted Living, a Minnesota non-profit corporation which operates the elder care center (including assisted living and hospital facilities) known as Lake Song.

2.87    "Other Tort and Employee Claims" means any and all Claims, demands, suits, causes of action, proceedings or any other rights or asserted rights to payment heretofore, now or hereafter asserted against the Debtors, whether or not reduced to judgment, for property damage,

- 13 -

liability or workers compensation for which one or more of the Debtors is or may be liable (directly or indirectly), whether arising from tort, contract or workers compensation for which there is Insurance Coverage, including but not limited to, any Claim for which any Debtor has a self-insured retention, but excluding Tort Claims, Unknown Tort Claims and any Claims of employees entitled to priority pursuant to Bankruptcy Code § 507.

2.88    "Parish" means a particular church established within the territory of a Diocese and, for the purposes of the Plan, the civil entity that conducts the civil business of a parish.

2.89    "Penalty Claims" means any Claims for any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including, but not limited to, any such Claims not meant to compensate the claimant for actual pecuniary loss.

2.90    "Person" has the meaning set forth in Bankruptcy Code § 101(41).

2.91    "Petition Date" means June 1, 2017, which is the filing date of the voluntary Chapter 11 petitions commencing the Reorganization Cases.

2.92    "Phoenix" means, unless the context requires otherwise, The Crosier Community of Phoenix, an Arizona non-profit corporation, the Debtor in the Phoenix Reorganization Case and a co-proponent of the Plan.

2.93    "Plan" means this "Joint Plan of Reorganization" filed by the Debtors with respect to each respective Debtor's Reorganization Case and every restatement, amendment, or modification thereof, if any, filed by the Debtors.

2.94    "Plan Documents" means all agreements, documents and exhibits, as the same may be amended, modified, supplemented, or restated from time to time, that are incorporated into the Plan and/or are necessary or appropriate to implement the Plan and the Trust, including the Trust Documents and the Hartford Agreement.

2.95    "Plan Proponents" means the Debtors and the Committee.

2.96    "Post-Effective Date Secured Tax Claims" means every whole or prorated portion of a Secured Tax Claim which arises on or after the Effective Date, and which will be paid in the ordinary course of business of the Reorganized Debtors.

2.97    "Prepetition Date Secured Tax Claims" means every whole or prorated portion of a Secured Tax Claim which arises before and up to the Petition Date, and which will be classified and paid under the Plan, as the Plan provides for Class 2 Claims.

2.98    "Priority Employee Unsecured Claim" means every Unsecured Claim of an employee of any of the Debtors for vacation or sick leave pay, which is otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(4)(A).

2.99    "Priority Tax Claim" means every Unsecured Claim or portion thereof, which is entitled to priority pursuant to Bankruptcy Code § 507(a)(8).

QB\155907.00003\50740176.2

2.100    "Priority Unsecured Claim" means every Unsecured Claim or portion thereof, which is not an Administrative Claim, a Priority Tax Claim or a Priority Employee Unsecured Claim and which is entitled to priority under any applicable provision of Bankruptcy Code § 507.

2.101    "Professional Charges" means the Allowed interim and final professional fees and expenses charged by the Debtors' Professionals, the Committee's Professionals, and the Unknown Claims Representative.

2.102    "Proof of Claim" means the form used by a creditor on which the specifics of a Claim are set forth as required by the Bankruptcy Code, the Bankruptcy Rules and the Proof of Claim Deadline Order, and which is filed in accordance with the procedures contained in the Proof of Claim Deadline Order.

2.103    "Proof of Claim Deadline" means the date established by the Court in the Proof of Claim Deadline Order as the last day to timely file a Proof of Claim, but excludes the Administrative Claim Deadline.

2.104    "Proof of Claim Deadline Order" means the "Order (I) Altering Time for Filing Proofs of Claim; (II) Approving Claim Forms; (III) Approving Manner and Form of Notice; and (IV) Approving Confidentiality Procedures," entered by the Bankruptcy Court in the Reorganization Cases [Province Dkt. No. 77, Onamia Dkt. No. 70, and Phoenix Dkt. No. 67].

2.105    "Property Tax Administrative Claim" means every Claim of any state or local governmental unit which is an Administrative Claim for unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes, and every prorated portion thereof arising on and after the Petition Date until the Effective Date.    Allowed Property Tax Administrative Claims will be classified and paid as Administrative Claims.

2.106    "Property Tax Claims" means collectively:    (a) every Property Tax Administrative Claim; (b) every Prepetition Date Secured Tax Claim; and (c) every Post-Effective Date Secured Tax Claim.

2.107    "Protected Party" means the Debtors, the Crosier Fathers Parties, Hartford and the Hartford Parties.

2.108    "Province" means the Crosier Fathers and Brothers Province, Inc., a Minnesota non-profit corporation, the Debtor in the Province Reorganization Case and a co-proponent of the Plan.

2.109    "PSO" means the Canons Regular of the Holy Cross of the Province of St. Odilia, which is a religious entity and the American division of the Roman Catholic religious order known as the Canons Regular of the Holy Cross.

2.110    "Related Insurance Claim" means (i) any Claim by any Person against Hartford that, directly or indirectly, arises from, relates to, or is in connection with a Tort Claim, including any such Claim for defense, indemnity, contribution, subrogation, or similar relief or any direct action; and (ii) any Extra-Contractual Claim that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, including any such Claim that, directly or indirectly,

arises out of, relates to or is in connection with any of the Hartford Parties' handling of any Tort Claim provided, however, that "Related Insurance Claim" does not include any Claim against Hartford to the extent that such Claim relates to coverage for a Person other than a Crosier Fathers Party under a policy that Hartford issued that is not a Hartford Policy.

2.111   "Reorganization Cases" mean, collectively, Chapter 11 Case No. 17-41681 with respect to the Province; Chapter 11 Case No. 17-41682 with respect to Onamia; and Chapter 11 Case No. 17-41683 with respect to Phoenix.

2.112   "Reorganized Debtors" means Onamia, Phoenix, and the Province, from and after the Effective Date.   Unless otherwise expressly stated or the context otherwise requires, references to "the Debtors and the Reorganized Debtors" and references to "the Debtors or the Reorganized Debtors" throughout various provisions of the Plan, are an effort to anticipate whether an event may occur before or after the Effective Date.   In this regard, and generally for purposes of the Plan, any written agreement made by the Debtors as part of the Plan before the Effective Date (unless provided otherwise), will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtors and every other party to such agreement (including, but not limited to, the provisions of the Plan as confirmed).

2.113   "Representatives" means the current and former prior provincials, provincials, priests, brothers, friars, clerics, members, parents, affiliates, subsidiaries, indirect parents, principals, shareholders, managers, claims managers, officers, directors, employees, attorneys, or agents acting in such capacity as well as the predecessors, successors, assignors and assigns of each of the foregoing of an Entity, but excluding (i) an individual having personally committed an act or acts giving rise to a Tort Claim against such Entity; or (ii) a Co-Defendant.

2.114   "Retained Claims" means the Debtors' Claims, including, but not limited to, all Avoidance Actions, that are not otherwise settled pursuant to the Plan or agreements approved by the Bankruptcy Court on or prior to the Effective Date, any rights or Claims of the Debtors for indemnification, contribution, or fault allocation, and other Claims of the Debtors against any Entity on account of any Claims which are or may be asserted against the Debtors.   Retained Claims do not include any Claims transferred or assigned to the Trust and expressly exclude any Claims against any Entity released by the Debtors under the Plan.

2.115   "Revested Assets" means all Assets and/or property, real or personal, owned by the Debtors which are not transferred to the Trust, including the non-profit membership Interest in Onamia Assisted Living.

2.116   "Robinson" means Cindy Robinson and Michael Robinson, the lenders and sellers under the Robinson Loan Documents.

2.117   "Robinson Loan Documents" means, collectively, (a) the Robinson Promissory Note and (b) the Deed of Trust dated March 3, 2017, executed by the Province as Trustor in favor of the Robinsons as Beneficiaries, and recorded in the Official Records of the Maricopa County Recorder at document number 20170159192 on March 6, 2017.

2.118  "Robinson Promissory Note" means the Promissory Note dated March 3, 2017, in the principal amount of eighty-eight thousand ($88,000.00) dollars, executed by the Province in favor of the Robinsons.

2.119  "RRE" means an entity with responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any, pursuant to the MSPA and Section 111 (42 U.S.C.A. § 1395y(b)(8)) of the MMSEA.

2.120  "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs of each of the Debtors filed pursuant to Bankruptcy Code § 521, the Official Bankruptcy Forms and the Bankruptcy Rules, and the amendments thereto, including any additional supplements or amendments thereto through the Confirmation Date.

2.121  "Secured Claim" means every Claim or portion thereof, which is asserted by the creditor holding such Claim to be secured by a lien, security interest, or assignment, encumbering property in which the Debtors have an Interest and including any right to setoff asserted by a creditor that is treated as a Secured Claim under the Bankruptcy Code, but only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment, and the value of the Interest of the creditor holding such Claim against such property of the Debtors.

2.122  "Secured Tax Claim" means every Claim of any federal, state, or local governmental unit, which is asserted by such governmental unit holding such Claim, which is secured by property of the Estates by operation of applicable non-bankruptcy laws, including, but not limited to, every such Claim for unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes of the Debtors, and further including, but not limited to, both the Prepetition Date Secured Tax Claims and the Post-Effective Date Secured Tax Claims, but only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment, and the value of the Interest of the governmental unit holding such Claim against the Debtors.  Any Claims for unpaid personal property taxes or unpaid sales taxes or leasing taxes pertaining to the Holy Cross Parish's interest in the Holy Cross Center will be paid by Holy Cross Center and are not treated under the Plan.

2.123  "Supplemental Insurance Injunction" means a provision entered pursuant to Sections 105(a) and 363 of the Bankruptcy Code enjoining all Persons holding, or who in the future may hold, Claims or Interests against any of the Hartford Parties to the extent such Claims or Interests arise directly or indirectly from or in connection with any Hartford Non-Excluded Policy, any Tort Claim, any Related Insurance Claim or any claim discharged in the Reorganization Cases from taking any action, directly or indirectly, to assert or enforce such Claims or Interests against any Crosier Fathers Party or any Hartford Party.

2.124  "Tort Claim" means any and all Claims for damages, including Penalty Claims, for attorneys' fees and other expenses, fees or costs for any equitable remedy asserted against the Debtors, any of the Crosier Fathers Parties, Hartford, the Hartford Parties, the Trustee, or the Trust, related to bodily injuries or personal injuries, including emotional distress, mental distress, mental anguish, shock or humiliation caused by or related to:  (a) acts of Abuse committed by any cleric, employee, volunteer or other Entity associated with the Debtors, the Crosier Fathers

- 17 -

Parties, PSO, or any affiliated Entity; (b) the failure to properly hire, install and/or supervise any cleric, any volunteer, or any other employee of, or Entity associated with, the Debtors, the Crosier Fathers Parties, the PSO or any affiliated Entity; (c) the processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any Abuse or other Claim asserted by a Tort Claimant related to the Debtors, the Crosier Fathers Parties or the PSO; or (d) the failure to warn, disclose or provide information concerning the Abuse or other misconduct of clergy, other employees or volunteers or Entities associated with the Debtors, the Crosier Fathers Parties, the PSO, or such affiliated Entities.  Subject to the limitations contained in the Plan and except for purposes of classification under the Plan, Tort Claims include Unknown Tort Claims when they are asserted by Unknown Tort Claimants.

2.125  "Tort Claimant" means any Person who holds or asserts a Tort Claim but excludes an Unknown Tort Claimant.

2.126  "Tort Claims Allocation Protocol" means the allocation protocol with respect to Class 8 Tort Claims in the form attached hereto as Exhibit A and incorporated herein.

2.127  "Trust" means the trust to be established pursuant to the Plan and the Trust Agreement.

2.128  "Trust Account" means the bank account that will be established by the Trustee into which the Cash designated under the Plan to be transferred to the Trust will be transferred by Hartford and the Debtors, in accordance with the provisions of the Plan, the Hartford Agreement, and the Trust Agreement.

2.129  "Trust Agreement" means the agreement attached hereto as **Exhibit D**.

2.130  "Trust Assets" means all property funded to the Trust pursuant to the Plan, the Confirmation Order, the Trust Documents, and the Plan Documents.

2.131  "Trust Documents" means the Trust Agreement and other instruments and documents that are reasonably necessary or desirable in order to implement the provisions of the Plan that relate to the creation, administration, and funding of the Trust, in a form that is acceptable to the Debtors and the Reorganized Debtors.

2.132  "Trustee" means the trustee of the Trust and any successor trustee appointed pursuant to the terms of the Plan and the Trust Agreement.  The initial Trustee will be chosen by the Committee.

2.133  "Unknown Claims Representative" means the Hon. (Ret.) Michael R. Hogan, the person appointed by the Bankruptcy Court to act as the Unknown Claims Representative who is appointed to represent the Interests of the Unknown Tort Claimants.

2.134  "Unknown Claims Reserve" means the reserve to be established by the Trustee in an amount to be determined in consultation with the Unknown Claims Representative and the Plan Proponents, and approved by the Bankruptcy Court after notice and an opportunity for parties with standing to be heard, which shall be used for the sole purpose of, and as the sole

- 18 -

source of, funding distributions to holders of Unknown Tort Claims who are entitled to an Award pursuant to the Unknown Tort Claims Allocation Protocol and the Plan. In the event the Unknown Claims Representative and the Plan Proponents (or either of them) are unable to agree on the amount of the Unknown Claims Reserve, one or more of them may seek a determination of the Bankruptcy Court upon notice and the opportunity of each to be heard.

2.135 "Unknown Tort Claim" means any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Proof of Claim Deadline by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Proof of Claim Deadline if the Person asserting the Tort Claim:

> (i)     Has a Tort Claim that was barred by the applicable statute of limitations as of the Proof of Claim Deadline but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such previously time-barred Tort Claims; or

> (ii)    Attains the age of eighteen (18) on or after the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases; or

> (iii)   As to which the applicable tort claim statute of limitations, for any reason, has not expired or has been tolled as of the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases, as determined under applicable law, but without regard to federal bankruptcy law; and

> (iv)    Submits a Proof of Claim in accordance with the procedures set forth in the Plan or the Confirmation Order.

2.136 "Unknown Tort Claimant" means the holder of an Unknown Tort Claim.

2.137 "Unknown Tort Claims Allocation Protocol" means the allocation protocol with respect to Class 9 Unknown Tort Claims in the form attached hereto as Exhibit B and incorporated herein.

2.138 "Unresolved" means, with respect to a Claim, a Claim that has neither been Allowed or disallowed nor liquidated.

2.139 "Unsecured Claim" means every Claim, or portion thereof, which is not a Secured Claim, regardless of the priority of such Claim.

## ARTICLE 3

## PLAN OBJECTIVES

3.1   <u>Objectives</u>.   The Plan provides the means for settling and paying all Claims asserted against the Debtors. The Plan also provides for Hartford to participate pursuant to the

Hartford Agreement, settle its insurance coverage disputes with the Debtors and contribute funds that will be used, in part, for the benefit of Tort Claimants. The Plan provides for the creation of a Trust for the exclusive benefit of Tort Claimants and Unknown Tort Claimants. The Trust Assets will consist of Cash contributions from the Debtors and Hartford and will be used to fund the Trust's costs and expenses and payments to Tort Claimants. The Unknown Claims Reserve held by the Trustee will provide funds for payment of Unknown Tort Claims when and if any such Unknown Tort Claims receive Awards. Distributions from the Trust to Tort Claimants and reserves will be determined by application of the Tort Claims Allocation Protocol. Distributions from the Trust to the Unknown Tort Claimants and reserves will be determined by application of the Unknown Tort Claims Allocation Protocol. General Unsecured Creditors will be paid the Allowed amount of their Claims over a period of time as more specifically set forth in Article 10 of the Plan. The Plan also addresses any claims for contribution, indemnification, allocation or otherwise of any Diocese, Parish or Co-Defendant. The Plan also provides for restructuring of the Secured Claims against the Debtors. The Debtors will receive the benefit of a Bankruptcy Code § 1141(d) discharge as set forth in the Plan and the Confirmation Order. In consideration of their respective contributions towards funding the Plan and the Trust, the Hartford Parties will receive the benefit of injunctions and releases provided under the Plan.

## ARTICLE 4

## UNCLASSIFIED CLAIMS

4.1     Administrative Claims (other than Professional Charges).     The holder of an Allowed Administrative Claim will receive, in full satisfaction of such Claim: (a) a single Cash payment in the Allowed amount of the Claim on the Effective Date (or the applicable Claim Payment Date); (b) payment as otherwise agreed in writing by the holder of the Allowed Claim; or, (c) payment as ordered by the Bankruptcy Court. Every Allowed Administrative Claim for an expense of operation of the Debtors incurred in the ordinary course of such operations will be paid fully and in Cash in the ordinary course of business (including any payment terms applicable to any such expense). Allowed Administrative Claims other than Professional Charges, if any, remaining unpaid as of the Effective Date will be paid from the Administrative Claims Reserve, and, to the extent there are insufficient funds in the Administrative Claims Reserve, other Assets.

4.2     Professional Charges.     Chapter 11 Professionals shall file final fee applications on or before forty-five (45) days after the Effective Date for approval of Professional Charges. The Reorganized Debtors shall pay all Professional Charges within ten (10) Business Days of entry of a Final Order approving such Professional Charges unless otherwise extended between the Chapter 11 Professional and the Reorganized Debtors. Allowed Professional Charges will be paid from the Administrative Claims Reserve, and, to the extent there are insufficient funds in the Administrative Claims Reserve, other Assets.

4.3     Priority Unsecured Claims.     The holder of every Allowed Priority Unsecured Claim will be paid, in full satisfaction of such Claim: (a) a single Cash payment in the Allowed amount of the Claim on the Effective Date (or the applicable Claim Payment Date); (b) as otherwise agreed in writing by the holder of the Allowed Claim; or (c) as ordered by the Bankruptcy Court.

4.4     Priority Tax Claims.  The holder of every Allowed Priority Tax Claim will be paid, in full satisfaction of such Claim pursuant to the provisions of Bankruptcy Code § 1129(a)(9)(C):  (a) in deferred Cash payments over a period of five (5) years from the Petition Date, to be paid in equal quarterly installments of principal and interest; (b) the first payment to be made on the first Business Day after the day which is ninety (90) days after the later of the Effective Date or the Claim Payment Date; and (c) each payment thereafter to be paid on the first Business Day of each succeeding quarter until paid in full; provided, however, that the entire unpaid amount of the Allowed Priority Tax Claim, together with any interest accrued thereon, will be paid in full on the date which is five (5) years after the Petition Date; or (d) as otherwise agreed in writing by the holder of the Allowed Claim or ordered by the Bankruptcy Court.

4.5     Elimination of Claim.  To the extent there are no amounts owing on the Effective Date for any Priority Unsecured Claims and/or any Priority Tax Claims, such treatment as set forth above will be deemed automatically eliminated from the Plan.

## ARTICLE 5

## CLASSIFICATION OF CLAIMS

5.1     Classification.  All Claims are classified under the Plan as hereafter stated in this Article; provided, however, that a Claim will be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class.  As of the Confirmation Hearing, any Class that does not contain any Claims will be deemed deleted automatically from the Plan, and any Class that does not contain an Allowed Claim (or a Claim temporarily or provisionally Allowed by the Bankruptcy Court for voting purposes) will be deemed automatically deleted from the Plan solely with respect to voting on confirmation of the Plan.

5.2     Classes.  For purposes of the Plan, Claims against the Debtors are hereby classified in the following Classes in accordance with Bankruptcy Code § 1122(a):

Class 1 – Priority Employee Unsecured Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept)

Class 2 – Prepetition Date Secured Tax Claims (Impaired; Entitled to Vote)

Class 3 – Secured Claim of Cindy and Michael Robinson (Impaired; Entitled to Vote)

Class 4 – General Unsecured Convenience Claims (Impaired; Entitled to Vote)

Class 5 – General Unsecured Claims (Impaired; Entitled to Vote)

Class 6 – Other Tort and Employee Claims (Impaired; Entitled to Vote)

Class 7 – Annuity Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept)

Class 8 – Tort Claims (Impaired; Entitled to Vote)

QB\155907.00003\50740176.2

Class 9 – Unknown Tort Claims (Impaired; Entitled to Vote)

Class 10 – Co-Defendant, Diocese and Parish Claims (Impaired; Not Entitled to Vote—Deemed to Reject)

Class 11 – Insurance and Benefit Claims (Impaired; Entitled to Vote)

Class 12 – Penalty Claims (Impaired; Not Entitled to Vote—Deemed to Reject)

Class 13 – Intercompany Claims (Impaired; Entitled to Vote)

## ARTICLE 6

### TREATMENT OF CLASS 1 CLAIMS
### (PRIORITY EMPLOYEE UNSECURED CLAIMS)

6.1    <u>Distribution</u>.  No holder of an Allowed Priority Employee Unsecured Claim will receive any Cash on account of such Claim.  All Allowed Priority Employee Unsecured Claims will be satisfied, in full, without interest, in accordance with the policies and procedures regarding vacation and sick leave pay in effect at each Debtor at the time such Priority Employee Unsecured Claim becomes matured and liquidated; provided, however, that each Debtor reserves the right to review its policies and procedures regarding vacation and sick leave pay and to propose modifications to those policies and procedures to become a part of the Plan prior to the Confirmation Date or after the Effective Date.  To the extent the Debtors (or any of them) propose any changes to such policies and procedures that become part of the Plan and would be retroactive, the Debtors will modify the Plan to include such changes and give notice to the holders of any Priority Employee Unsecured Claims at least ten (10) days before the Confirmation Hearing.  In that event, the holders of the Priority Employee Unsecured Claims will be impaired and the Plan will be modified to so state.

## ARTICLE 7

### TREATMENT OF CLASS 2 CLAIMS
### (PREPETITION DATE SECURED TAX CLAIMS)

7.1    <u>Distribution</u>.  All Class 2 Claims, as and when they are Allowed Claims, will be treated as fully Secured Claims and will be paid fully and in Cash as follows:

(a)    In order to compute the Prepetition Date Secured Tax Claims, which are the Class 2 Claims, a property tax claims pro-ration will be conducted as of the Effective Date, if necessary.  The Prepetition Date Secured Tax Claims, which are Allowed Claims, will bear interest from and after the Effective Date until they are paid in full, at the rate of two percent (2%) per annum or such other rate as ordered by the Bankruptcy Court.

(b)    The Allowed Class 2 Claims, including interest thereon from and after the Effective Date, will be paid in three (3) equal installments.  The first (1st) installment will be paid on the first Business Day which is ninety (90) days after

QB\155907.00003\50740176.2

the Effective Date or the Claim Payment Date.  The second (2nd) installment will be paid on the first Business Day after the first (1st) anniversary of the Effective Date or the applicable Claim Payment Date.  The third (3rd) and last installment will be paid on the first Business Day after the second (2nd) anniversary of the Effective Date or the applicable Claim Payment Date.

(c)      No penalties will be paid on any of the Allowed Class 2 Claims.

7.2      <u>Disputed Claims</u>.  Notwithstanding the pendency of any appeal to any state or local taxing authorities of a determination of property taxes or assessments on the Petition Date, nothing contained herein will prohibit the Debtors from exercising their rights pursuant to Bankruptcy Code § 505 and having the Class 2 Claim(s) determined by the Bankruptcy Court to the extent that any Class 2 Claims are Disputed Claims.

7.3      <u>Retention of Liens</u>.  Each creditor holding an Allowed Class 2 Claim will retain its lien(s) on its collateral to the extent of its Allowed Class 2 Secured Claim.

7.4      <u>Other Claims</u>.  The Reorganized Debtors will pay the Post-Effective Date Secured Tax Claims in the ordinary course of its business operations after the Effective Date.  All Property Tax Administrative Claims will be paid as Administrative Claims pursuant to Section 4.1 of the Plan.

## ARTICLE 8

### TREATMENT OF CLASS 3 CLAIMS
### (SECURED CLAIM OF ROBINSONS)

8.1      <u>Distribution</u>.  Allowed Class 3 Claims will be paid fully and in Cash as follows:

(a)      The Robinson Promissory Note will be amended to allow the Province, at its sole election, to extend the payment date of one or both of the payments due pursuant to the terms of the Robinson Promissory Note as follows:

(i)      The Province shall give written notice to the Robinsons no later than sixty (60) days prior to the payment date of the intent of the Province to extend the applicable payment date;

(ii)      The payment date may be extended for no more than sixty (60) days after the applicable payment date set forth in the Robinson Promissory Note; and

(iii)      The extension notice shall be accompanied by an extension fee equal to one percent (1%) of the payment amount.

8.2      <u>Interest</u>.  Pursuant to the prepetition terms of the Robinson Promissory Note, no interest will be payable and, so long as payments are made timely in accordance with the Plan, no default interest shall accrue or be Allowed.

8.3     <u>Further Modification of Robinson Loan Documents</u>.  Notwithstanding anything in the Robinson Loan Documents to the contrary, the Robinson Loan Documents will be further modified to allow the Province, as a Reorganized Debtor, to grant additional liens secured by the real property so long as such liens are junior and subordinate to the Class 3 Claim.  All other terms of the Robinson Loan Documents not expressly modified by the Plan will remain in full force and effect.

8.4     <u>Retention of Liens</u>.  The holders of an Allowed Class 3 Claim will retain their lien(s) on their existing collateral to the extent of the Class 3 Claim until it is fully paid in accordance with the Plan.

## ARTICLE 9

### TREATMENT OF CLASS 4 CLAIMS
### (GENERAL UNSECURED CONVENIENCE CLAIMS)

9.1     <u>Distribution</u>.  All Class 4 Claims that are in an amount less than $500, inclusive of interest, will be paid in full.  All Class 4 Claims that resulted from the election of a holder of a General Unsecured Claim to be paid as a General Unsecured Convenience Claim will receive $500 total, without interest.  Holders of Class 4 Claims, as and when such Class 4 Claim is or becomes an Allowed Claim, will be paid on the first Business Day which is six (6) months after the later of Effective Date or the Claim Payment Date.

9.2     <u>Interest and Penalties</u>.  No interest or penalties will be payable on any Class 4 Claims.

## ARTICLE 10

### TREATMENT OF CLASS 5 CLAIMS
### (GENERAL UNSECURED CLAIMS)

10.1     <u>Distribution</u>.  Each holder of a Class 5 General Unsecured Claim, as and when such General Unsecured Claim is or becomes an Allowed Claim, will be paid the principal amount of its Claim in Cash in two (2) installments with the first installment to be paid on the first Business Day which is six (6) months after the later of the Effective Date or the Claim Payment Date, and the next installment on the first Business Day that is twelve (12) months after the previous payment.

10.2     <u>Interest and Penalties</u>.  No interest or penalties will be payable on any Class 5 Claims.

QB\155907.00003\50740176.2

## ARTICLE 11

### TREATMENT OF CLASS 6 CLAIMS
### (OTHER TORT AND EMPLOYEE CLAIMS)

11.1    <u>Distribution</u>.  Each holder of a Class 6 Other Tort and Employee Claim, as and when such Claim becomes an Allowed Claim, will be paid solely from any Insurance Coverage applicable to such Other Tort and Employee Claim.  To the extent that such Claims may not be satisfied in full by the foregoing, then such Other Tort and Employee Claims, to the extent not so satisfied, will receive no distribution under the Plan.

11.2    <u>Interest and Penalties</u>.  No interest or penalties will be payable on any Class 6 Claims.

## ARTICLE 12

### TREATMENT OF CLASS 7 CLAIMS
### (ANNUITY CLAIMS)

12.1    <u>Unimpairment</u>.  The legal, equitable, and contractual rights of each holder of an Allowed Class 7 Claim will be reinstated in full on the Effective Date if any such legal, equitable or contractual rights have been altered prior to the Effective Date.

12.2    <u>Distribution</u>.  In full satisfaction of each Allowed Class 7 Claim, the Reorganized Debtor who is the party to the Annuity Agreement will continue to pay the Annuity payments in accordance with the terms of the applicable Annuity Agreement.

## ARTICLE 13

### TREATMENT OF CLASS 8 CLAIMS
### (TORT CLAIMS)

13.1    <u>Establishment of Trust</u>.  On the Effective Date, the Trust shall assume all liability for all Class 8 Claims.  The Trust shall pay Class 8 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Tort Claims Allocation Protocol, and Trust Documents.

13.2    <u>Treatment</u>.  Tort Claimants shall have their Class 8 Claims treated pursuant to the Tort Claims Allocation Protocol attached as Exhibit A and incorporated herein, including review of such Tort Claims by the Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol.

13.3    <u>Rights Against Co-Defendants</u>.  Nothing in the Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant or other joint tortfeasor who is not otherwise a Protected Party, but solely with respect to any direct liability of such Co-Defendant or joint tortfeasor.  Under no circumstances will the reservation of such Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party impair the releases, discharge or injunctions with respect to any Protected Party and the Reorganized Debtors, against whom all such rights and/or Claims shall be and are hereby

- 25 -

released and enjoined as provided in Sections 26.5-26.9 of the Plan. Tort Claimants expressly reserve their rights against any Co-Defendant including any joint tortfeasor who is not otherwise a Protected Party, who remain severally liable on any Class 8 Claims.

  13.4 <u>Waiver</u>. The right of any Tort Claimant to a trial by jury or otherwise against the Reorganized Debtors and any of the Protected Parties is waived and released upon the occurrence of the Effective Date, and the Tort Claim of a Tort Claimant will be solely determined by the Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.

  13.5 <u>Release and Certification</u>. No Tort Claimant shall receive any payment on any Award unless and until such Tort Claimant has executed a written release of any and all past, present, and future Claims against all of the Protected Parties, the Reorganized Debtors, and all of Hartford's reinsurers or retrocessionaires; and made the certifications set forth in the Class 8 Ballot. The release and certifications included in the Class 8 Ballot for voting on the Plan are sufficient for this purpose. A Tort Claimant who does not timely submit a Ballot must personally execute the release and certifications required by this Section. Notwithstanding the foregoing, nothing in this Article requires any Tort Claimant to release any Claims against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party, and such Claims are reserved, except as expressly provided in this Article. The eventual release of these Class 8 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). Any Person or Entity that is or was alleged to be a joint tortfeasor with the Debtors or the Crosier Fathers Parties in connection with any Tort Claim or Unknown Tort Claim shall not be liable for the Debtors' or Crosier Fathers Parties' share of liability or fault for such Claim. The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

  13.6 <u>Denial of Payment</u>. If a Tort Claim is denied payment pursuant to the Tort Claims Allocation Protocol, the holder of such Tort Claim will nevertheless have no rights against the Protected Parties, the Trust, the Trustee, or the Reorganized Debtors arising out of, relating to, or in connection with such Tort Claim and such Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunctions as provided in the Plan.

  13.7 <u>Tort Claimants' Fees and Costs</u>. None of the Protected Parties or the Reorganized Debtors will have any liability for any fees and expenses of attorneys representing any of the Tort Claimants.

  13.8 <u>No Penalty Claims</u>. Except for any payment that may be provided from the Trust as part of the Tort Claims Allocation Protocol, Penalty Claims relating to Tort Claims will receive no distribution and will be Disallowed Claims.

  13.9 <u>Withdrawal of Tort Claim</u>. If a Tort Claim is withdrawn, it may not be reasserted against the Protected Parties or the Reorganized Debtors, including as an Unknown Tort Claim. Such Tort Claim shall be discharged and subject to the Channeling Injunctions as provided in the Plan. Any other procedures and implications relating to withdrawal of a Tort Claim are set forth in the Tort Claims Allocation Protocol.

- 26 -

## ARTICLE 14

## TREATMENT OF CLASS 9 CLAIMS
## (UNKNOWN TORT CLAIMS)

14.1     <u>Establishment of Unknown Claims Reserve</u>.  On the Effective Date, the Trust shall establish the Unknown Claims Reserve, assume all liability for and pay all Unknown Tort Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, the Unknown Tort Claims Allocation Protocol, and Trust Documents.

14.2     <u>Treatment</u>.  Unknown Tort Claimants shall have their Class 9 Claims treated pursuant to the Unknown Tort Claims Allocation Protocol attached hereto as Exhibit B and incorporated herein, including review of such Claims by the Abuse Claims Reviewer in accordance with the Unknown Tort Claims Allocation Protocol.

14.3     <u>Rights Against Co-Defendants</u>.  Nothing in the Plan is intended to affect, diminish or impair any Unknown Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party, but solely with respect to any direct liability of such Co-Defendant or joint tortfeasor.  Under no circumstances will the reservation of such Unknown Tort Claimant's rights against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party impair the releases, discharge or injunctions with respect to any Protected Party and the Reorganized Debtors against whom all such rights and/or Claims shall be and are hereby released and enjoined as provided in Sections 26.5-26.9 of the Plan.  Unknown Tort Claimants expressly reserve their rights against any Co-Defendant including any joint tortfeasor who is not otherwise a Protected Party, who remain severally liable on any Class 9 Claims.

14.4     <u>Waiver</u>.  The right of any Unknown Tort Claimant to a trial by jury or otherwise against the Reorganized Debtors and any of the Protected Parties is waived and released upon the occurrence of the Effective Date, and the Class 9 Claim of an Unknown Tort Claimant will be solely determined in accordance with the Unknown Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.

14.5     <u>Release and Certification</u>.  No Unknown Tort Claimant shall receive any payment from the Trust unless and until the Unknown Tort Claimant has personally executed a written release of any and all past, present, and future Claims against all of the Protected Parties, the Reorganized Debtors, and all of Hartford's reinsurers or retrocessionaires; and made the same certifications set forth in the Class 8 Ballot.  The release and certifications included in the Class 8 Ballot for voting on the Plan are sufficient for this purpose.  Notwithstanding the foregoing, nothing in this Article requires any Unknown Tort Claimant to release any Claims against any Co-Defendant or joint tortfeasor who is not otherwise a Protected Party except as expressly provided in this Article.  The eventual release of these Class 9 Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).  Any Person or Entity that is or was alleged to be a joint tortfeasor with the Debtors or the Crosier Fathers Parties in connection with any Tort Claim or Unknown Tort Claim shall not be liable for the Debtors' or Crosier Fathers Parties' share of liability or fault for such Claim.  The Trust shall be obligated to provide copies of the Unknown Tort Claimants' releases and certifications to any of the Protected Parties upon request.

QB\155907.00003\50740176.2

14.6    <u>Limitation on Unknown Claims Reserve</u>.  In the event all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Claims Allocation Protocol are less than the amount of the Unknown Claims Reserve, in the aggregate, the Unknown Claims Allocation Protocol shall govern the distribution of any funds remaining in the Unknown Claims Reserve.  If all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Claims Allocation Protocol are greater than the amount of the Unknown Claims Reserve, no further payment or compensation will be paid to the Trust or to the Unknown Tort Claimants by the Debtors, the Reorganized Debtors, or any other Protected Parties.

14.7    <u>Disallowed Unknown Tort Claims</u>.  If a Class 9 Claim is disallowed or denied payment pursuant to the Unknown Tort Claims Allocation Protocol, the holder of such Unknown Tort Claim will have no further rights against the Protected Parties, the Reorganized Debtors, the Trust, or the Trustee arising out of, relating to, or in connection with such Unknown Tort Claim and such Unknown Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunction as provided in the Plan.

14.8    <u>Unknown Tort Claimants' Fees and Costs</u>.  None of the Protected Parties or the Reorganized Debtors will have any liability for any fees and expenses of attorneys representing any of the Unknown Tort Claimants.

14.9    <u>No Penalty Claims</u>.  Except for any payment that may be provided from the Trust as part of the Unknown Tort Claims Allocation Protocol, Penalty Claims relating to Unknown Tort Claims will receive no distribution and will be Disallowed Claims.

14.10    <u>Disallowed Unknown Tort Claims</u>.  If an Unknown Tort Claim is withdrawn, it may not be reasserted against the Protected Parties or the Reorganized Debtors.  Such Unknown Tort Claim shall be discharged and subject to the Channeling Injunctions as provided in the Plan. Any other procedures and implications relating to withdrawal of an Unknown Tort Claim are set forth in the Unknown Tort Claims Allocation Protocol.

## ARTICLE 15

### TREATMENT OF CLASS 10 CLAIMS
### (CO-DEFENDANT, DIOCESE AND PARISH CLAIMS)

15.1    <u>Distribution</u>.  All Class 10 Claims will be Disallowed Claims and there will be no distribution to the holders of any Class 10 Claims.

## ARTICLE 16

### TREATMENT OF CLASS 11 CLAIMS
### (INSURANCE AND BENEFIT CLAIMS)

16.1    <u>Distribution</u>.  The Class 11 Claims will be treated and satisfied by the Reorganized Debtors in accordance with the past practices and policies of the Debtors.

16.2    <u>Interest</u>.  Unless otherwise provided or required pursuant to the past practices and policies of the Debtors, no interest will accrue or be paid on any Insurance and Benefit Claims.

- 28 -

## ARTICLE 17

## TREATMENT OF CLASS 12 CLAIMS
## (PENALTY CLAIMS)

17.1    <u>Distribution</u>.  No Penalty Claims will be Allowed.  All Penalty Claims will be Disallowed Claims, and there will be no distribution to the holders of any Penalty Claims.

## ARTICLE 18

## TREATMENT OF CLASS 13 CLAIMS
## (INTERCOMPANY CLAIMS)

18.1    <u>Distribution</u>.  No payments shall be made on account of the Class 13 Claims until the Trust has been funded in accordance with the Plan and Confirmation Order and until all Claims in Classes 1, 2, 3, 4, 5, and 6 are paid in accordance with the Plan and Confirmation Order.

18.2    <u>Interest</u>.  No interest will be paid or accrued on any Intercompany Claims.

## ARTICLE 19

## MEANS OF IMPLEMENTATION OF THE PLAN

19.1    <u>Establishment of Trust Account and Funding</u>.  After the Confirmation Date, the Trustee will establish the Trust Account, which will be held and administered in accordance with the Plan, the Hartford Agreement, and the Confirmation Order.  The Trust Account will include the following:

        (a)    <u>Debtors' Funding</u>.  The Debtors will transfer $5,712,000, **less** the amount of the Administrative Claims Reserve, to the Trust Account.

        (b)    <u>Hartford Funding</u>.  Pursuant and subject to the Hartford Agreement, Hartford will transfer $19,788,000 to the Trust Account.

19.2    <u>Establishment of Disputed Claims Reserve</u>.  To the extent required, the Debtors shall establish and fund the Disputed Claims Reserve as of the Effective Date.

19.3    <u>Establishment of Administrative Claims Reserve</u>.  The Debtors shall establish the Administrative Claims Reserve, which may be held in any of the Debtors' existing bank accounts or a new account, in the Debtors' sole discretion, and which will be treated as restricted funds.

19.4    <u>Payment and Treatment of Claims Other Than Tort Claims and Unknown Tort Claims</u>.  Payments due to creditors on account of Allowed Non-Tort Claims will be paid pursuant to the terms of the Plan from the Reorganized Debtors' Revested Assets and ongoing operations.

19.5    Retained Claims.  On or before the Effective Date, all Retained Claims will be assigned by the Debtors to the Reorganized Debtors.  Each Reorganized Debtor may pursue any Retained Claims at the discretion of such Reorganized Debtor and will retain the proceeds of all such Retained Claims pursued, if any.

19.6    Approval of Section 363 Sales.  On or before the Effective Date, the Court shall have approved, with a Final Order, the sale under Bankruptcy Code § 363, free and clear of all liens, Claims, encumbrances, and Interests, of (i) any Hartford Policies to be purchased by Hartford pursuant to the requirements of the Hartford Agreement, and (ii) any other Interests in any Hartford Policies to be purchased pursuant to the requirements of the Hartford Agreement, and the Court shall have granted Hartford the protections available under Bankruptcy Code § 363(m).  The entry of the Confirmation Order may constitute the Final Order approving the Bankruptcy Code § 363 sale and granting of Bankruptcy Code § 363(m) protections.

19.7    Approval of Settlement Agreements.  Pursuant to Bankruptcy Code § 105 and in consideration for the classification, distributions and other benefits provided under the Plan, including, inter alia, (i) the commitment by the Debtors to fund the Debtors' obligations under the Plan and (ii) the Hartford Agreement, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims against the Debtors.  On or before the Effective Date, the Bankruptcy Court shall have approved, by Final Order, such global compromise and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Crosier Fathers Parties, the Estates, the Tort Claimants, the Unknown Tort Claimants, holders of other Claims, Hartford, the Hartford Parties and other parties in interest, and are fair, equitable and within the range of reasonableness.  The entry of the Confirmation Order may constitute the Final Order approving the compromises and settlements.

19.8    Debtors' Waiver and Release of Claims Against Hartford.  As required in the Hartford Agreement, upon satisfaction of the conditions contained in the Hartford Agreement, upon the occurrence of the Effective Date and payment by Hartford of the amount required to be paid by Hartford pursuant to the Hartford Agreement, the Debtors hereby fully, finally, and completely remise, release, acquit, and forever discharge the Hartford Parties and any of their reinsurers or retrocessionaires, solely in their capacity as such:  (i) from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims, the Unknown Tort Claims, or the Hartford Non-Excluded Policies, including any Channeled Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Cases; and (ii) from any and all past, present, and future Claims, including Claims arising out of or relating in any way to the Hartford Policies, for which Crosier Fathers receives a discharge pursuant to Sections 524 and 1141 of the Bankruptcy Code or under the terms of any confirmed Plan or any Order of the Bankruptcy Court, including the Confirmation Order.

19.9    Procedure for Determination of Non-Tort Claims.  The following procedures will be used solely for purposes of allowance and disallowance of Non-Tort Claims:

(a)     Objections to Claims.  Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date, all objections to Claims must be filed by the Claim Objection Deadline, provided, however, that nothing contained in the Plan will affect the right of the Debtors to seek estimation of any Non-Tort Claims on any grounds permitted by the Bankruptcy Code at any time.

(b)     Disputed Claims.  No payments or other distributions will be made to the holders of Disputed Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.  If a Disputed Claim is not an Allowed Claim by the Effective Date, or when payment is otherwise due under the Plan, payment on the Allowed Claim (plus interest, if any is provided for in the Plan) will commence on the Claim Payment Date.

(c)     Treatment of Contingent Claims.  Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is a Disallowed Claim, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.  The holder of a Contingent Claim will only be entitled to a distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim, subject, however, to the provisions of Bankruptcy Code § 502(e), and, provided that if such Contingent Claim is for reimbursement, indemnification or contribution at the time of allowance or disallowance, it will be a Disallowed Claim pursuant to Bankruptcy Code § 502(e)(1)(B).

19.10  Payments Effective Upon Tender.  Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtors, or the Reorganized Debtors to the creditor to whom payment is due.  If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtors or the Reorganized Debtors for the benefit of that creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtors or the Reorganized Debtors failed to pay the tendered payment.

19.11  Preservation of Debtors' Claims, Demands, and Causes of Action.  The Reorganized Debtors shall retain all Claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtors and/or the Estates against any other Entity, including but not limited to, the Retained Claims arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date.  The Debtors or the Reorganized Debtors shall have the exclusive right, authority and discretion to enforce the Claims, demands, and causes of action of any kind or nature, including the Retained Claims, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in these Reorganization Cases.  The Debtors or the Reorganized Debtors shall also have the exclusive right, authority, and discretion

- 31 -

to institute, prosecute, abandon, settle, or compromise any and all such Claims, demands, and causes of action of any kind or nature, including the Retained Claims, without obtaining Bankruptcy Court approval. To the extent necessary, the Reorganized Debtors are hereby designated as the representatives of the Estates pursuant to, and in accordance with, Bankruptcy Code § 1123(b)(3)(B). The Debtors and the Reorganized Debtors will also be entitled to assign their rights under the Plan (except to as to any Claims, causes of action, cross-claims and counterclaims against Hartford or the Hartford Parties which are to be released pursuant to the Hartford Agreement and the Plan). On the Effective Date, and except as otherwise specifically provided in the Plan, including but not limited to with respect to Retained Claims which are specifically retained by the Debtors and assigned to the Reorganized Debtors, the Trustee is hereby designated as the representative of the Estates, pursuant to and in accordance with, Bankruptcy Code § 1123(b)(3) with respect to any and all Claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtors or their Estates with respect to Tort Claims and Unknown Tort Claims but excluding Claims, defenses, counterclaims, setoffs, and recoupments against Hartford or the Hartford Parties (if any).

19.12 <u>Review of Non-Tort Claims</u>. Except for Tort Claimants and Unknown Tort Claimants, any Entity to whom the Debtors have incurred an obligation (whether on account of the provision of goods, services or otherwise), or who has received goods or services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtors in these Reorganization Cases; (ii) such Entity's Proof of Claim has been objected to; (iii) such Entity's Claim was included in the Schedules; or (iv) such Entity's scheduled Claims have been objected to or have been identified as disputed, Contingent, or unliquidated.

19.13 <u>Special Provisions Governing Unimpaired Claims</u>. Except as otherwise provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses with respect to any unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, such unimpaired Claims.

19.14 <u>Operative Documents</u>. The Debtors will prepare any documents which the Debtors or the Reorganized Debtors deem are necessary or appropriate to execute the Plan or are provided for under the Plan, including, but not limited to, the Plan Documents. If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts by the Debtors to negotiate and obtain approval of the documents by the other affected Entity, any such dispute will be presented to the Bankruptcy Court for determination, at or in conjunction with the Confirmation Hearing; provided that any Plan Documents relating to Hartford will be subject to the approval of Hartford, with such approval not to be unreasonably withheld, and any Plan Documents relating to Tort Claims will be subject to approval of Hartford and the Committee, with such approval not to be unreasonably withheld.

19.15 <u>Return of Deposits</u>. To the extent that the Debtors were required to and did pay deposits to any creditors before or after the Petition Date, as a condition of or as security for continued service after the Petition Date, including, but not limited to, deposits paid to utility

companies for adequate assurance pursuant to Bankruptcy Code § 366, then, upon satisfaction of the Claims of such creditor pursuant to the Plan or if such creditor did not have any Claims against the Debtors, any such deposits, together with any interest or other income earned thereon, if any, will be refunded to the applicable Reorganized Debtor within fifteen (15) days of demand by such Reorganized Debtor for return of such deposit.

19.16   Delivery of Distributions (Except to Tort Claims and Unknown Tort Claims). Distributions will be made by the Debtors or the Reorganized Debtors as follows:

(a)    At the addresses set forth in the Proofs of Claim (and if both a claimant's address and a claimant's counsel are listed on the Proof of Claim then to counsel's address) filed by holders of Claims or the last known addresses of such holders if no Proof of Claim is filed or if the Debtors or the Reorganized Debtors have not been notified of a change of address; or

(b)    At the addresses set forth in written notices of address change delivered to the Debtors or the Reorganized Debtors after the date of any related Proof of Claim; or

(c)    At the addresses reflected in the Schedules filed in the Reorganization Cases if no Proof of Claim has been filed and the Claim is or becomes an Allowed Claim, and the Debtors or the Reorganized Debtors (as applicable) have not received a written notice of change of address.

19.17   Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants. Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to Tort Claimants and Unknown Tort Claimants will be made by the Trustee in accordance with the Plan Documents, including the Trust Documents.

19.18   Efforts Regarding Absence of Address or Returned Mail.   If a claimant's distribution is not mailed or is mailed but returned to the Reorganized Debtors or Trustee because of the absence of a proper mailing address, the Reorganized Debtors or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such claimant from information generally available to the public and from such party's own records, but shall not be liable to such claimant for having failed to find a correct mailing address.  The Trustee shall have no liability to a Tort Claimant on account of distributions made to the client trust account of a Tort Claimant's attorney.

## ARTICLE 20

## TRUST

20.1   Establishment of Trust.  On the Confirmation Date, the Trust shall be established in accordance with the Trust Documents.  The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The Debtors are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1).  The Trustee shall be classified as the

- 33 -

"administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

20.2   Reserve Accounts.   As set forth in the Trust Agreement, the Trustee shall establish reserves for various purposes, including the Unknown Claims Reserve.

20.3   No Execution.   All property transferred to the Trust will remain property of the Trust until such time as the property actually has been paid to and received by an Entity entitled to receive payment pursuant to the terms of the Plan, Plan Documents, Confirmation Order and Trust Documents.   Except as expressly provided in the Plan, Plan Documents, Confirmation Order, and the Trust Documents, the Trust shall not be responsible for administration of payment of any Claims against the Debtors other than Tort Claims or Unknown Tort Claims.

20.4   Special Distribution Conditions.

20.4.1   Medicare-Related Provisions.   Pursuant to Section 111 of the MMSEA (42 U.S.C.A. § 1395y(b)(8)), the Trust shall be the applicable plan from which any Tort Claimants who might also be Medicare beneficiaries receive payment on account of their Tort Claims.   All payment obligations to a Tort Claimant will be funded from the assets of the Trust, and the Trustee, in his capacity as trustee, shall be the fiduciary and/or administrator as that term is defined in 42 U.S.C.A. § 1395y(b)(8)(F).   Accordingly, the Trustee shall be the RRE as that term is defined in Section 111 of the MMSEA and the Confirmation Order shall so provide.

20.4.2   Medicare-Related Obligations.   In addition to the foregoing obligations, the Trustee shall be the RRE with responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any, pursuant to the MSPA and Section 111 of the MMSEA and any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith.

20.4.2.1   On or after the date that the Confirmation Order becomes a Final Order, the Trustee shall determine, for any Tort Claimant whose Claim, including a Proof of Claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "Post-1980 Claimant"), by query to CMS:  (i) whether that Post-1980 Claimant is Medicare Eligible and, if so, (ii) whether he or she has received any Conditional Payment arising from or relating to treatment for Abuse.   The Trustee shall initiate such queries as soon as practicable, including prior to the Effective Date. The Trust shall also, reasonably and contemporaneously with initiating such queries, provide to Hartford all information necessary to perform the same queries, although Hartford is under no obligation to conduct such queries.

- 34 -

20.4.2.2 If the Trustee does not receive a response from CMS (including a response from a query that Hartford or Tort Claimant's counsel has initiated, so long as Hartford receives a copy of any such query initiated by Tort Claimant's counsel) within seventy-five (75) days as to whether a Post-1980 Claimant is Medicare Eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response, certify in writing to the Trustee that he or she (i) is not Medicare Eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSPA.

20.4.2.3 Prior to issuing a payment to any Post-1980 Claimant who is Medicare Eligible, the Trust and Trustee shall require that Tort Claimant's counsel to hold in escrow an amount equal to the lesser of (1) the amount of the potential payment to the Tort Claimant or (2) the amount of any Medicare Conditional Payments, including Conditional Payments issued by any MAO. Such amount shall be held in escrow until such time that Tort Claimant's counsel has provided written documentation from Medicare, including any MAO, demonstrating that such Conditional Payments have been satisfied, waived or otherwise released.

20.4.2.4 If a portion of the settlement amount is paid to any Post-1980 Claimant who is identified as Medicare Eligible, the Trust will report such payments to Medicare in accordance with the MMSEA. The Trust will also provide to the Hartford Parties all information necessary for the Hartford Parties to report such payments to Medicare although Hartford is under no obligation to make such reports.

20.4.2.5 The Trust shall defend, indemnify and hold harmless the Reorganized Debtors and the Protected Parties from any Claims related to Medicare Claims reporting and payment obligations, whether relating to past Conditional Payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Trust shall not be required to create a reserve for this potential obligation.

20.5    Indemnification.    The Trust shall defend, indemnify and hold harmless the Reorganized Debtors and the Protected Parties from any Claims related to Medicare Claims reporting and payment obligations, whether relating to past Conditional Payments made, future

payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Trust shall not create a reserve for this potential obligation.

20.6    <u>Termination of Trust</u>.   The Trust shall terminate as provided in the Trust Agreement, and the Trustee shall have no further obligations under the Plan or the Trust Agreement upon termination.

# ARTICLE 21

## TREATMENT OF EXECUTORY CONTRACTS

21.1    <u>Assumption and Rejection of Executory Contracts</u>.   On the Effective Date, except as otherwise provided herein, all Executory Contracts of the Debtors that have not been previously rejected or terminated, will be assumed in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, other than those Executory Contracts that: (a) have already been assumed by Final Order of the Bankruptcy Court; (b) are subject to a motion to reject Executory Contract that is pending on the Effective Date (subject to the Debtors right to request rejection retroactive to an earlier date); or (c) are subject to a motion to reject an Executory Contract pursuant to which the requested effective date of such rejection is after the Effective Date.   Approval of any motions to assume Executory Contracts pending on the Confirmation Date or thereafter will be approved by the Bankruptcy Court on or after the Confirmation Date by a Final Order.   Each Executory Contract assumed by a Debtor pursuant to this Article will revest in and be fully enforceable by the corresponding Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

21.2    <u>Indemnification of Members, Managers, Officers, and Employees</u>.   The obligation of the Debtors to indemnify any Person serving at any time on or prior to the Effective Date as one of its officers, employees, council members or volunteers, to the extent provided in any of such Debtor's constituent documents or by a written agreement with such Debtor or under the state laws pertaining to such Debtor, as applicable, will be deemed and treated as an Executory Contract that is assumed by the applicable Reorganized Debtor, pursuant to the Plan and Bankruptcy Code § 365 as of the Effective Date.   Obligations of the Debtors to indemnify any such individual that are assumed will survive unimpaired and unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date unless such individual is a Protected Party. Notwithstanding the foregoing, under no circumstances will the Debtors or the Reorganized Debtors assume or be responsible for any alleged indemnification obligations of any priests, brothers, members, officers, directors or others against whom the Debtors have determined or may, in the future, determine, that there are credible allegations of Abuse or other Tort Claims asserted against such individual(s) or such Entity has or may have engaged in some other conduct that would excuse the Reorganized Debtors from providing any indemnification to such individual or Entity.

21.3    <u>Claims Based on Rejection of Executory Contracts</u>.  Every Claim asserted by a creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Effective Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection, if such Final Order is entered after the Effective Date. Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated under Class 5 of the Plan.  Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged, and the creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

## ARTICLE 22

## OTHER POST-EFFECTIVE DATE OBLIGATIONS

22.1    <u>Closing</u>.  Closing will be conducted at such location designated by the Debtors and the Committee, as soon as reasonably practicable following the Effective Date for the purpose of the Reorganized Debtors executing and delivering the Plan Documents and completing those actions necessary for the Reorganized Debtors to establish and fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date and in accordance with the terms of the Hartford Agreement.  As soon as practicable after conditions set forth in Section 25.1 have been satisfied or waived in accordance with Section 25.2, the Trustee shall file notice of the Closing and the Reorganized Debtors will file notice of the occurrence of the Effective Date.

22.2    <u>Obligations of the Reorganized Debtors</u>.  The Reorganized Debtors will:

(a)    In the exercise of their respective business judgment, review all Claims filed against the Estates except for Tort Claims and Unknown Tort Claims and, if advisable, object to such Claims;

(b)    Within ten (10) days after payment of all Allowed Administrative Claims, including all Allowed Professional Charges, transfer to the Trust Account all funds remaining in the Administrative Claims Reserve;

(c)    Honor the Debtors' obligations arising under the Hartford Agreement and any other agreement that has been approved by the Bankruptcy Court as part of the Plan; and

(d)    Perform all of their obligations under the Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

22.3    <u>No Professional Fees or Expenses</u>.  No professional fees or expenses incurred by a claimant will be paid by the Reorganized Debtors, the Protected Parties, the Trust, or the Trustee with respect to any Claim except as specified in the Plan or the Plan Documents.

22.4    <u>Closing of the Case</u>.  As soon as practicable after the Effective Date, when the Reorganized Debtors deem appropriate, the Reorganized Debtors will seek authority from the Bankruptcy Court to close the Reorganization Cases in accordance with the Bankruptcy Code

and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Reorganization Cases shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtors, the Trustee, or any other party in interest to reopen the Reorganization Case(s) for any matter over which the Bankruptcy Court or the U.S. District Court for the District of Minnesota has retained jurisdiction under the Plan.  Any order closing these Reorganization Cases will provide that the Bankruptcy Court or the U.S. District Court for the District of Minnesota, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Reorganization Cases, and the obligations created by the Plan and the Plan Documents; (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents; and (c) provide that the Trust may be terminated and the Trustee discharged as ordered by the Bankruptcy Court without reopening any of the Reorganization Cases.

22.5   <u>Non-Monetary Terms</u>.  The protocol for the production of files relating to individuals against whom a credible Claim of Abuse of a minor has been made ("File Production Protocol") is attached hereto as **<u>Exhibit E</u>** and is incorporated herein as part of the Plan for all purposes.

## ARTICLE 23

## INSURANCE PROVISIONS

23.1   <u>No Direct Action Against Hartford</u>.  Nothing in the Plan, in the Confirmation Order or in any Plan Document shall grant to any Person any right to sue the Hartford Parties directly in connection with a Tort Claim, Unknown Tort Claim or any Hartford Policies.  To the extent that a Hartford Policy or any part thereof continues in effect after the Effective Date, the Hartford Agreement, the terms of the Hartford Policy, and applicable non-bankruptcy law will govern the rights and obligations of the Persons with respect to the applicable Hartford Policy; provided, however, that pursuant to the Plan and the Hartford Agreement, no Person shall have any right to sue Hartford directly or indirectly in connection with (i) a Tort Claim, Unknown Tort Claim, any Claim for coverage or benefits under the Hartford Non-Excluded Policies except to the extent that such Claim is by a Person not a Crosier Fathers Party and arises under a Hartford Non-Excluded Policy that was not issued to a Crosier Fathers Party, or (ii) any Claims for which the Debtors have received a discharge pursuant to the Plan, the Confirmation Order or Bankruptcy Code §§ 524 and 1141.

23.2   <u>Judgment Reduction</u>.  If any other Person obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Hartford Parties as a result of a Claim for contribution, subrogation or indemnification for any of the Hartford Parties' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation for any Claims or reimbursement obligations for any Medicare Claims released or resolved pursuant to the Hartford Agreement, the Plan or the Trust, then Debtors, Reorganized Debtors or the Trust, as applicable, shall voluntarily reduce its judgment or Claim against, or settlement with, such other Person to the extent necessary to satisfy such contribution, subrogation or indemnification Claims against the Hartford Parties.  To ensure that such a reduction is accomplished, the Hartford Parties shall be entitled to assert this Section 23.2 and the provisions of the Hartford Agreement as a defense to any action against

them brought by any other Person for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Hartford Parties from any liability for the judgment or Claim.

23.3    <u>No Right of Reimbursement</u>.  The Hartford Parties shall not seek reimbursement for any payments they make under the Hartford Agreement or the Plan under theories of contribution, subrogation, indemnification, or similar relief from any other Insurer unless such other Insurer first seeks contribution, subrogation, indemnification, or similar relief from any of the Hartford Parties.  Notwithstanding the foregoing, nothing herein shall be construed as prohibiting any of the Hartford Parties from seeking recovery from their reinsurers.

23.4    <u>No Limitation On Hartford's Rights</u>.  Notwithstanding any other provision of the Plan, nothing in this Article 23 shall (i) affect or be construed to restrict or limit the scope or application of the Channeling Injunction or the Supplemental Insurance Injunction or (ii) alter, impair, or diminish any of the protections afforded to Hartford or the Hartford Parties under the Plan, the Confirmation Order, the Hartford Agreement or the order approving the Hartford Agreement.

## ARTICLE 24

### LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS

24.1    <u>Liquidation and Payment of Tort Claims and Unknown Tort Claims</u>.  Tort Claims and Unknown Tort Claims shall be liquidated and paid in accordance with the Plan, the Confirmation Order, the Plan Documents, the Trust Documents, and the applicable Allocation Protocol.  Any payment on a Tort Claim or Unknown Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

24.2    <u>Trust Expenses and Costs</u>.  Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estates, the Reorganized Debtors, Hartford or the Hartford Parties relating to the treatment of Tort Claims and Unknown Tort Claims or (ii) otherwise modify the rights or obligations of the Estates, the Reorganized Debtors, or Hartford or the Hartford Parties as otherwise set forth in the Hartford Agreement, Plan, or a Plan Document.

## ARTICLE 25

### CONDITIONS PRECEDENT

25.1    <u>Conditions to Occurrence of the Effective Date</u>.  The Effective Date will occur when each of the following conditions have been satisfied in accordance with the following:

(a)    The Bankruptcy Court shall have entered a Final Order (which may be the Confirmation Order) approving the Hartford Agreement and any appropriate judgments consistent therewith, in form and substance acceptable to Hartford and the Debtors consistent with the requirements of the Hartford Agreement, and no stay of such order(s) is in effect;

QB\155907.00003\50740176.2

(b)      The Bankruptcy Court shall have entered a Final Order (which may be the Confirmation Order) approving the sale under Bankruptcy Code § 363 of the Hartford Policies and Interests in the Hartford Policies to be purchased by Hartford pursuant to the requirements of the Hartford Agreement and shall have granted Hartford, the purchaser, the protections available under Bankruptcy Code § 363(m);

(c)      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and Hartford;

(d)      The Confirmation Order is a Final Order and no stay of the Confirmation Order is in effect;

(e)      The Trustee and the Reorganized Debtors have executed the Trust Agreement, which will, among other things, establish the protocols for fiduciary management of the Trust and the amount to be set aside within the Trust for the Unknown Claims Reserve;

(f)      The Trustee has opened the Trust Account;

(g)      Hartford has transferred the amounts set forth in Article 19 of the Plan to the Trust Account; and

(h)      The Debtors have transferred the amounts set forth in Article 19 of the Plan, less the amount of the Administrative Claims Reserve, to the Trust Account.

25.2    Waiver of Conditions.  Any condition set forth in Section 25.1 of the Plan may be waived by the mutual written consent of the Debtors and the Committee, or, with respect to any conditions affecting Hartford's obligations, the Debtors, the Committee, and Hartford.

## ARTICLE 26

## EFFECTS OF CONFIRMATION

26.1    Discharge.   Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Debtors will be discharged from and their liability will be extinguished completely in respect to any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, Contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose from any agreement of the Debtors entered into or obligation of the Debtors incurred before the Confirmation Date, or from any conduct of the Debtors prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims and debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the Plan.

26.2   <u>Vesting</u>.   Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtors will be vested with all of the Assets of each of their corresponding Debtors, including all property of the Estates free and clear of all Claims, liens, encumbrances, charges and other Interests of creditors, and the Reorganized Debtors will, thereafter, hold, use, dispose or otherwise deal with such property, operate their business and conduct their and the PSO's ministry and mission free of any restrictions imposed by the Bankruptcy Code or by the Court.   All Retained Claims are preserved under the Plan for the benefit of the Reorganized Debtors.   Any Claims, causes of action or demands transferred to the Trust are preserved for the benefit of the Trustee under the Trust.

26.3   <u>Exculpation and Limitation of Liability</u>.   Except as expressly provided in the Plan, none of the Protected Parties will have or incur any liability to, or be subject to any right of action by, any claimant, any other party in interest, or any of their respective Representatives, financial advisors, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Cases, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or the Trust created hereunder, except for their willful misconduct or gross negligence and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the Reorganization Cases.   Without limiting the generality of the foregoing, the Debtors and their financial advisors and other professionals shall be entitled to and granted the benefits of Bankruptcy Code § 1125(e).

26.4   <u>Limitation of Liability</u>.   The Protected Parties, the Trust, the Trustee, and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental Entity or Insurer, on account of payments made to a Tort Claimant, including any liability under the MSPA.

26.5   <u>Channeled Claims</u>.   In consideration of the undertakings of the Protected Parties hereunder and other consideration, and to further preserve and promote the agreements between and among the Debtors and Hartford which also benefit the Tort Claimants and Unknown Tort Claimants and the protections afforded the Protected Parties under the Bankruptcy Code, including Bankruptcy Code § 105, any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan, the Allocation Protocols and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims.

26.6   <u>Permanent Injunction Against Released and Channeled Claims</u>.   In consideration of the undertakings of the Protected Parties hereunder and other consideration, and to further preserve and promote the agreements between and among the Debtors and Hartford which also benefit the Tort Claimants and Unknown Tort Claimants and the protections afforded the Protected Parties under the Bankruptcy Code, including Bankruptcy Code § 105 and except as otherwise expressly provided in the Plan, for the consideration described herein or in the Plan, or described in the Hartford Agreement, all Persons who have held, hold, or may hold Channeled Claims or Claims against the Protected Parties, whether known or unknown, and their respective civil law and Canon Law officers, directors, officials, Representatives, council members,

employees, accountants, agents, attorneys, and all others acting for or on their behalf, will be permanently enjoined on and after the Effective Date from:

(a)     Commencing or continuing in any manner any action or any other proceeding of any kind with respect to any Claim, including, but not limited to, any Tort Claim, any Unknown Tort Claim or any Channeled Claim against the Protected Parties or the property of the Protected Parties;

(b)     Asserting a Claim against any Person if as a result of such Claim such Person has or may have a Claim against one or more of the Protected Parties;

(c)     Seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Protected Parties or the property of the Protected Parties, with respect to any discharged Claim or Channeled Claim;

(d)     Creating, perfecting or enforcing any lien or encumbrance of any kind against any Protected Parties, or the property of any Protected Parties with respect to any discharged Claim or Channeled Claim;

(e)     Asserting, implementing or effectuating any discharged Claim or Channeled Claim of any kind against:

(i)     Any obligation due any of the Protected Parties;

(ii)     Any Protected Party; or

(iii)     The property of any Protected Party;

(f)     Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties or the property of any of the Protected Parties with respect to any discharged Claim or Channeled Claim; and

(g)     Taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or the Plan Documents, including the Trust Agreement.

Subject to the Hartford Agreement, the provisions of Section 26.5 of the Plan will further operate, as between all Protected Parties, as a mutual release of all Claims relating to the Debtors, the Claims against the Debtors and the Hartford Policies, which any Protected Party may have against another Protected Party except as may be specifically reserved or set forth in the Hartford Agreement or the Plan.

The channeling provisions are an integral part of the Plan and are essential to its implementation.

26.7     <u>Supplemental Injunction Preventing Prosecution of Claims</u>.     Pursuant to Bankruptcy Code §§ 105(a) and 363 and in consideration of the undertakings of Hartford

- 42 -

pursuant to the Hartford Agreement, including Hartford's purchase of the Hartford Policies free and clear of all interests pursuant to Bankruptcy Code § 363(f), any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Hartford Agreement) against any of the Protected Parties, which, directly or indirectly, relate to any of the Hartford Policies, any Tort Claims or any Unknown Tort Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against Hartford, the Hartford Parties, the Crosier Fathers Parties and/or the Hartford Policies, except as set forth in the Hartford Agreement, including:

(a)   Commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise against Hartford, the Hartford Parties, the Crosier Fathers Parties or the property of Hartford or the Crosier Fathers Parties;

(b)   Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against Hartford, the Hartford Parties, the Crosier Fathers Parties or the property of Hartford, the Hartford Parties or the Crosier Fathers Parties;

(c)   Creating, perfecting, or enforcing any lien of any kind against Hartford, the Hartford Parties, the Crosier Fathers Parties;

(d)   Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to Hartford, the Hartford Parties, the Crosier Fathers Parties; and

(e)   Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

26.8   <u>Injunctions Integral</u>.  The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation.   Any and all currently pending court proceedings, the continuation of which would violate the provisions of Article 26 of the Plan shall be dismissed with prejudice.

26.9   <u>Injunction Deemed Issued and Permanent</u>.  On the Effective Date, the injunctions provided herein shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.   All injunctions and/or stays provided herein, the injunctive provisions of Bankruptcy Code §§ 524 and 1141, and all injunctions or stays protecting Hartford are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.

QB\155907.00003\50740176.2

## ARTICLE 27

## MODIFICATION OF PLAN

27.1    <u>Non-Material Modification of Plan</u>.    The Plan may be modified by the Plan Proponents, the Reorganized Debtors, and the Trustee (as applicable) from time to time in accordance with, and pursuant to, Bankruptcy Code §§ 1125 and 1127.    The Plan may be modified by the Plan Proponents at any time before the Confirmation Date, provided that the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123, the Hartford Agreement and the Plan Proponents have complied with Bankruptcy Code § 1125.    Each holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such holder.    Each holder of a Claim that votes in favor of the Plan authorizes the Plan Proponents to modify, at any time prior to the Effective Date and without the requirement of further solicitation, the treatment provided to the Class of Claims such Claims are classified in, provided that the Bankruptcy Court determines that such modification is not material.

27.2    <u>Additional Documentation; Non-Material Modifications of Plan Documents</u>. From and after the Effective Date, the Trustee, the Reorganized Debtors and Hartford shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan and Plan Documents without further order of the Bankruptcy Court.    Additionally, the Trustee, the Reorganized Debtors, and Hartford may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement previously approved by the Bankruptcy Court.

27.3    <u>No Re-Solicitation</u>.    An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Article shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan to the extent not required under the Bankruptcy Code and other applicable law.

## ARTICLE 28

## RETENTION OF JURISDICTION

28.1    <u>Retention of Jurisdiction</u>.    Notwithstanding confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction for the following purposes set forth in Article 28.

28.2    <u>In General</u>.    The Bankruptcy Court will retain jurisdiction to determine the allowance and payment of any Claims upon any objections thereto (or other appropriate proceedings).    As part of such retained jurisdiction, the Bankruptcy Court will continue to determine the allowance of Administrative Claims and any request for payment thereof, including Administrative Claims for Professional Charges.    The Bankruptcy Court will not retain or obtain jurisdiction to determine any internal disputes between or among the Debtors, the PSO or another Province, or any other related Entity that, under applicable Canon Law, would be determined in a specialized religious court.

- 44 -

28.3    <u>Tort Claims and Unknown Tort Claims</u>.  Subject to the limitations set forth in the Plan, the Bankruptcy Court will retain jurisdiction to hear and determine and take such actions as are necessary or appropriate with respect to the payment or disallowance of Tort Claims or Unknown Tort Claims so long as such retained jurisdiction is consistent with the terms of the Plan and the Plan Documents, including the Trust Agreement.

28.4    <u>Plan Disputes and Enforcement</u>.  Subject to the limitations set forth in the Plan, the Bankruptcy Court will retain jurisdiction to determine any dispute which may arise regarding the interpretation of any provision of the Plan.  The Bankruptcy Court will also retain jurisdiction to enforce any provisions of the Plan and any and all Plan Documents, including, but not limited to, any actions to enforce the discharge, releases and injunctions provided for in Article 26 of the Plan.  The Bankruptcy Court will also retain jurisdiction over any matter relating to the implementation, effectuation, and/or consummation of the Plan as expressly provided in any provision of the Plan.

28.5    <u>Further Orders</u>.  Subject to the limitations set forth in the Plan, the Bankruptcy Court will retain jurisdiction to facilitate the performance of the Plan by entering, consistent with the provisions of the Plan, any further necessary or appropriate order regarding enforcement of the Plan, the Plan Documents and any provisions thereof, and to protect the Debtors, the Reorganized Debtors, and the Protected Parties from actions prohibited under the Plan.  In addition, the Bankruptcy Court will retain jurisdiction to facilitate or implement the allowance, disallowance, treatment, or satisfaction of any Claim, or any portion thereof, pursuant to the Plan (other than Tort Claims or Unknown Tort Claims, except to the extent that any retained jurisdiction is consistent with the Plan and the Trust Agreement) to which an objection has not been filed prior to the Effective Date.

28.6    <u>Retained Debtor Claims</u>.  Subject to the limitations set forth in the Plan, and to the extent the Bankruptcy Court would otherwise have jurisdiction over such Claims, the Bankruptcy Court will retain jurisdiction with respect to any Claims not otherwise compromised or settled by the Debtors prior to the Effective Date.

28.7    <u>Governmental Units or Regulatory Agencies</u>.  The Bankruptcy Court will retain jurisdiction to adjudicate any dispute or to hear and determine any action taken, proposed, or threatened by any state, federal, or local governmental regulatory agency or unit having or asserting jurisdiction or power over the conduct of the business of the Debtors and/or the Reorganized Debtors.

28.8    <u>Final Decree</u>.  The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Reorganization Cases; provided, however, that the Bankruptcy Court will retain jurisdiction to enter an order terminating the Trust and discharging the Trustee in accordance with the terms of the Trust notwithstanding the issuance of the final decrees and closing of the Reorganization Cases and without the necessity of reopening any of the Reorganization Cases.

28.9    <u>Appeals</u>.  In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to

implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary to effectuate the reorganization of the Debtors.

28.10  Executory Contracts.  The Bankruptcy Court will retain jurisdiction to determine any and all motions regarding assumption or rejection of Executory Contracts and any and all Claims arising therefrom.

28.11  Claims.  Subject to the limitations set forth in the Plan, the Bankruptcy Court will retain jurisdiction:

> (a)  To hear and determine any Claim or cause of action by or against the Debtors, the Debtors' officers, officials, employees or Representatives, the Chapter 11 Professionals, and the Reorganized Debtors;

> (b)  To adjudicate any causes of action or other proceeding currently pending or otherwise referenced here or elsewhere in the Plan, including, but not limited to, the adjudication of the Retained Claims and any and all "core proceedings" under 28 U.S.C. § 157(b) which may be pertinent to the Reorganization Cases and which the Debtors or the Reorganized Debtors may deem appropriate to initiate and prosecute before the Bankruptcy Court in aid of the implementation of the Plan;

> (c)  To approve any settlements between or among the Debtors and any party against whom the Debtors or Reorganized Debtors assert a Retained Claim; and

> (d)  To hear objections to Tort Claims prior to the Effective Date.

28.12  Modification of the Plan.  The Bankruptcy Court will retain jurisdiction to modify the Plan pursuant to the provisions of the Plan.

28.13  Failure of Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising out of the Reorganization Cases, including matters set forth in this Article, such lack of jurisdiction will not diminish, control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE 29

## REORGANIZATION OF DEBTORS

29.1  Continued Corporate Existence of Debtors as Reorganized Debtors.  The Debtors will each, as Reorganized Debtors, continue to exist after the Effective Date as separate legal entities, with all powers of a non-profit corporation under the laws of the state where each is domiciled and without prejudice to any right to alter or terminate such existence under applicable state law but subject to applicable Canon Law.

- 46 -

29.2   Management of Reorganized Debtor.   From and after the Effective Date, the Reorganized Debtors will continue to be managed in accordance with the principles of Canon Law and applicable state law and by the same role and management as exists on the Confirmation Date.

29.3   Abuse Claims Reviewer.   The Committee designated Roger L. Kramer as the Abuse Claims Reviewer and will designate the person who shall serve as the Trustee.   The Abuse Claims Reviewer's and proposed Trustee's curriculums vitae will be filed with the Court, along with a proposal from the Abuse Claims Reviewer and Trustee with respect to his or her service as the Abuse Claims Reviewer or Trustee, respectively, including proposed fees with respect to his or her service, and, as to the Abuse Claims Reviewer, the proposed Allocation Protocols.

## ARTICLE 30

## GENERAL PROVISIONS

30.1   Election Pursuant to Bankruptcy Code § 1129(b).   If necessary, the Debtors hereby request confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) if the requirements of all provisions of Bankruptcy Code § 1129(a), except Section (a)(8) thereof, are met with regard to the Plan.

30.2   Current Insurance Coverage.   Except as expressly set forth in any Hartford Agreement, the Plan and Confirmation Order have no effect on any Insurance Coverage under any certificates or policies of insurance issued to the Debtors that are not otherwise released or sold pursuant to the Hartford Agreement.

30.3   Extension of Payment Dates.   If any payment date falls due on any day which is not a Business Day, then such due date will be extended to the next Business Day.

30.4   Notices.   Any notice required or permitted to be provided under the Plan will be in writing and served by regular first class mail, electronic mail, overnight delivery, or hand-delivery.

30.5   Interest.   Whenever interest is to be computed under the Plan, interest will be simple interest and not compounded.

30.6   Additional Assurances.   The Debtors, the Reorganized Debtors, and the Trustee and the creditors holding Claims herein, including Tort Claims and Unknown Tort Claims, will execute such other further documents as are necessary to implement any of the provisions of the Plan.

30.7   Confirmation by Nonacceptance Method.   The Debtors hereby request, if necessary, confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any impaired Class of Claims which does not vote to accept the Plan.

- 47 -

30.8   Withdrawal of Plan.   The Plan may be withdrawn or revoked by the Plan Proponents prior to entry of the Confirmation Order, in which event the provisions of Section 30.13 of the Plan will apply.

30.9   Severability and Reformation.   It is the Debtors' intention to comply fully with the Bankruptcy Code and applicable non-bankruptcy law in proposing the Plan.   Therefore, if any provision of the Plan is determined by the Bankruptcy Court to be contrary to the Bankruptcy Code or applicable non-bankruptcy law, in the discretion of the Debtors and the Committee, that provision will be deemed severed and automatically deleted from the Plan, if it cannot be reformed or the provision or its interpretation will be deemed reformed to ensure compliance; provided, however, that nothing contained in this Section will prevent the Debtors from modifying the Plan in any manner whatsoever in accordance with and as set forth in the Plan.   Pursuant to any ruling by the Bankruptcy Court regarding the subject matter of this Section, any such severance or reformation will be stated specifically in the Confirmation Order, which then will control notwithstanding any contrary or inconsistent provisions of the Plan. Notwithstanding the foregoing, nothing in this Section shall affect the rights of Hartford under the Hartford Agreement.

30.10   Prohibition Against Prepayment Penalties.   If the Debtors or the Reorganized Debtors choose, in their sole and absolute discretion, to prepay any obligation on which deferred payments are provided for under the Plan, the Debtors or the Reorganized Debtors will not be liable or subject to the assessment of any prepayment penalty thereon unless otherwise ordered by the Bankruptcy Court.

30.11   Fractional Dollars.   Notwithstanding any other provision of the Plan, no payments or distributions under the Plan of or on account of fractions of dollars will be made.   When any payment or distribution of or on account of a fraction of a dollar to any holder of an Allowed Claim would otherwise be required, the actual payment or distribution made will reflect a rounding of such fraction to the nearest whole number (up or down).

30.12   Payment of Statutory Fees and Filing of Quarterly Reports.   All fees payable pursuant to 28 U.S.C. § 1930 as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law.   All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

30.13   Reservation of Rights.   Except as expressly provided herein, the Plan will have no force or effect unless the Confirmation Order and any other Final Orders that are conditions precedent to the Effective Date are entered by the Bankruptcy Court and the Effective Date has occurred.   None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan will be nor will it be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims prior to the Effective Date or with respect to any matter which is pending before or may come before the Bankruptcy Court or any other court for determination in the Reorganization Cases or any other case.

QB\155907.00003\50740176.2

30.14  <u>No Professional Fees or Expenses</u>.    None of the Protected Parties or the Reorganized Debtors will have any liability for any fees and expenses of attorneys representing any creditor.

30.15  <u>Dissolution of Committee</u>.    Upon the occurrence of the Effective Date, the Committee will be dissolved; provided, however, that Committee may continue to exist after the Effective Date with respect to any and all applications for Professional Charges but not for any other purpose.

30.16  <u>Section 1146 Exemption</u>.    Pursuant to Bankruptcy Code § 1146(c), any transfers of property pursuant hereto will not be subject to any document, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

30.17  <u>Successors and Assigns</u>.    The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heirs, executors, administrator, successors or assigns of such Entity.

QB\155907.00003\50740176.2

Dated and Submitted this 23rd day of March, 2018.

CROSIER FATHERS AND BROTHERS
PROVINCE, INC., a Minnesota non-profit
corporation,
-and-
THE CROSIER COMMUNITY OF PHOENIX,
and Arizona non-profit corporation,

By                                                              
THOMAS ENNEKING, osc, President

CROSIER FATHERS OF ONAMIA, a Minnesota
non-profit corporation,

By
KERMIT HOLL, osc, President

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By     _Ben Januschka_____

Ben Januschka, Committee Chairperson

Prepared and Submitted By:


*/s/  Susan G. Boswell*

Susan G. Boswell (AZ Bar No. 004791)
Lori L. Winkelman (AZ Bar No. 021400)
Elizabeth S. Fella (AZ Bar No. 025236)
*Admitted Pro Hac Vice*
QUARLES & BRADY LLP
One S. Church Ave., Suite 1700
Tucson, Arizona 85701
-and-
Thomas J. Flynn (MN Bar No. 0030570)
LARKIN HOFFMAN
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota 55437


*Counsel for the Debtors*

*/s/  Robert T. Kugler*

Robert T. Kugler (Bar No. 194116)
Edwin H. Caldie (Bar No. 388930)
Phillip J. Ashfield (Bar No. 388990)
STINSON LEONARD STREET LLP
50 South Sixth Street
Suite 2600
Minneapolis, Minnesota 55402


*Counsel for the Official Committee of
Unsecured Creditors*

QB\155907.00003\50740176.2

# EXHIBIT A

## TORT CLAIMS ALLOCATION PROTOCOL

### 1. **Definitions.**

1.1     <u>Capitalized Terms</u>. Capitalized terms used in this Tort Claims Allocation Protocol shall have the meanings given them in the Plan, the Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Tort Claims Allocation Protocol Plan by reference.

### 2. **Purpose, Interpretation.**

2.1     <u>Purpose</u>. This Tort Claims Allocation Protocol is designed to provide guidance to the Abuse Claims Reviewer in determining the amount of each Class 8 Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

2.2     <u>General Principles</u>. As a general principle, this Tort Claims Allocation Protocol intends to set out a procedure that provides substantially the same treatment to holders of similar Class 8 Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Abuse Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 8 Claim are intended to reflect the relative values of Class 8 Claims.

2.3     <u>Sole and Exclusive Method</u>. The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 8 Claim may seek allowance and distribution of such Claim. Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Claims, the Abuse Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

2.4     <u>Interpretation</u>. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Tort Claims Allocation Protocol.

### 3. **Abuse Claims Reviewer.**

3.1     <u>Designation</u>.  Roger Kramer is the Abuse Claims Reviewer, subject to an order of the Bankruptcy Court.  The Abuse Claims Reviewer shall conduct a review of each of the Class 8 Claims and, according to the Evaluation Factors and other provisions contained in §§ 5 and 6 below, make determinations upon which individual monetary distributions will be made subject to the Plan and Confirmation Order.

### 4. **Procedure.**

4.1     <u>Allowance of a Class 8 Claim</u>. A Class 8 Claim shall be allowed if the Abuse Claims Reviewer determines the Class 8 claimant proved his or her claim by a preponderance of the evidence. If necessary, the Abuse Claims Reviewer can ask for additional information to make this determination. The Class 8 claimant may refuse such a request at his or her own risk.

TORT CLAIMS ALLOCATION PROTOCOL

If a Class 8 Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Class 8 Claim by assigning such Class 8 Claim a value pursuant to the Evaluation Factors. The Abuse Claims Reviewer may consider the credibility of the Class 8 claimant and the facts alleged in support of the Claim and, in the Abuse Claims Reviewer's sole discretion, reduce or deny the Class 8 Claim.

4.2     Supplemental Information and Interviews. The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Class 8 claimant in the Class 8 claimant's filed proof of claim. Within fourteen (14) calendar days after confirmation of the Plan, Class 8 claimants may submit supplemental information to the Abuse Claims Reviewer in support of their Class 8 Claims.  The Abuse Claims Reviewer shall have the ability to request additional information from any Class 8 claimant.

Class 8 claimants, or their counsel, may request an interview (telephonic or in-person) with the Abuse Claims Reviewer.  Such interview is for the purpose of supplementing information or otherwise assisting the Abuse Claims Reviewer.  A Class 8 claimant shall not be obligated to conduct an interview with the Abuse Claims Reviewer.  A Class 8 claimant shall not be penalized in any way if he or she chooses not to request or ultimately participate in an interview with the Abuse Claims Reviewer.

4.3     Determinations by the Abuse Claims Reviewer. The Abuse Claims Reviewer shall notify each Class 8 claimant in writing of the estimated monetary distribution based on the points awarded under § 5 below with respect to the Class 8 claimant's claim, which may be greater or smaller than the actual monetary distribution to be received based on the outcome of any reconsideration claims. The Abuse Claims Reviewer's determination shall be final unless the Class 8 claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer in accordance with § 4.4 below. The Class 8 claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award. The Abuse Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a full and fair review process for all Class 8 Claims.

4.4     Requests for Reconsideration. The Class 8 claimant may request reconsideration by delivering a written request for reconsideration to the Abuse Claims Reviewer within fourteen (14) calendar days after the date of mailing of the notice of the preliminary monetary distribution provided by the Abuse Claims Reviewer under § 4.3 above. Each written request must be accompanied by a check for the reconsideration fee of five hundred dollars ($500). The Class 8 claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Class 8 claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

TORT CLAIMS ALLOCATION PROTOCOL

4.5     Deceased Abuse Survivor. The Abuse Claims Reviewer shall review the claim of a deceased Class 8 claimant without regard to the Class 8 claimant's death, except that the Abuse Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

## 5.   Guidelines for Allocation for Abuse Survivor Claims.

5.1     Evaluation Factors. Each Class 8 Claim will be evaluated by the Abuse Claims Reviewer. Each Class 8 Claim will be assigned points according to the following system, and the points shall determine the amount of distribution to each Class 8 claimant on a pro-rata basis ("Evaluation Factors"):

  a.     **Nature of Abuse & Circumstances.** A point value ranging from 0 to 50 should be allocated for this section. Considerations should include, but are not limited to, the following factors:

  (1)     The duration and/or frequency of the abuse.

  (2)     Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk.

  (3)     The identity of the abuser, and whether the abuser is on any credibly accused list of abusers or was accused of abuse by other Class 8 claimants.

  (4)     Circumstances of abuse:

  a.     grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

  b.     coercion or threat or use of force or violence, stalking;

  c.     relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator;

  d.     multiple priests involved in sexual misconduct; and

3

TORT CLAIMS ALLOCATION PROTOCOL

        e.    location of abuse, including but not limited to isolated location, Class 8 claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

b.    **Impact of the Abuse.** Overall, this category looks to how the abuse impacted the Class 8 claimant. This includes how the abuse impacted the Class 8 claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the Class 8 claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive. A point value ranging from 0 to 50 should be allocated for this section.

The Abuse Claims Reviewer should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

Mental Health Issues: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

Physical Health Issues: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

Spiritual Well-being: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

4

TORT CLAIMS ALLOCATION PROTOCOL

Vocational Capacity: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

Academic Capacity: This includes but is not limited to school behavior problems.

Legal difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

6.  **Tort Claim Provisions**. The following provisions shall apply to Class 8 Claims other than Non-Lawsuit Claims (as defined in § 7.1 below):

6.1  <u>Minimum Payment</u>. Notwithstanding anything to the contrary herein or in the Plan, every holder of an allowed Class 8 Claim shall receive a distribution of at least $50,000.00, unless the Claim is disallowed in its entirety by an Order of the Bankruptcy Court or a determination by the Abuse Claims Reviewer that such claim is not allowed under § 3.1 above.

6.2  <u>Bell Curve of Point Totals</u>. The Abuse Claims Reviewer should aim to have distributions to Class 8 claimants generally follow a bell curve, where the majority of cases are close to the average points awarded.

7.  **Non-Lawsuit Tort Claims.**

7.1  <u>Fund Allocated to Class 8 Claims Barred by Statute of Limitations</u>. With respect to Class 8 claimants who did not bring a lawsuit against the debtors as of the Petition Date or whose claims were barred by applicable statute of limitations as of the Petition Date ("Non-Lawsuit Claims"), such Non-Lawsuit Claims shall only be entitled to recover, at maximum, an aggregate amount of five-percent (5%) of the initial corpus of the Trust ("Non-Lawsuit Claims Fund"). For the avoidance of doubt, distributions to Non-Lawsuit Claims shall be made solely out of the Non-Lawsuit Claims Fund.

7.2  <u>Maximum Distribution on any Non-Lawsuit Claim</u>. The maximum distribution on account of any single Non-Lawsuit Claim shall be equal to fifty percent (50%) of the average distribution to Class 8 Claims that are not Non-Lawsuit Claims.

7.3  <u>Guidelines</u>.  Each Non-Lawsuit Claim shall be evaluated under the procedures and guidelines set forth in §§ 4 and 5 above.

7.4  <u>Remaining Funds</u>. Any Trust Assets remaining in the Non-Lawsuit Claims Fund after distribution to Non-Lawsuit Claims shall be re-distributed to Class 8 claimants that are not holders of Non-Lawsuit Claims, according to the points awarded to such Class 8 claimants under § 5 above.

# EXHIBIT B

## UNKNOWN TORT CLAIMS ALLOCATION PROTOCOL

**1. Definitions.**

1.1 <u>Capitalized Terms</u>. Capitalized terms used in this Unknown Tort Claims Allocation Protocol shall have the meanings given them in the Plan, the Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Unknown Tort Claims Allocation Protocol Plan by reference.

**2. Purpose, Interpretation.**

2.1 <u>Purpose</u>. This Unknown Tort Claims Allocation Protocol is designed to provide guidance to the Abuse Claims Reviewer in determining the amount of each Class 9 Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

2.2 <u>General Principles</u>. As a general principle, this Unknown Tort Claims Allocation Protocol intends to set out a procedure that provides substantially the same treatment to holders of similar Class 9 Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Abuse Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 9 Claim are intended to reflect the relative values of Class 9 Claims.

2.3 <u>Sole and Exclusive Method</u>. The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 9 Claim may seek allowance and distribution of such Claim. Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Claims, the Abuse Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

2.4 <u>Interpretation</u>. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Unknown Tort Claims Allocation Protocol.

**3. Abuse Claims Reviewer.**

3.1 <u>Designation</u>. Roger Kramer is the Abuse Claims Reviewer, subject to an order of the Bankruptcy Court. The Abuse Claims Reviewer shall conduct a review of each of the Class 9 Claims and, according to the Evaluation Factors and other provisions contained in §§ 5 and 6 below, make determinations upon which individual monetary distributions will be made subject to the Plan and Confirmation Order.

**4. Procedure.**

4.1 <u>Allowance of a Class 9 Claim</u>. A Class 9 Claim shall be allowed if the Abuse Claims Reviewer determines the Class 9 claimant proved his or her claim by a preponderance of the evidence. If necessary, the Abuse Claims Reviewer can ask for additional information to

## UKNOWN TORT CLAIMS ALLOCATION PROTOCOL

make this determination. The Class 9 claimant may refuse such a request at his or her own risk. If a Class 9 Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Class 9 Claim to be paid from the Unknown Claims Reserve by assigning such Class 9 Claim a value pursuant to the Evaluation Factors. The Abuse Claims Reviewer may consider the credibility of the Class 9 claimant and the facts alleged in support of the Claim and, in the Abuse Claims Reviewer's sole discretion, reduce or deny the Class 9 Claim.

4.2    <u>Supplemental Information and Interviews</u>. The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Class 9 claimant in the Class 9 claimant's filed proof of claim. The Abuse Claims Reviewer shall have the ability to request additional information from any Class 9 claimant.

Class 9 claimants, or their counsel, may request an interview (telephonic or in-person) with the Abuse Claims Reviewer.  Such interview is for the purpose of supplementing information or otherwise assisting the Abuse Claims Reviewer.  A Class 9 claimant shall not be obligated to conduct an interview with the Abuse Claims Reviewer.  A Class 9 claimant shall not be penalized in any way if he or she chooses not to request or ultimately participate in an interview with the Abuse Claims Reviewer.

4.3    <u>Determinations by the Abuse Claims Reviewer</u>. The Abuse Claims Reviewer shall notify each Class 9 claimant in writing of the estimated monetary distribution based on the points awarded under § 5 below with respect to the Class 9 claimant's claim, which may be greater or smaller than the actual monetary distribution to be received based on the outcome of any reconsideration claims. The Abuse Claims Reviewer's determination shall be final unless the Class 9 claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer in accordance with § 4.4 below. The Class 9 claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award.  The Abuse Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a full and fair review process for all Class 9 Claims.

4.4    <u>Requests for Reconsideration</u>. The Class 9 claimant may request reconsideration by delivering a written request for reconsideration to the Abuse Claims Reviewer within fourteen (14) calendar days after the date of mailing of the notice of the preliminary monetary distribution provided by the Abuse Claims Reviewer under § 4.3 above. Each written request must be accompanied by a check for the reconsideration fee of five hundred dollars ($500). The Class 9 claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Class 9 claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

QB\155907.00003\50742257.1

4.5     Deceased Abuse Survivor.  The Abuse Claims Reviewer shall review the claim of a deceased Class 9 claimant without regard to the Class 9 claimant's death, except that the Abuse Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

## 5.     Guidelines for Allocation for Abuse Survivor Claims.

5.1     Evaluation Factors. Each Class 9 Claim will be evaluated by the Abuse Claims Reviewer. Each Class 9 Claim will be assigned points according to the following system, and the points shall determine the amount of distribution from the Unknown Claims Reserve to each Class 9 claimant on a pro-rata basis ("Evaluation Factors"):

a.     **Nature of Abuse & Circumstances.** A point value ranging from 0 to 50 should be allocated for this section. Considerations should include, but are not limited to, the following factors:

(1)     The duration and/or frequency of the abuse.

(2)     Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk.

(3)     The identity of the abuser, and whether the abuser is on any credibly accused list of abusers or was accused of abuse by other Class 9 claimants.

(4)     Circumstances of abuse:

a.     grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

b.     coercion or threat or use of force or violence, stalking;

c.     relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator;

d.     multiple priests involved in sexual misconduct; and

3

### UKNOWN TORT CLAIMS ALLOCATION PROTOCOL

        e.   location of abuse, including but not limited to isolated location, Class 9 claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

b.    **Impact of the Abuse.** Overall, this category looks to how the abuse impacted the Class 9 claimant. This includes how the abuse impacted the Class 9 claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the Class 9 claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive. A point value ranging from 0 to 50 should be allocated for this section.

The Abuse Claims Reviewer should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

Mental Health Issues: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

Physical Health Issues: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

Spiritual Well-being: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

Vocational Capacity: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and

UKNOWN TORT CLAIMS ALLOCATION PROTOCOL

maintaining employment, feeling of unworthiness or guilt related to financial success.

Academic Capacity: This includes but is not limited to school behavior problems.

Legal difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

**6.** **Tort Claim Provisions.**  The following provisions shall apply to Class 9 Claims other than Time-Barred Claims (as defined in § 7.1 below):

6.1    Minimum Payment. Notwithstanding anything to the contrary herein or in the Plan, every holder of an allowed Class 9 Claim shall receive a distribution of at least $50,000.00, unless the Claim is disallowed in its entirety by an Order of the Bankruptcy Court or a determination by the Abuse Claims Reviewer that such claim is not allowed under § 3.1 above.

6.2    Bell Curve of Point Totals.  The Abuse Claims Reviewer should aim to have distributions to Class 9 claimants generally follow a bell curve, where the majority of cases are close to the average points awarded.

**7.** **Time-Barred Tort Claims.**

7.1    Fund Allocated to Class 9 Claims Barred by Statute of Limitations.  With respect to Class 9 claimants whose claims were barred by applicable statute of limitations as of the Petition Date ("Time-Barred Claims"), such Time-Barred Claims shall only be entitled to recover, at maximum, an aggregate amount of five-percent (5%) of the initial corpus of the Unknown Claims Reserve ("Time-Barred Claims Fund").  For the avoidance of doubt, distributions to Time-Barred Claims shall be made solely out of the Time-Barred Claims Fund.

7.2    Maximum Distribution on any Time-Barred Claim.  The maximum distribution on account of any single Time-Barred Claim shall be equal to fifty percent (50%) of the average distribution to Class 9 Claims that are not Time-Barred Claims.

7.3    Guidelines.  Each Time-Barred Claim shall be evaluated under the procedures and guidelines set forth in §§ 4 and 5 above.

7.4    Remaining Funds.  Any Trust Assets remaining in the Time-Barred Claims Fund after distribution to Time-Barred Claims shall be re-distributed to Class 9 claimants that are not holders of Time-Barred Claims, according to the points awarded to such Class 9 claimants under § 5 above.

# EXHIBIT C

EXECUTION COPY

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("Agreement") is hereby made by, between, and among the "Crosier Fathers" (as defined in Section 1.1.5 below) and "Hartford" (as defined in Section 1.1.10 below).

## RECITALS

WHEREAS, numerous individuals have asserted certain "Tort Claims" (as defined in Section 1.1.24 below) against Crosier Fathers and/or the Crosier Fathers Parties (as defined in Section 1.1.6 below);

WHEREAS, Hartford issued, allegedly issued, or may have issued certain insurance policies that insured Crosier Fathers and/or one or more Crosier Fathers Parties;

WHEREAS, certain disputes between Hartford and Crosier Fathers have arisen and/or may arise in the future, including disputes concerning the nature and scope of Hartford's responsibility, if any, to provide coverage to Crosier Fathers under the Hartford Policies, including those disputes at issue in the lawsuit captioned *Twin City Fire Insurance Company and Hartford Accident and Indemnity Company v. Canons Regular of the Order of the Holy Cross*, No. 15-cv-4437 (ADM-BRT) pending in the United States District Court for the District of Minnesota (the "Coverage Suit");

WHEREAS, each of Crosier Fathers has filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Minnesota, Case Nos. 17-41681, 17-41682 and 17-41683;

WHEREAS, through this Agreement, Crosier Fathers and Hartford, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all disputes between and among them relating to Crosier Fathers, the Coverage Suit, the Hartford Policies, and/or responsibility for the Tort Claims;

WHEREAS, as part of the compromise and resolution of the Coverage Suit, Crosier Fathers and Hartford wish to effect a sale of certain of the Hartford Policies and/or Interests under the Hartford Policies issued or allegedly issued to Crosier Fathers or under which any of Crosier Fathers is a named insured or otherwise claims an entitlement to coverage, pursuant to 11 U.S.C. § 363(b), (f), and (m); and

WHEREAS, through this Agreement, Crosier Fathers further intend to provide the Hartford Parties with the broadest possible release and the broadest possible buyback with respect to the Hartford Non-Excluded Policies and to further provide that the Hartford Parties shall be released, discharged and shall have no further obligations now or in the future under any Hartford Policies for any obligations that are discharged in the Reorganization Case; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the United States Bankruptcy Court for

**EXECUTION COPY**

the District of Minnesota (the "<u>Bankruptcy Court</u>"), Crosier Fathers and Hartford hereby agree as follows:

## 1. DEFINITIONS

1.1    As used in this Agreement, the following terms shall have the meanings set forth below or in the recitals. Capitalized terms not defined below, herein, or in the recitals shall have the meanings given to them in the Plan and the Bankruptcy Code. In the event of a conflict, the definitions in this Agreement shall control.

1.1.1    "<u>Abuse</u>" means any (a) act of sexual conduct, misconduct, abuse, or molestation; any other sexually related act, contact, or interaction; indecent assault and/or battery; rape; lascivious behavior; undue familiarity; pedophilia; or ephebophilia; (b) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (c) assault; battery; corporal punishment; or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation; or (d) fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, or any other tort relating to the acts and/or omissions listed in subparts (a)-(c) of this sentence. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the Person.

1.1.2    "<u>Bar Date</u>" shall have the meaning ascribed to it in the Plan (as defined herein).

1.1.3    "<u>Channeled Claim</u>" means any Tort Claim or any other Claim against any of the Crosier Father Parties or the Hartford Parties that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim.

1.1.4    "<u>Claim</u>" means any past, present or future claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.5    "<u>Crosier Fathers</u>" means each of the following as now constituted or may previously have been constituted: (i) the religious entity, Canons Regular of the Order of the Holy Cross Province of St. Odilia ("PSO"), (ii) its civil counterpart, Crosier Fathers and Brothers Province, Inc., (iii) Crosier Community of Onamia, (iv) The Crosier Community of Phoenix, and (v) the Estate (pursuant to section 541 of the Bankruptcy Code).

2

1.1.6  "Crosier Fathers Parties" means Crosier Fathers and: (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies, affiliates, related companies and entities of Crosier Fathers; (ii) any and all named insureds, insureds, and additional insureds under the Hartford Policies; (iii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions and acquired companies, affiliates, related companies and entities; (iv) each of the foregoing Persons' respective predecessors, successors and assigns; and (v) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iv), in their capacity as such.  Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Crosier Fathers or subject to its control.  An individual who perpetrated an act of Abuse that forms the basis of a Tort Claim is not a Crosier Fathers Party with respect to that Tort Claim.

1.1.7  "Execution Date" means the date on which the Agreement has been executed by both Crosier Fathers and Hartford.

1.1.8  "Extra-Contractual Claim" means any Claim against any of the Hartford Parties based, in whole or in part, on allegations that any of the Hartford Parties acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; failure to act in good faith; violation of any express or implied duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of any of the Hartford Parties of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance. Extra-Contractual Claims include: (i) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Hartford Parties' handling of any Claim or any request for insurance coverage, including any request for coverage for any Claim, including any Tort Claim; (ii) any claim that, directly or indirectly, arises out of, relates to, or is in connection with any of the Hartford Policies or any contractual duties arising therefrom, including any contractual duty to defend any of the Crosier Fathers Parties against any Claim, including any Tort Claims; and (iii) the conduct of the Hartford Parties with respect to the Reorganization Case and/or the negotiation of this Agreement.

1.1.9  "Final Order" means any judgment or order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing will then be pending, or as to which any right to appeal, petition for certiorari, re-argue or rehear will have been waived in writing, in form and substance satisfactory to the Debtors, or, on and after the Effective Date, in form and substance satisfactory to the Reorganized Debtors and as to the Trust, the Trustee, or in the event that an appeal, writ of certiorari, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction will have been determined by the highest court to which such order was appealed, or certiorari, re-argument or

3

rehearing will have been denied, and the time to take any further appeal, petition for certiorari or move for re-argument or rehearing will have expired or (ii) the Debtors and Hartford have mutually agreed in writing that the order from which such appeal or review has been taken should be deemed to be a Final Order.

1.1.10 "Hartford" means Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Casualty and Indemnity Company, Hartford Fire Insurance Company, Hartford Underwriters' Insurance Company and Twin City Fire Insurance Company.

1.1.11 "Hartford Parties" means Hartford; each of its past, present and future parents, subsidiaries, affiliates, and divisions; each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies; each of the foregoing Persons' respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them.

1.1.12 "Hartford Non-Excluded Policies" means any and all Hartford Policies that do not contain exclusions for liability arising from, relating to or in connection with Abuse whether known or unknown, including the Hartford Policies identified on Exhibit 1.

1.1.13 "Hartford Policies" means any and all policies of insurance, whether known or unknown, that (i) were issued by any Hartford Party to any of the Crosier Fathers, (ii) under which any or all of the Crosier Fathers are an insured, named insured or additional insured or (iii) under which Crosier Fathers otherwise contends it is entitled to coverage or benefits including the Policies listed on Exhibits 1 and 2.

1.1.14 "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

1.1.15 "Named Insureds" means any entity identified as a named insured or additional insured under the Hartford Policies.

1.1.16 "Parties" means Crosier Fathers and Hartford.

1.1.17 "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity or organization, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof.

1.1.18 "Plan Effective Date" means the date upon which the conditions set forth in Section 2 of this Agreement have been satisfied pursuant to a plan of reorganization that has been confirmed through an Order that has become a Final Order.

1.1.19 "Related Insurance Claim" means (i) any Claim by any Person against Hartford that, directly or indirectly, arises from, relates to, or is in connection with a Tort Claim, including any such Claim for defense, indemnity, contribution, subrogation, or similar relief or any direct action; and (ii) any Extra-Contractual Claim that, directly or indirectly, arises out of, relates to, or is in connection with any Tort Claim, including any such Claim that, directly or indirectly, arises out of, relates to or is in connection with any of the Hartford Parties' handling of any Tort Claim.

1.1.20 "Reorganization Case" means the Chapter 11 cases for bankruptcy relief that Crosier Fathers filed on June 1, 2017 in the United States Bankruptcy Court for the District of Minnesota, the proceedings in any such bankruptcy case and any related actions or adversary proceedings.

1.1.21 "Reorganized Debtor" means Crosier Fathers on and after the Plan Effective Date.

1.1.22 "Settlement Amount" means Nineteen Million Seven Hundred Eighty-eight Thousand Dollars ($19,788,000).

1.1.23 "Supplemental Insurance Injunction" means the injunction issued pursuant to Sections 105(a) and 363 of the Bankruptcy Code enjoining all Persons holding, or who in the future may hold, Claims or Interests against any of the Hartford Parties to the extent such Claims or Interests arise directly or indirectly from or in connection with any Hartford Non-Excluded Policy, any Tort Claim, any Related Insurance Claim or any claim discharged in the Reorganization Case from taking any action, directly or indirectly, to assert or enforce such Claims or Interests against any Crosier Fathers Party or any Hartford Party.

1.1.24 "Tort Claim" means any and all Claims for damages, attorneys' fees and other expenses, fees or costs for any equitable remedy asserted against the Debtors, any of the Crosier Fathers Parties, Hartford, the Hartford Parties, the Trustee, or the Trust, related to bodily injuries or personal injuries, including emotional distress, mental distress, mental anguish, shock or humiliation caused by or related to: (a) acts of Abuse committed by any cleric, employee, volunteer or other Entity associated with the Debtors, the Crosier Fathers Parties, or the PSO, which is the American division of the Roman Catholic religious Order known as the Canons Regular of the Order of the Holy Cross or any affiliated Entity; (b) the failure to properly hire, install, supervise and/or terminate any cleric, any volunteer, or any other employee of, or Entity associated with, the Debtors, the Crosier Fathers Parties, the PSO or any affiliated Entity; (c) the processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any Abuse or other Claim asserted by a Tort Claimant related to the Debtors, the Crosier Father Parties or the PSO; or (d) the failure to warn, disclose or provide information concerning the Abuse or other misconduct of clergy, other employees or volunteers or Entities associated with the Debtors, the

Crosier Fathers Parties, the PSO or such affiliated Entities. For avoidance of doubt, "Tort Claims" includes Unknown Tort Claims.

1.1.25 "Tort Claimant" means any Person holding a Tort Claim.

1.1.26 "Unknown Tort Claim" means any Tort Claim that is neither filed, nor deemed filed, by the Bar Date (as opposed to the Proof of Claim filed by an Unknown Claims Representative and is held by an individual who (i) was between the Bar Date and the Plan Effective Date continuously under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law of any other jurisdiction suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4); (ii) has a Tort Claim that was barred by the statute of limitations as of the Bar Date but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives previously time-barred Tort Claims; (iii) demonstrates he or she was incapable of knowing of the existence of his or her Tort Claim as of the Bar Date for any reason, including alleged memory repression or suppression; or (iv) as otherwise defined by subsequent order of the Bankruptcy Court.

## 2. THE REORGANIZATION CASE AND THE PLAN OF REORGANIZATION

2.1      On December 22, 2017, Crosier Fathers filed a proposed Plan of Reorganization (the "Plan"). The Plan, including any subsequent amendments thereto, shall be in all respects consistent with this Agreement and shall, in all material respects be acceptable to Hartford, whose acceptance shall not be unreasonably withheld. Any amendments to the Plan shall not deprive the Hartford Parties of any right or benefit under this Agreement or otherwise adversely affect the Interests of the Hartford Parties under this Agreement. Hartford will be deemed to consent to any amendment that does not affect its rights or obligations (including any rights and obligations under this Agreement) unless it objects to such amendment within five (5) business days of receiving notice of such amendment. All other amendments must, in form and substance, be affirmatively approved by the Hartford Parties, with such approval not to be unreasonably withheld for any amendment that is consistent with this Agreement. All Parties agree that under no circumstances will any failure to consent to a proposed amendment within a period of less than ten (10) business days be deemed unreasonable.

2.1.1   The Plan shall include an injunction (the "Channeling Injunction") pursuant to section 105(a) of the Bankruptcy Code barring and permanently enjoining all Persons who have held or asserted, or may in the future hold or assert, Channeled Claims from taking any action, directly or indirectly, for purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim and channeling such Channeled Claims to a trust or trusts to be established pursuant to the Plan ("Trust"), which shall be the sole and exclusive source of payment for Channeled Claims.

2.1.2   The Plan shall also include the Supplemental Insurance Injunction, with only such modifications as are acceptable to the Parties, pursuant to sections 105(a) and 363 of the Bankruptcy Code.

2.1.3   The Plan shall identify the Hartford Parties as parties protected by the Channeling Injunction and the Supplemental Injunction.

**EXECUTION COPY**

2.1.4   The Plan shall provide that Crosier Fathers has consented to the sale of all Interests in the Hartford Non-Excluded Policies and of the Interests in the remaining Hartford Policies as specified in this Agreement. Crosier Fathers represent and warrant that all of the entities identified as Named Insureds on all known Hartford Policies fall within the scope of the defined term "Crosier Fathers Parties" in this Agreement.

2.2      Crosier Fathers shall serve and file a motion (the "Approval Motion") pursuant to which Crosier Fathers will seek the entry of an order in form and substance acceptable to Hartford, entered by the Bankruptcy Court under sections 363(b), (f), and (m) and 105(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004 and 9019 and under such other provisions as the Bankruptcy Court may order, approving this Agreement and authorizing the Parties to undertake the settlement and the transactions contemplated by this Agreement (the "Approval Order") subject to the entry of a Final Order confirming the Plan. The Parties shall use their best efforts to have the Approval Motion heard and decided by the Bankruptcy Court concurrent with the hearing by the Bankruptcy Court on confirmation of the Plan and entry of the Plan Confirmation Order (as defined herein).

2.3      Crosier Fathers shall provide written notice of the Approval Motion in accordance with the local rules at least twenty-one (21) days in advance of the hearing to (a) all Tort Claimants to the extent they are known by Crosier Fathers, even if not scheduled or the subject of a proof of claim, by serving their counsel of record, or if *pro se* or unrepresented at their last known address to the extent available after a reasonable search; (b) counsel for any committee of creditors appointed in the Reorganization Case; (c) the Unknown Claims Representative; (d) all Persons who have filed notices of appearance in the Reorganization Case; and (e) all co-defendants and their counsel (to the extent of record) in any pre-petition litigation brought by Tort Claimants as to whom any claim for contribution or indemnity arose for purposes of statute of limitations after June 1, 2015 at the last address shown on any filed appearance or, if such co-defendant is proceeding *pro se*, then to the last address of record for such *pro se* co-defendant. Crosier Fathers shall serve all claimants identified in Section 2.3(a) above at the address shown on their proofs of claim or to their counsel of record or, if no proof of claim was filed, then at the address on Crosier Fathers' schedules. Crosier Fathers shall also cause a notice of intent to seek entry of the Approval Order to be published twice in the *USA Today*, *Star Tribune*, *The Arizona Republic*, *The Catholic Sun* and/or *The Catholic Spirit* in forms and at times as ordered by the Bankruptcy Court. Such notice may be provided contemporaneously with notice of the confirmation of the proposed Plan and need not be separate.

2.4      If any Person files an objection to the Approval Motion, Crosier Fathers shall file a written response requesting that the Court overrule any objections and enter the Approval Order, in form and substance acceptable to Hartford, such acceptance not to be unreasonably withheld. Crosier Fathers shall take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.

2.5      Crosier Fathers shall seek and obtain entry of a Final Order (the "Plan Confirmation Order") in form and substance acceptable to Hartford approving a Plan pursuant to Section 1129 of the Bankruptcy Code that contains the provisions set forth in Section 2.1 above.

2.5.1   The Plan Confirmation Order shall be in all respects consistent with this Agreement and shall contain no provisions that diminish or impair the benefit of this Agreement to the Hartford Parties. The Plan Confirmation Order shall provide that this Agreement is binding upon Crosier Fathers and their successors, including the Reorganized Debtors, and upon the Trust.

2.5.2   In seeking to obtain the Plan Confirmation Order, Crosier Fathers shall: (i) seek a confirmation hearing within a reasonable time after expiration of the Bar Date; (ii) urge the Bankruptcy Court to overrule any objections and confirm the proposed Plan; and (iii) take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.5.3   The form and manner of notice of the hearing to confirm the Plan are subject to advance approval by Hartford, which approval shall not be unreasonably withheld.

2.5.4   Prior to entry of the Plan Confirmation Order, Crosier Fathers, at their own expense, shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Tort Claim. If the Bankruptcy Court lifts the stay as to any Tort Claim prior to entry of the Plan Confirmation Order, Hartford shall have the right, but not the duty, to defend Crosier Fathers and the other Crosier Fathers Parties against that Tort Claim subject to a reservation of rights and with counsel of Hartford's choosing. If Hartford does not defend against the Tort Claim, Crosier Fathers and the other Crosier Fathers Parties shall defend against the Tort Claim and comply with the terms of the stay relief order, and Hartford shall reimburse the reasonable and necessary costs and expenses incurred in defending such Tort Claims. The Crosier Fathers Parties, at their own expense, will cooperate with Hartford in connection with the defense of any Tort Claim to the extent required by the respective Policies and applicable law. Any actions taken by Hartford pursuant to this Section 2.5.4, including in connection with the defense of any Tort Claim, shall be subject to a complete reservation of all rights and defenses, including all rights and defenses reserved in prior or contemporaneous correspondence in the event the Bankruptcy Court does not enter the Approval Order or the Approval Order otherwise does not become a Final Order.

2.5.5   Hartford shall have the obligation to indemnify Crosier Fathers and the other Crosier Fathers Parties insured under the Hartford Non-Excluded Policies for such Tort Claims to the extent, if any, required under the Hartford Non-Excluded Policies in the absence of this Agreement. Any amounts that Hartford pays in connection with the defense or indemnification of any Tort Claim shall be deducted from the Settlement Amount. In the event that Hartford pays an amount equal to the Settlement Amount, it shall have no further obligations to indemnify Crosier Fathers and the other Crosier Fathers Parties insured under the Hartford Non-Excluded Policies, and Hartford shall have no further payment obligations under this Agreement.

2.6      As of the first day on which the Plan Confirmation Order is a Final Order, Crosier Fathers, the Reorganized Debtor and the Trust will undertake all reasonable actions and cooperate with the Hartford Parties, including cooperation in connection with the Hartford Parties' reinsurers, responding to reasonable requests for information and meeting with representatives of reinsurers as set forth below.

2.6.1    As of the first day following the Plan Effective Date, the Hartford Parties shall have the right (upon reasonable notice and in a manner convenient to Crosier Fathers or the Trust, as applicable) to review and obtain from Crosier Fathers or the Trust relevant files, information and documents (a) concerning Claims subject to payment or potential payment with the Settlement Amount, and (b) required of or necessary to the Hartford Parties in connection with any Claims for reinsurance for the Settlement Amount or in connection with this Agreement.  The Hartford Parties will accept the documents in the format provided to Crosier Fathers or the Trust or in the form easiest for Crosier Fathers or the Trust to provide.  Neither Crosier Fathers nor the Trust shall be required to modify or change the form or format of any such information.

2.6.2    For the avoidance of doubt, the relevant files, information and documents referenced in Section 2.6.1 shall include:

    (a)    Information from any database maintained by the Trust, any information that the Trust collects pursuant to any trust distribution procedures, and any information included on any claim form used by the Trust with respect to Channeled Claims, and,

    (b)    For each Channeled Claim that has been resolved by settlement, judgment, disallowance or otherwise:

        (i)    the claimant's name;

        (ii)    the claimant's social security number;

        (iii)    the identity of the claimant's abuser(s);

        (iv)    a claim number, if the Trust uses such a number to identify Claims;

        (v)    dates of alleged Abuse;

        (vi)    the age of the claimant at the time of the alleged Abuse; and

        (vii)    the amount paid to the claimant.

2.6.3    As of the first day on which the Plan Confirmation Order is a Final Order, Crosier Fathers, the Reorganized Debtor and the Trust, once established, shall reasonably cooperate in obtaining and providing the files, information and documents referred to in Sections 2.6, 2.6.1 and 2.6.2 at the Hartford Parties' reasonable request and expense (provided that the Hartford Parties shall have no obligation to pay, other than reasonable copying costs, any internal costs of Crosier Fathers or the Trust, including costs associated with time or expenses of the Trust's employees).  Such cooperation shall include providing the Hartford Parties' representatives access to all files relating to Channeled Claims, including all medical, claim status, and payment records contained in such files.  For the avoidance of doubt, Sections 2.6 and 2.6.1 through 2.6.6, and any results of such a review:

(a)     shall not affect Hartford's payment obligations under this Agreement;

(b)     shall not obligate Crosier Fathers or the Trust to collect any information from any claimant that it is not otherwise obligated to collect;

(c)     shall not give the Hartford Parties any right to challenge the allowance or payment of any Claim by the Trust;

(d)     shall not require Crosier Fathers to produce to Hartford the personnel files for any member whose file has not been produced to a Tort Claimant or his (or her) counsel;

(e)     shall not require Crosier Fathers or the Trust to generate any documents not within the ordinary course of their business, nor to provide any documents not within their respective possession, custody or control; and

(f)     shall not require Crosier Fathers or the Trust to make any representations or warranties regarding the accuracy of any information contained in or derived from a proof of claim in the Reorganization Case.

2.6.4    At the Trust's sole discretion, the Trust may satisfy its obligations under Section 2.6 by providing the Hartford Parties with a report ("Report") concerning Claims activity with respect to the time period that is the subject of the Hartford Parties' requests for relevant files, information and documents. If a Trust is required to collect under the Plan or any trust distribution procedures, or in fact collects the following information, such Reports shall include, subject to the information within the Trust's possession, custody or control:

(a)    With respect to the Trust, the number of total Claims filed, pending, settled or dismissed, the total indemnity paid, and total expense paid; and

(b)    With respect to each Claim resolved during the relevant period:

      (i)     the claimant's name and Social Security number;

      (ii)    the claim number, if any;

      (iii)   status (open or closed);

      (iv)   the date of first Abuse as set forth in the complaint or as reflected by information reasonably available to Crosier Fathers or the Trust (as applicable);

      (v)    the age of the claimant at the time of first alleged Abuse;

      (vi)   the name of the Abuse perpetrator for which the Crosier is alleged to be responsible;

      (vii)   date of death, if applicable; and

(viii)   the amount paid.

2.6.5   If the Trust exercises its discretion to provide Reports to the Hartford Parties pursuant to Section 2.6.4, the Trust shall still be obligated, at the Hartford Parties' request, to make available information and documents described in Sections 2.6.1 through 2.6.3 relating to Claims that are the subject of the Report.

2.6.6   Nothing in Sections 2.6.1 through 2.6.5 requires Crosier Fathers or the Trust to disclose any privileged information, violate any order, rule, local rule or statute concerning confidentiality of information contained in Proofs of Claim.

2.7     Medicare-Related Provisions.   Pursuant to Section 111 of the MMSEA ((42 U.S.C.A. § 1395y(b)(8)), the Trust shall be the applicable plan from which any Tort Claimants who might also be Medicare beneficiaries receive payment on account of their Tort Claims. All payment obligations to a Tort Claimant will be funded from the assets of the Trust, and the Trustee, in his capacity as trustee, shall be the fiduciary and/or administrator as that term is defined in 42 U.S.C.A. § 1395y(b)(8)(F). Accordingly, the Trustee shall be the Responsible Reporting Entity ("Reporting Entity") as that term is defined in Section 111 of the MMSEA and the Confirmation Order shall so provide. The Trustee shall have responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any, pursuant to the MSP and Section 111 of the MMSEA and any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith.

2.7.1     On or after the date that the Confirmation Order becomes a Final Order, the Trustee shall determine, for any Tort Claimant whose Claim, including a proof of claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "Post-1980 Claimant"), by query (by the Trust, by Hartford or by claimant's counsel) to CMS: (i) whether that Post-1980 Claimant is Medicare Eligible (as defined in the Plan) and, if so, (ii) whether he or she has received any Conditional Payment arising from or relating to treatment for Abuse. The Trustee shall initiate such queries as soon as practicable, including prior to the Effective Date. The Trust shall also, reasonably contemporaneously with initiating such queries, provide to Hartford all information necessary to perform the same queries, although Hartford is under no obligation to conduct such queries.

2.7.2     If the Trustee does not receive a response from CMS (including a response from a query that Hartford or Tort Claimant's counsel has initiated, so long as Hartford receives a copy of any such query initiated by Tort Claimant's counsel) within seventy-five days as to whether a Post-1980 Claimant is Medicare Eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response, certify in writing to the Trustee that he or she (i) is not Medicare Eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSP.

2.7.3     Prior to issuing a payment to any Tort Claimant who is Medicare Eligible, the Trust and Trustee shall require that Tort Claimant's counsel to hold in escrow an amount equal to the lesser of (1) the amount of the potential payment to the Tort

Claimant or (2) the amount of any Medicare Conditional Payments, including Conditional Payments issued by Medicare Advantage Organizations (MAOs). Such amount shall be held in escrow until such time that Tort Claimant's counsel has provided written documentation from Medicare, including any MAO, demonstrating that such conditional payments have been satisfied, waived or otherwise released.

2.7.4    If a portion of the Settlement Amount is paid to any Tort Claimant who is identified as Medicare Eligible, the Reporting Entity will report such payments to Medicare in accordance with the MMSEA. The Reporting Entity also will provide to the Hartford Parties all information necessary for the Hartford Parties to report such payments to Medicare including the information listed in Section 2.6.2(b) of this Agreement. The Hartford Parties may, but are not required to, report to Medicare payments made to Tort Claimants who are Medicare Eligible even though the Hartford Parties do not agree that they are a Responsible Reporting Entity under the MMSEA for such payments.

2.7.5    The Trust shall defend, indemnify and hold harmless the Reorganized Debtors and the Hartford Parties from any Claims related to reporting and payment obligations under the MSPA and/or MMSEA, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims.

2.7.6    Subject to the provisions of the Plan and the Trust Agreement, the Trust Assets may also be used for payment of indemnity and expenses relating to reimbursing the United States government or its contractors for conditional payments made pursuant to the MSPA applicable to any given Medicare Beneficiary, Tort Claimants and Unknown Tort Claimants. Except for the payment of amounts payable under this Agreement and/or the Plan, no Hartford Party or Crosier Fathers Party shall be obligated to make any payments for this purpose, including any payments to the Trust.

2.8    The Parties shall cease all litigation activities against each other in the Coverage Suit; provided, however, that each Party may take whatever steps that, in its sole judgment, are necessary to defend its interests so long as it remains a party in the Coverage Suit. But in no event shall any further litigation in the Coverage Suit relieve Hartford of its obligation to pay the Settlement Amount nor obligate Hartford to pay more than the Settlement Amount unless this Agreement is terminated in accordance with Section 5.

2.9    Within seven (7) days after Hartford pays the Settlement Amount, the Parties shall sign and file any necessary papers to dismiss with prejudice any and all claims asserted in the Coverage Suit. The Parties agree that such action shall not constitute any violation of the Automatic Stay in the Reorganization Case, to the extent such stay is then in force.

## 3.  PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    <u>Conditions Precedent.</u>  Hartford's obligation to pay the Settlement Amount is conditioned on entry of the Approval Order and the Plan Confirmation Order (the "<u>Bankruptcy Orders</u>") as Final Orders. Notwithstanding the foregoing, nothing shall prevent Hartford, in its sole discretion, from paying the Settlement Amount after entry of the

Approval Order and Plan Confirmation Order and waiving the requirement that each become a Final Order prior to payment. If Hartford waives the requirement that each become a Final Order prior to payment, the definition of Final Order under this Agreement shall be deemed to include the waiver of each such order being a Final Order.

3.2     In full and final settlement of all responsibilities under and arising out of the Hartford Policies including the Hartford Non-Excluded Policies that were issued to Crosier Fathers or under which any Crosier Fathers Party is an insured, and in consideration of the sale of the Hartford Non-Excluded Policies to Hartford free and clear of all Interests of any Person and the other releases provided herein, Hartford shall pay the Settlement Amount in accordance with the Plan or such sum as remains after payments, if any, are made pursuant to Section 2.5.4 above are deducted from the Settlement Amount pursuant to Section 2.5.4. Such payment shall be made within ten (10) days after Hartford receives written notice from Crosier Fathers that the Bankruptcy Orders are Final Orders and Hartford has received directions as to transmission of the payment, unless Hartford elects to tender the Settlement Amount on an earlier date pursuant to Section 3.1.

3.3     The Parties agree that the Settlement Amount is the total amount Hartford is obligated to pay on account of (1) any and all Claims under, arising out of, relating to, or in connection with the Hartford Non-Excluded Policies (including Channeled Claims and any reimbursement obligations for Conditional Payments under the Medicare Secondary Payor Act "MSPA") and (2) any and all Claims that are discharged under any confirmed Plan or pursuant to the Plan Confirmation Order. Upon payment of the Settlement Amount, under no circumstance will the Hartford Parties ever be obligated to:  (i) make any additional payments to or on behalf of anyone in connection with the Hartford Non-Excluded Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Channeled Claims; (ii) to make any additional payments to or on behalf of the Crosier Fathers Parties or any Tort Claimants in connection with any policies of insurance issued or allegedly issued by the Hartford Parties with respect to any Claims that, directly or indirectly, arise out of, relate to, or are in connection with any Tort Claims, including any Channeled Claims; and all limits of liability of the Hartford Non-Excluded Policies shall be deemed fully and properly exhausted.

3.4     The Parties agree that (a) the consideration to be provided by Hartford pursuant to this Agreement (including the Settlement Amount) constitutes a fair and reasonable exchange for the consideration granted to the Hartford Parties in this Agreement (including the releases set forth below), and (b) the consideration to be provided by Crosier Fathers to the Hartford Parties pursuant to this Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Crosier Fathers Parties in this Agreement (including the Settlement Amount). Hartford is not acting as a volunteer in paying the Settlement Amount, and payment of the Settlement Amount reflects potential liabilities and obligations to Crosier Fathers of amounts Hartford allegedly is obligated to pay or may become obligated to pay on account of Claims.

## 4.  RELEASES AND SALE FREE AND CLEAR

4.1     Upon Hartford's payment of the Settlement Amount pursuant to Section 3 of this Agreement:

**EXECUTION COPY**

(a) Crosier Fathers Parties hereby fully, finally, and completely remise, release, acquit, and forever discharge the Hartford Parties and any of their reinsurers or retrocessionaires, solely in their capacity as such, from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims or the Hartford Non-Excluded Policies, including any Channeled Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case; and

(b) Crosier Fathers Parties further fully, finally and completely remise, release, acquit, and forever discharge the Hartford Parties and any of their reinsurers or retrocessionaires, solely in their capacity as such, from any and all past, present, and future Claims, including Claims arising out of or relating in any way to the Hartford Policies, for which Crosier Fathers receives a discharge pursuant to Sections 524 and 1141 of the Bankruptcy Code or under the terms of any confirmed Plan or the Bankruptcy Orders.

4.2      Upon Hartford's payment of the Settlement Amount, the Hartford Parties fully, finally, and completely remise, release, acquit, and forever discharge the Crosier Fathers Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims or the Hartford Non-Excluded Policies, including any Channeled Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Case.

4.3      From and after the first day on which the Bankruptcy Orders are Final Orders, none of the Crosier Fathers Parties shall assert against any of the Hartford Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Hartford Non-Excluded Policies, any Channeled Claim, any Tort Claim and/or any other matter released pursuant to Section 4.1 above. Notwithstanding the foregoing, nothing herein shall preclude the Crosier Fathers Parties from enforcing their right to obtain payment of the Settlement Amount if Hartford does not make such payment in accordance with Section 3.2 of this Agreement.

4.4      As of the date that Hartford pays the Settlement Amount, the Hartford Parties buy back from Crosier Fathers, and Crosier Fathers sell to the Hartford Parties, the Hartford Non-Excluded Policies, and any Interests in all remaining Hartford Policies to the extent they provide or allegedly provide coverage for Claims released under Section 4.1(b) of this Agreement. Such buybacks shall be free and clear of all Interests of all Persons, including all Interests of the Crosier Fathers Parties, any other Person claiming coverage by, through, or on behalf of any of the Crosier Fathers Parties, any other insurer, and any Tort Claimant.

4.5      The Parties agree that this sale of the Hartford Policies set forth in Section 4.4 of this Agreement is pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that: (a) the Hartford Parties are good faith purchasers of the Hartford Non-Excluded Policies and Interests in all remaining Hartford Policies to the extent they provide or allegedly provide coverage for Claims released under Section 4.1(b) of this Agreement within the meaning of

14

section 363(m) of the Bankruptcy Code; (b) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Hartford Non-Excluded Policies and Interests in all remaining Hartford Policies to the extent they provide or allegedly provide coverage for Claims released under Section 4.1(b) of this Agreement and constitutes reasonably equivalent value; (c) the releases in this Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws; (d) upon entry of the Bankruptcy Orders as Final Orders, the Hartford Non-Excluded Policies and Interests in all remaining Hartford Policies to the extent they provide or allegedly provide coverage for Claims released under Section 4.1(b) of this Agreement shall be terminated and of no further force and effect; (e) Hartford's payment of the Settlement Amount constitutes the full and complete performance of any and all obligations under the Hartford Non-Excluded Policies, including any performance owed to the Crosier Fathers Parties, and exhausts all limits of liability; (f) all Interests the Crosier Fathers Parties may have had, may presently have, or in the future may have in the Hartford Non-Excluded Policies will be released pursuant to the terms of this Agreement upon the date that Hartford pays the Settlement Amount; and (g) all Interests the Crosier Fathers Parties may have had, may presently have, or in the future may have in the other Hartford Policies for Claims released pursuant to Section 4.1(b) of this Agreement will be released pursuant to the terms of this Agreement.

4.6      The Bankruptcy Orders shall further provide that the Crosier Fathers Parties accept the Settlement Amount in full and complete satisfaction of the Hartford Parties' past, present, and future obligations as to any and all Claims for insurance coverage or policy benefits under (i) the Hartford Non-Excluded Policies and (ii) all other Hartford Policies with respect to Crosier Fathers' liability for Claims for which Crosier Fathers have received a discharge pursuant to Sections 524 and 1141 of the Bankruptcy Code and under the Plan and the Plan Confirmation Order effective upon the Bankruptcy Orders becoming Final Orders and the Plan Effective Date having occurred. This applies whether such obligations are legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent and regardless of whether or not such Claims arise from, relate to or are in connection with the Channeled Claims or the Reorganization Case.

4.7      Crosier Fathers represent and warrant that they are not presently aware of liability insurance coverage from any other insurer, not a Party, that was issued to Crosier Fathers or under which any of Crosier Fathers is an insured or otherwise entitled to benefits that may provide coverage for Abuse Claims, including Tort Claims. In the event that Crosier Fathers learn of such other insurance, and if Crosier Fathers enter into any agreement with such other insurer in the Reorganization Case that provides such insurer with releases or other benefits that are more favorable than those contained in this Agreement, then this Agreement shall be deemed to be modified to provide the Hartford Parties with those more favorable releases and/or benefits. Crosier Fathers shall notify Hartford promptly of the existence of both other available insurance, if any, and of entry into any other agreement providing such insurer with more favorable releases or benefits.

4.8      Notwithstanding anything in this Agreement, nothing in this Agreement is intended to or shall be construed to apply to or have any effect on the Hartford Parties' right to reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover

losses arising under or in connection with the Hartford Policies or any other binder, certificate, or policy of insurance issued by the Hartford Parties.

4.9      This Section 4 is not intended to, and shall not be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement.

## 5. TERMINATION OF AGREEMENT

5.1      Crosier Fathers or Hartford may terminate this Agreement prior to the Bankruptcy Orders becoming Final Orders by providing written notice to the other Party if one or more of the conditions ("Termination Conditions") identified in Section 5.2 below occurs. Upon termination, this Agreement shall be void and of no effect and the Parties shall retain all of their rights, defenses, and obligations, including with respect to the Hartford Policies, as if this Agreement never existed.

5.2      Termination Conditions for purposes of Section 5.1 of this Agreement are:

(a)      the Bankruptcy Court issues (i) an order denying the request for the Approval Order, the Channeling Injunction, or the Supplemental Injunction, (ii) an order denying confirmation of the Plan (including any amendments or modifications thereto which are consistent with the terms of this Agreement) containing either the Channeling Injunction or the Supplemental Injunction, (iii) an order confirming a plan proposed by Tort Claimants or any other Person other than Crosier Fathers, or (iv) an order dismissing the Reorganization Case, and either:

(i)      any of the foregoing orders becomes a Final Order; or

(ii)      both of the following have occurred:

(x)      the Debtor has sought interlocutory review of each such order by all possible means, including by invoking all exceptions to the final order requirement for appellate review, all certifications for immediate appeal, and all available writs, each as provided by the federal rules, U.S. Code, or decisional authority, and all such requests have been denied by all reviewing courts; and

(y)      one year has elapsed since remand or refusal to permit interlocutory appeal and issuance of a mandate or order in response to the last application for review;

or:

(b)      Crosier Fathers and Hartford agree that the Agreement should be terminated by written agreement.

5.3      If this Agreement is terminated in accordance with Sections 5.1 and 5.2 above, then notwithstanding any other proceedings in the Reorganization Case, the Parties agree that Hartford shall be given a reasonable opportunity to file objections to any proposed

16

bankruptcy plan that does not afford Hartford all of the benefits provided for in this Agreement, and that all such objections are preserved.

## 6. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1        The Parties separately represent and warrant as follows:

6.1.1   To the extent it is a corporation, including a non-profit corporation, or other legal entity, it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

6.1.2   This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

6.2        Crosier Fathers represent and warrant that they have not and will not assign any Interest in the Hartford Policies including the Hartford Non-Excluded Policies.

6.3        Crosier Fathers represents and warrants that to the best of its knowledge that it is the owner of the Hartford Policies, including the Hartford Non-Excluded Policies, and that no Person that is not a Crosier Fathers Party has any Interest in the Hartford Policies.

6.4        Crosier Fathers and Hartford, respectively, represent and warrant that they have completed a search for evidence of any Hartford Policy that could afford coverage with respect to any Tort Claim.  Other than the policies or alleged policies identified in Exhibits 1 and 2, no such policies have been identified.  Notwithstanding the foregoing, nothing in this Agreement, including the Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued and/or affords coverage in connection with any Tort Claims.

## 7. ACTIONS INVOLVING THIRD PARTIES

7.1        For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Policies resulting from the purchase and sale thereof contemplated by this Agreement, the Crosier Fathers Parties hereby agree as follows:

7.1.1   From and after the first day on which the Bankruptcy Orders become Final Orders, if any other Person obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Hartford Parties as a result of a claim for contribution, subrogation or indemnification for any of the Hartford Parties' alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Agreement, then Crosier Fathers or the Trust, as applicable, shall voluntarily reduce its judgment or Claim against, or settlement with, such other Person to the extent necessary to satisfy such contribution, subrogation or indemnification claims against the Hartford Parties. To ensure that such a reduction is accomplished, the Hartford Parties shall be entitled to assert this Section 7 as a defense to any action against them brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request

17

that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Hartford Parties from any liability for the judgment or Claim.

7.1.2   Unless this Agreement is terminated, the Hartford Parties shall not seek reimbursement for any payments they make under this Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other insurer unless such other insurer first seeks contribution, subrogation, indemnification, or similar relief from any of the Hartford Parties. Notwithstanding the foregoing, nothing herein shall be construed as prohibiting any of the Hartford Parties from seeking recovery from their reinsurers.

7.2      From and after the Plan Effective Date, the Trust shall indemnify, and hold harmless the Hartford Parties with respect to any and all Claims relating to the Hartford Non-Excluded Policies, including all Claims made by (i) any Person who has made, will make, or can make a Tort Claim or Related Insurance Claim; (ii) claims by other insurers, if any, for contribution, subrogation, indemnification or other similar relief; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim arising out of or relating to a Tort Claim under any of the Hartford Policies. This indemnification includes Claims made by Persons over whom Crosier Fathers does not have control, including any other Person who asserts Claims against or rights to coverage under any of the Hartford Policies. The Hartford Parties shall have the right to defend any Claims identified in this Section 7.2 and shall do so in good faith. The Hartford Parties agree to notify the Trust as soon as practicable of any Claims identified in this Section 7.2 and of their choice of counsel. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Hartford Parties in defending and resolving such Claims.

7.3      If any Person attempts to prosecute a Channeled Claim against any of the Hartford Parties before the Bankruptcy Orders become Final Orders, then promptly following notice to do so from the Hartford Party against whom the Claim is asserted, Crosier Fathers will file a motion and supporting papers to obtain an order from the Court, pursuant to Bankruptcy Code §§ 362 and 105(a), protecting the Hartford Party from any such Claims until the Bankruptcy Orders become Final Orders.

## 8.  MISCELLANEOUS

8.1      If any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

8.2      The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.

8.3      The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Reorganization Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably

18

requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof. If the Bankruptcy Court issues an order denying the request for the Channeling Injunction, denying confirmation of the Plan as such may be amended or modified, confirming a plan proposed by a Person other than the Crosier Fathers, or dismissing the Reorganization Case or if the Bankruptcy Court issues an order on the Approval Motion that refuses to approve the Agreement, Crosier Fathers shall exhaust all rights to appeal with respect to such order and, if no appeal of right is allowed, Crosier Fathers shall seek interlocutory review of each such order by all possible means, including by invoking all exceptions to the final order requirement for appellate review, all certifications for immediate appeal, and all available writs, each as provided by the federal rules, U.S. Code, or decisional authority unless Hartford and the Crosier Fathers agree that no such appeals or further appeals should be pursued. Notwithstanding the foregoing, Crosier Fathers shall not be obligated to seek a writ of certiorari from the United States Supreme Court

8.4     This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.5     This Agreement may be modified only by a written amendment signed by the Parties, and no waiver of any provision of this Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

8.6     By entering into this Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

8.7     This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret Hartford's obligations under any of the Hartford Policies or any other binder, certificate, or policy of insurance issued by the Hartford Policies.

8.8     None of the Parties shall make any public statements or disclosures, except for statements in pleadings in the Reorganization Case, regarding the Agreement. No Party shall assert imply in any way that any other Party acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Hartford Policies or any other binder, certificate, or policy of insurance

EXECUTION COPY

issued or allegedly issued by the Hartford Parties, including handling of or involvement in connection with the Tort Claims or the resolution of the Tort Claims.

8.9     Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties.

8.10     This Agreement was jointly drafted by the Parties and the language of all parts of this Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any of the Parties.

8.11     Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

8.12     All notices, demands, or other communication to be provided pursuant to this Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to Crosier Fathers:

> Thomas A. Ennecking, OSC
> 717 East Southern
> Phoenix, AZ  85040

> With copy to:

> Susan G. Boswell
> Quarles & Brady LLP
> One South Church Street, Suite 1700
> Tucson, AZ  85701
> Susan.Boswell@quarles.com

If to Hartford:

> Glenn A. Frankel
> Vice President
> The Hartford
> Hartford Plaza, T-7
> Hartford, CT  06155
> glenn.frankel@thehartford.com

> With copy to:

> James P. Ruggeri
> Joshua D. Weinberg
> Shipman & Goodwin LLP
> 1875 K Street, NW
> Washington, D.C.  20006
> jruggeri@thehartford.com
> jweinberg@thehartford.com

8.13     This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.  This agreement may be electronically signed.  Any such electronic signatures are the same as handwritten signatures for the purposes of validity, enforceability and admissibility.

8.14     Nothing contained in this Agreement shall be deemed or construed to constitute (i) an admission by any of the Hartford Parties that the Crosier Fathers Parties, or any other Person was or is entitled to any insurance coverage under any of the Hartford Policies or any other binder, certificate, or policy of insurance issued by the Hartford Parties or as to the validity of any of the positions that have been or could have been asserted by the Crosier Fathers Parties, (ii) an admission by the Crosier Fathers Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Hartford Parties or any Claims that have been or could have been asserted by the Crosier Fathers Parties against the Hartford Parties, or (iii) an admission by the Crosier Fathers Parties or the Hartford Parties of any liability or validity whatsoever with respect to any of the Tort Claims.

8.15     Subject to Sections 2.5.4 and 2.5.5, the Crosier Fathers and Hartford shall each be responsible for their own fees and costs incurred in connection with the Reorganization Case, this Agreement, and the implementation of this Agreement.

8.16     Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17     The Bankruptcy Court entering the Approval Order and the Confirmation Order shall retain jurisdiction to interpret and enforce the provisions of the Approval Order, the Confirmation Order and this Agreement, which shall be construed in accordance with Minnesota law except to the extent preempted by bankruptcy law.  The Hartford Parties do not, by virtue of this Section 8.18 or any other provision in this Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.18     This Agreement and Crosier Fathers's obligations under this Agreement shall be binding on the Reorganized Debtors and shall survive the entry of the Plan Confirmation Order.

**EXECUTION COPY**

8.19     This Agreement shall be effective on the Execution Date, subject to approval of the Bankruptcy Court and the provisions herein.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of Crosier Fathers**

By: _Tom Enneking_

_TOM ENNEKING_

Title: _Prior Provincial_

Date: _02-06-2018_

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of Hartford**

By: _____

Title: _____

Date: _____

22

8.19      This Agreement shall be effective on the Execution Date, subject to approval of the Bankruptcy Court and the provisions herein.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

### On behalf of Crosier Fathers

By: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

### On behalf of Hartford

By: _____

Title: V.P. _____

Date: 2/6/18 _____

22

**EXECUTION COPY**

## EXHIBIT 1

### KNOWN HARTFORD NON-EXCLUDED POLICIES

**Primary Policies**

| Policy Number | Effective Date | End Date | Issuing Company |
|---|---|---|---|
| 83CBP105312 | 6/30/1969 | 6/30/1972 | Twin City Fire Insurance Company |
| 36CBP105775 | 6/30/1972 | 6/30/1975 | Twin City Fire Insurance Company |
| 36CBP185308 | 6/30/1975 | 6/30/1978 | Twin City Fire Insurance Company |
| 36SMP107420 | 6/30/1978 | 6/30/1979 | Hartford Accident and Indemnity Company |
| 36SMP108713 | 6/30/1979 | 6/30/1980 | Hartford Accident and Indemnity Company |
| 36SMP109881 | 6/30/1980 | 6/30/1981 | Hartford Accident and Indemnity Company |
| 36SMP110502 | 6/30/1981 | 6/30/1983 | Hartford Accident and Indemnity Company |
| 36CBPJG0376 | 6/30/1983 | 6/30/1986 | Hartford Casualty Insurance  Company |
| 36CBPJG0376 | 6/30/1986 | 6/30/1987 | Hartford Accident and Indemnity Company |
| 36CBPJG0376 | 6/30/1987 | 6/30/1988 | Hartford Accident and Indemnity Company |

**Umbrella Policies**

| Policy Number | Effective Date | End Date | Issuing Company |
|---|---|---|---|
| 83 XHU 600187 | 11/1/1970 | 11/1/1973 | Hartford Accident and Indemnity Company |
| 36 HU 630404 | 11/1/1973 | 11/1/1976 | Hartford Accident and Indemnity Company |
| 36 HU 630811 | 11/1/1976 | 6/30/1978 | Hartford Accident and Indemnity Company |
| 36 HU 631110 | 6/30/1978 | 6/30/1979 | Hartford Accident and Indemnity Company |
| 36 RHU 631197 | 6/30/1979 | 6/30/1980 | Hartford Accident and Indemnity Company |

**EXECUTION COPY**

| | | | |
|---|---|---|---|
| 36RHU 631482 | 6/30/1980 | 6/30/1981 | Hartford Accident and Indemnity Company |
| 36 RHU 661031 | 6/30/1981 | 6/30/1982 | Hartford Accident and Indemnity Company |
| 36 RHU 661031 | 6/30/1982 | 6/30/1983 | Hartford Accident and Indemnity Company |
| 36 RHU 661031 | 6/30/1983 | 6/30/1984 | Hartford Accident and Indemnity Company |
| 36 RHU KB6756 | 6/30/1984 | 6/30/1985 | Hartford Accident and Indemnity Company |
| 36HHUPE3859 | 6/30/1985 | 6/30/1986 | Hartford Accident and Indemnity Company |
| 36HHUPE3859 | 6/30/1987 | 6/30/1988 | Hartford Accident and Indemnity Company |
| 36HHUPE3859 | 6/30/1988 | 6/30/1989 | Hartford Accident and Indemnity Company |
| 36RHURL8795 | 6/30/1989 | 6/30/1990 | Hartford Accident and Indemnity Company |
| 36RHURL8795 | 6/30/1990 | 6/30/1991 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1991 | 6/30/1992 | Hartford Casualty and Insurance Company |

**EXECUTION COPY**

## EXHIBIT 2

## ALL OTHER KNOWN OR ALLEGED HARTFORD POLICIES

**Primary Policies**

| Policy Number | Effective Date | End Date | Issuing Company |
|---|---|---|---|
| 36UUNNL8672 | 6/30/1988 | 6/30/1989 | Hartford Accident and Indemnity Company |
| 36UUNNQ6844 | 6/30/1989 | 6/30/1990 | Hartford Accident and Indemnity Company |
| 36UUNNQ6844 | 6/30/1990 | 6/30/1991 | Hartford Accident and Indemnity Company |
| 36UUNNQ6844 | 6/30/1991 | 6/30/1992 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1992 | 6/30/1993 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1993 | 6/30/1994 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1994 | 6/30/1995 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1995 | 6/30/1996 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1996 | 6/30/1997 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1997 | 6/30/1998 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1998 | 6/30/1999 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/1999 | 6/30/2000 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2000 | 6/30/2001 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2001 | 6/30/2002 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2002 | 6/30/2003 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2003 | 6/30/2004 | Twin City Fire Insurance Company |

**EXECUTION COPY**

| | | | |
|---|---|---|---|
| 36UUNNQ6844 | 6/30/2004 | 6/30/2005 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2005 | 6/30/2006 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2006 | 6/30/2007 | Twin City Fire Insurance Company |
| 36UUNNQ6844 | 6/30/2007 | 6/30/2008 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2008 | 6/30/2009 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2009 | 6/30/2010 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2010 | 6/30/2011 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2011 | 6/30/2012 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2012 | 6/30/2013 | Hartford Underwriters Insurance Company |
| 36UUNNQ6844 | 6/30/2013 | 6/30/2014 | Twin City Fire Insurance Company |
| 36UUNNPY9310 | 6/30/2014 | 6/30/2015 | Hartford Fire Insurance Company |
| 36UUNNPY9310 | 6/30/2015 | 6/30/2016 | Hartford Fire Insurance Company |
| 36UUNNPY9310 | 6/30/2016 | 6/30/2017 | Hartford Fire Insurance Company |

## Umbrella Policies

| Policy Number | Effective Date | End Date | Issuing Company |
|---|---|---|---|
| 36RHURL8795 | 6/30/1993 | 6/30/1994 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1994 | 6/30/1995 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1995 | 6/30/1996 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1996 | 6/30/1997 | Hartford Casualty and Insurance Company |

**EXECUTION COPY**

| | | | |
|---|---|---|---|
| 36RHURL8795 | 6/30/1997 | 6/30/1998 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1998 | 6/30/1999 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/1999 | 6/30/2000 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2000 | 6/30/2001 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2001 | 6/30/2002 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2002 | 6/30/2003 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2003 | 6/30/2004 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2004 | 6/30/2005 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2005 | 6/30/2006 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2006 | 6/30/2007 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2007 | 6/30/2008 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2008 | 6/30/2009 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2009 | 6/30/2010 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2010 | 6/30/2011 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2011 | 6/30/2012 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2012 | 6/30/2013 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2013 | 6/30/2014 | Hartford Casualty and Insurance Company |
| 36RHURL8795 | 6/30/2014 | 6/30/2015 | Hartford Casualty and Insurance Company |
| 36RHUPY8414 | 6/30/2015 | 6/30/2016 | Hartford Casualty and Insurance Company |
| 36RHUPY8414 | 6/30/2016 | 6/30/2017 | Hartford Casualty and Insurance Company |

**EXECUTION COPY**

## Other Alleged Policies

| Policy Number | Effective Date | End Date | Issuing Company |
|---|---|---|---|
| 80 CBP 101917 | 6/30/1962 | 6/30/1963 | |
| 80 CBP 101917 | 6/30/1963 | 6/30/1964 | |
| 80 CBP 101917 | 6/30/1964 | 6/30/1965 | |
| 80 CBP 101917 | 6/30/1965 | 6/30/1966 | |
| 80 CBP 101917 | 6/30/1966 | 6/30/1967 | |
| 80 CBP 101917 | 6/30/1967 | 6/30/1968 | |
| 80 CBP 101917 | 6/30/1968 | 6/30/1969 | |
| | | | |
| 36HHUPE3859 | 6/30/1986 | 6/30/1987 | |
| 36RHURL8795 | 6/30/1992 | 6/30/1993 | |

# EXHIBIT D

## CROSIER FATHERS AND BROTHERS PROVINCE, INC., CROSIER FATHERS OF ONAMIA, AND THE CROSIER COMMUNITY OF PHOENIX
## TRUST AGREEMENT

This TRUST AGREEMENT is made and entered into as of the Effective Date of the *Joint Plan of Reorganization* dated December 22, 2017 (together with any and all amendments thereto, all exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof) (the "Plan") in the following bankruptcy cases pending in the United States Bankruptcy Court for the District of Minnesota: (1) *Crosier Fathers and Brothers Province, Inc.* (Case No. 17-41681); (2) *Crosier Fathers of Onamia* (Case No. 17-41682), and (3) *The Crosier Community of Phoenix* (Case No. 17-41683), by and between the Crosier Fathers and Brothers Province, Inc., Crosier Fathers of Onamia, and The Crosier Community of Phoenix (the "Debtors") on the one hand and _____ ("Trustee") on the other hand.   This Trust Agreement is entered into pursuant to the Plan.   Unless otherwise defined herein, capitalized terms used in this Trust Agreement shall have the meanings assigned to them in Article 2 of the Plan.   Terms defined in the Bankruptcy Code, and not otherwise specifically defined in the Plan or herein, when used herein, have the meanings attributed to them in the Bankruptcy Code.

## RECITALS

A.      On the Petition Date, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code.   Each Debtor continued in possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

B.      On _____, 2018, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order").

C.      The Plan provides for the creation of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.      Pursuant to the Plan, the Trust is to use the Trust Assets to pay the Class 8 and Class 9 Claims.

E.      The Trust is established for the benefit of the Beneficiaries and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder and codified at 16 C.F.R. Sections 1.468B-1 through 1.468B-5.

F.      Pursuant to the Plan and the Confirmation Order, the Trustee was duly appointed as a representative of the Estates pursuant to Sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the premises and the provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

# ARTICLE I

# AGREEMENT OF TRUST

1.1     Creation and Name.  The Debtors hereby create a trust known as "The Crosier Settlement Trust," which is the Trust provided for in the Plan.  In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

1.2     Purpose.  The purpose of the Trust is to assume responsibility for preserving, managing and distributing Trust Assets to Class 8 and Class 9 Claimants in accordance with the Trust Agreement and the requirements of the Plan and the Confirmation Order.

1.3     Transfer of Assets.  Pursuant to the Plan and the Confirmation Order, the Debtors irrevocably transfer, absolutely grant, assign, convey, sets over and deliver to the Trustee, and at such times as set forth in the Plan, all of its right, title and interest in and to the Trust Assets, including the cash amounts identified in Section 19.1 of the Plan, to be held in trust and for the uses and purposes stated herein and in the Plan.  The Trustee hereby agrees to accept and hold the Trust Assets in trust for the Beneficiaries subject to the terms of this Trust Agreement and the Plan.  The Trustee is hereby authorized to file with governmental authorities any documents necessary or helpful to establish the Trust.

1.4     Irrevocability.  The Trust shall be irrevocable.  The Reorganized Debtors shall not alter, amend, revoke or terminate the Trust.  The Reorganized Debtors shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtors.

1.5     Beneficiaries.  The beneficiaries of the Trust ("Beneficiaries") are Class 8 and Class 9 Claimants whose Claims are not disallowed by the Abuse Claims Reviewer.

1.6     Acceptance of Assets and Assumption of Liabilities.

1.6.1     In furtherance of the purposes of the Trust, the Trustee hereby accepts the trusteeship of the Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery of Trust Assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan and the Confirmation Order.

1.6.2     In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing and distributing Trust Assets to the Beneficiaries. The Claims of the Beneficiaries will be evaluated by the Abuse Claims Reviewer in accordance with the Allocation Protocols attached hereto as Exhibit 1.

1.6.3     The Trustee shall have all the rights, powers and duties set forth in this Trust Agreement, the Allocation Protocols and the Plan, and available under applicable law, for accomplishing the purposes of the Trust.  The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Trust and in accordance with applicable law.  The Trustee shall have the authority to bind the Trust within the limitations set forth

2

herein but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6.4   In furtherance of the purposes of the Trust, the Trustee assumes responsibility for: (a) making payments to Beneficiaries; (b) receiving, collecting, liquidating, maintaining and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement and the Plan.  The Trust will be administered consistent with the liquidating purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the liquidation value of the Trust Assets or as otherwise provided in the Plan.

1.6.5   <u>Source of Payments</u>.  All Trust expenses and all liabilities of the Trust with respect to Class 8 and Class 9 Claims shall be payable solely by the Trustee out of the Trust Assets.

## ARTICLE II

## <u>CORPUS OF THE TRUST</u>

2.1   <u>Trust Composition</u>.  The Trust Assets shall include all property transferred to the Trust pursuant to the Plan and future orders of the Bankruptcy Court, including (but not limited to) all rights of every kind, nature and description transferred to the Trust pursuant to Section 19.1 of the Plan, future orders of the Bankruptcy Court, or otherwise belonging to the Trust.

2.2   <u>Transfer to Trustee</u>.  From and after the Effective Date of the Plan, pursuant to, and at such times set forth in the Plan, title to and all rights and interests in the Trust Assets shall be transferred to the Trust free and clear of all Interests of any kind in such property of any other Person (including all Interests of creditors of or holders of claims against or Interests in the Debtors) in accordance with Sections 1123, 1141 and 1146(a) of the Bankruptcy Code, except as otherwise expressly provided for in the Plan.  The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3   <u>Trustee's Right to and Title and Interest in Trust Assets</u>.  Upon the transfer of the Trust Assets, the Trustee succeeds to all of the Debtors' and the Estates' right to and title and Interest in the Trust Assets, and the Debtors and the Estates will have no further right to or title or Interest in or with respect to the Trust Assets or this Trust, except as provided herein, in the Plan or the Confirmation Order.

2.4   <u>No Tax on Transfers to Trust</u>.  Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale or assignments executed in connection with any transfer to the Trust, or receipt, or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

2.5   <u>Spendthrift Provision</u>.  To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of

creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court.

2.6     Trust Corpus.    The entirety of the Trust's corpus shall be available to pay Beneficiaries and authorized expenses.  The Trust Corpus shall be allocated, administered, and distributed as provided in the Allocation Protocols.

2.7     Future Tort Claim Reserve Fund.  Five percent (5%) of the Trust's initial corpus shall be allocated to the Unknown Claims Reserve.  The balance of the initial funding shall be available to pay eligible Class 8 Claims under the Allocation Protocols and authorized expenses.

2.8     Counsel Fees.  Each claimant's counsel fees will be deducted and paid from the claimant's individual recovery and shall not be paid from the gross amount available for distribution among multiple claimants occupying a given class or category.

## ARTICLE III

## POWERS AND DUTIES OF TRUSTEE

3.1     Powers and Duties.  The Trustee shall have, in addition to any other powers and discretions conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable Bankruptcy law and/or the Plan), the Plan and other provisions in this instrument, the following powers and discretions:

3.1.1    To act as custodian of, receive, control, manage, liquidate, monetize and dispose of all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order;

3.1.2    To abandon any property which it determines in its reasonable discretion to be of *de minimis* value or of more burden than value to the Trust;

3.1.3    To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

3.1.4    To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan;

3.1.5    To open and maintain bank accounts on behalf of the Trust, deposit funds therein and draw checks thereon, as appropriate under this Trust Agreement, the Plan and the Confirmation Order;

3.1.6    To obtain all reasonably necessary insurance coverage with respect to any property that is or may in the future become a Trust Asset;

3.1.7   To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs and expenses of administering the Trust as provided in this Trust Agreement and the Plan.  These fees, costs and expenses include: (a) the fees of bankruptcy claims and/or distribution agents; (b) the fees and costs of Professionals employed by the Trustee, such as the Abuse Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries or auditors; and (c) the premiums charged by insurers, including, but not limited to, professional liability insurers;

3.1.8   In accordance with the evaluation of the Abuse Claims Reviewer pursuant to the Allocation Protocols, to make distributions to Beneficiaries in accordance with the Allocation Protocols and the Plan;

3.1.9   In its discretion, to rely on the authenticity of the signature of the Abuse Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Abuse Claims Reviewer in the administration of the Allocation Protocols and assessment of the Class 8 and Class 9 Claims without any verification or confirmation;

3.1.10  In its discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust;

3.1.11  To retain any attorney-at-law, Abuse Claims Reviewer, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence;

3.1.12  To make, sign, execute, acknowledge and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan and/or the Trust or to maintain and administer the Trust;

3.1.13  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including Bankruptcy Rule 2004;

3.1.14  To file a motion with the Bankruptcy Court, with notice to the parties in interest, for a modification of the provisions of this Trust Agreement if the Trustee determines that such modification is necessary to conform to legal and/or administrative requirements and to the purpose of the Trust;

3.1.15  Upon any event terminating the Trust, to defer distribution of property from the Trust for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although Beneficiaries' rights to distributions shall vest immediately;

3.1.16  To comply with Bankruptcy Code Section 345 with regard to the investment of Trust Assets.  The Trustee is relieved of any obligation to diversify;

5

3.1.17  To establish such accounts, funds and reserves, as required by the Plan, for ease of administration.  Nothing in this provision shall restrict the Trustee's authority to pool such accounts, funds or reserves for investment purposes or require separate bank accounts for such accounts, funds or reserves;

3.1.18  To be responsible for only that property delivered to it and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.1.19  To meet its obligations under the Plan to cooperate with Reorganized Debtors and Hartford, including providing information relating to the Class 8 and Class 9 Claims submitted to the Trust including:

3.1.19.1     The total number of Claims filed, pending, settled and dismissed or disallowed, as well as the total indemnity paid and total expense incurred; and

3.1.19.2     For each Channeled Claim that has been resolved by settlement, judgment, disallowance or otherwise:

(i)      the claimant's name;

(ii)     the last four digits of the claimant's social security number;

(iii)    the identity of the claimant's abuser(s);

(iv)     a claim number, if the Trust uses such a number to identify Claims;

(v)      dates of alleged Abuse;

(vi)     the age of the claimant at the time of the alleged Abuse; and

(vii)    the amount paid to the claimant.

3.1.19.3     At the Trust's sole discretion, the Trust may satisfy its obligations under this subsection by providing a report ("Report") concerning Claims activity with respect to the time period that is the subject of their requests for relevant files, information and documents and including the information identified above.  If the Trust exercises its discretion to provide a Report containing the requested information, the Trust shall still be obligated, at the requesting party's request and reasonable expense, to make available documents relating to Claims that are the subject of the Report.

3.2  Medicare-Related Obligations.  In addition to the foregoing obligations, the Trustee shall be the RRE with responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any, pursuant to the MSP and Section 111 of the MMSEA and

QB\155907.00003\49955065.1

any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith.

3.2.1    On or after the date that the Confirmation Order becomes a Final Order, the Trustee shall determine, for any Tort Claimant whose Claim, including a proof of claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "Post-1980 Claimant"), by query to CMS: (i) whether that Post-1980 Claimant is Medicare Eligible (as defined in the Plan) and, if so, (ii) whether he or she has received any Conditional Payment arising from or relating to treatment for Abuse.  The Trustee shall initiate such queries as soon as practicable, including prior to the Effective Date.  The Trust shall also, reasonably contemporaneously with initiating such queries, provide to Hartford all information necessary to perform the same queries, although Hartford is under no obligation to conduct such queries.

3.2.2    If the Trustee does not receive a response from CMS (including a response from a query that Hartford or Tort Claimant's counsel has initiated, so long as Hartford receives a copy of any such query initiated by Tort Claimant's counsel) within seventy-five days as to whether a Post-1980 Claimant is Medicare Eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response, certify in writing to the Trustee that he or she (i) is not Medicare Eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSP.

3.2.3    Prior to issuing a payment to any Post-1980 Tort Claimant who is Medicare Eligible, the Trust and Trustee shall require that Tort Claimant's counsel to hold in escrow an amount equal to the lesser of (1) the amount of the potential payment to the Tort Claimant or (2) the amount of any Medicare Conditional Payments, including Conditional Payments issued by any MAO.  Such amount shall be held in escrow until such time that Tort Claimant's counsel has provided written documentation from Medicare, including any MAO, demonstrating that such conditional payments have been satisfied, waived or otherwise released.

3.2.4    If a portion of the Settlement Amount is paid to any Post-1980 Tort Claimant who is identified as Medicare Eligible, the Trust will report such payments to Medicare in accordance with the MMSEA.  The Trust will also provide to the Hartford Parties all information necessary for the Hartford Parties to report such payments to Medicare although Hartford is under no obligation to make such reports.

3.2.5    The Trust shall defend, indemnify and hold harmless the Reorganized Debtors and the Protected Parties from any Claims related to Medicare Claims reporting and payment obligations, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents.  The Trust shall not be required to create a reserve for this

potential obligation.

3.3    <u>Limitations on the Trustee</u>.  Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

        3.3.1    To guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

        3.3.2    To loan Trust Assets;

        3.3.3    To make any transfer or distribution of Trust Assets other than those authorized by this Trust Agreement, the Plan or the Confirmation Order;

        3.3.4    To engage in any trade or business;

        3.3.5    To engage in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

## ARTICLE IV

## TERMINATION OF THE TRUST

4.1    <u>When Termination Shall Occur</u>.  The Trustee shall terminate the Trust after its liquidation and the administration and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Plan.  The Trust shall terminate no later than the seventh (7th) anniversary of the Effective Date.

4.2    <u>Termination Procedures</u>.  After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed.  The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until distribution of all the Trust Assets.  For purposes of this provision Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $25,000.  At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of:  (a) the first anniversary of the final distribution of the Trust Assets; and (b) the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice thereof.

4.3    <u>Termination Distribution</u>.  Upon termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments remaining in the Trust, if any, including any investment earnings thereon to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order; provided that such funds and investments shall not exceed $25,000.  For the avoidance of doubt, any such funds in excess of $25,000 shall be distributed to the Beneficiaries of the Trust.

8

4.4    Discharge, Exculpation and Exoneration.    Upon termination of the Trust and accomplishing of all activities described in this Article, the Trustee and its professionals shall be discharged and exculpated from liability, and the Trustee's bond shall be exonerated (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his designated agents or representatives). The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

## ARTICLE V

## IMMUNITY, LIABILITY AND INDEMNIFICATION OF TRUSTEE

5.1    Limitations on Liability.    Neither the Trustee nor any of its duly designated agents or representatives or Professionals shall be liable for any act or omission taken or omitted to be taken by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or its designated agents or representatives.    The Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys-at-law, accountants, financial advisors and agents and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.    Notwithstanding such authority, the Trustee shall be under no obligation to consult with its attorneys-at-law, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Trustee, unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2    No Recourse Against Trustee Personally.    No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney-at-law, accountant or other Professional retained in accordance with the terms of this Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or trust agreement whatsoever executed by the Trustee in implementation of this Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any such promise, contract, instrument, undertaking, obligation, covenant or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets.    Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had against:    (a) the Trustee's bond or applicable insurance coverage and; (b) to the extent not covered by such bond, directly against the Trustee.

5.3    Indemnification.    The Trustee, using Trust Assets, shall defend, indemnify and hold harmless the Trustee, its officers, directors, agents, representatives and employees to the fullest extent that a corporation or trust organized under the laws of Minnesota is entitled to defend, indemnify and hold harmless its trustees, officers, directors, agents, representatives and

9

employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder; provided that neither the Trustee nor its officers, directors, agents, representatives or employees shall be defended, indemnified or held harmless in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 5.1.

## ARTICLE VI

## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE AND ITS AGENTS

6.1    <u>Trustee Compensation</u>.  The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in <u>Exhibit 2</u>.

6.2    <u>Compensation of Trustee's Agents</u>.  Any Person retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered at a rate reflecting actual time billed by such professional or Person on an hourly basis, at the standard billing rates in effect at the time of service, or such other rate or basis of compensation that is reasonable and agreed upon by the Trustee.

6.3    <u>Reimbursement of Expenses</u>.  Any and all reasonable and necessary costs and expenses incurred by the Trustee and any Person retained by the Trustee, in performing its respective duties under this Trust Agreement, will be reimbursed by the Trustee from the Trust Assets.

## ARTICLE VII

## SUCCESSOR TRUSTEES

7.1    <u>Vacancy Caused by Trustee Resignation or Removal</u>.

7.1.1    The Trustee may resign at any time upon thirty (30) days' written notice to be filed with the Bankruptcy Court.  The Trustee shall, within thirty (30) days after such resignation takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Trustee while serving as such.

7.1.2    The Bankruptcy Court may remove a Trustee upon finding that the Trustee has engaged in a serious breach of fiduciary duty.  The removal will take effect upon the date the Bankruptcy Court specifies.  In the event of removal, the Trustee shall, as soon as reasonably practical after such removal takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

7.2    <u>Outgoing Trustee Obligations</u>.  In the event of the resignation or removal of the Trustee, the outgoing Trustee shall:

7.2.1   Execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

7.2.2   Deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee; and

7.2.3   Otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee.

The resigning, removed or departed Trustee hereby irrevocably appoints the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

7.3   <u>Appointment of Successor Trustee</u>. Any vacancy in the office of Trustee shall be filled by the nomination of a majority of the members of the Committee (notwithstanding dissolution of the Committee on the Effective Date), subject to the approval of the Bankruptcy Court, after notice and a hearing. If at least three (3) members of the Committee do not participate in the nomination of a successor Trustee within thirty (30) days after the Trustee resigns or becomes unable to serve, the Bankruptcy Court shall designate a successor after notice to Beneficiaries and a hearing.

7.4   <u>Acceptance of Appointment of Successor Trustee</u>. Any successor Trustee's acceptance of appointment as a successor Trustee shall be in writing and shall be filed with the Bankruptcy Court. The acceptance shall become effective when filed with the Bankruptcy Court. The Trustee shall thereupon be considered the Trustee of the Trust without the necessity of any conveyance or instrument. Any successor Trustee shall have all of the rights, powers, duties, authority and privileges as if initially named as a Trustee hereunder. Any successor Trustee shall be exempt from any liability related to the acts or omissions of the Trustee prior to the appointment of the successor Trustee.

7.5   <u>Preservation of Record of Changes in Trustees</u>. A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## ARTICLE VIII

## <u>TRUSTEE REPORTING AND DISCHARGE</u>

8.1   <u>Annual Accountings</u>. The Trustee shall prepare, at least annually, and upon termination of the Trust, a written accounting of the administration of the Trust listing the current assets (with fair market values) and detailing all transactions that occurred during the period

11

covered by such accounting. Each such accounting shall be filed with the Bankruptcy Court. Copies of such accounting shall be available to Beneficiaries upon request.

8.2 Approval of Accountings and Discharge of the Trustee. The Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1. Upon the entry of an order of the Bankruptcy Court approving any such accounting, the Trustee shall be discharged from all liability, with respect to all assets listed and transactions detailed in such accounting, to the Trust, any Beneficiary or any Person who or which has had or may then or thereafter have a claim against the Trust for acts or omissions in the Trustee's capacity as the Trustee or in any other capacity contemplated by this Trust Agreement or the Plan.

## ARTICLE IX

## SECTION 468B SETTLEMENT FUND

9.1 Generally.

9.1.1 In accordance with the Plan, the Trustee will take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of § 468B of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and the regulations promulgated pursuant thereto. The Debtors are the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

9.1.2 It is further intended that the transfers to the Trust will satisfy the "all events test" and the "economic performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461- 1 (a)(2).

9.2 Employer Identification Number. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

9.3 Relation-Back Election. If applicable, the Trustee and the Debtors or the Reorganized Debtors, as applicable, shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

9.4 Filing Requirements. The Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Debtors or Reorganized Debtors shall file an election statement(s) satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and the regulations promulgated thereunder. The election statement shall be included with the Trust's first timely filed trust income tax return. The Debtors and Reorganized Debtors shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15th of the year following each calendar year in which the Debtors and Reorganized Debtors makes a transfer to the Trust.

QB\155907.00003\49955065.1

9.5    <u>Broad Powers of the Trustee</u>.   The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the regulations promulgated pursuant thereto.  Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

## ARTICLE X

## BENEFICIARIES

10.1    <u>Names and Addresses</u>.   The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Plan.  The Trustee may rely upon this Register for the purposes of delivering distributions or notices.   In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trustee.

10.2    <u>Rights of Beneficiaries</u>.   The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of such Beneficiary.  A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets.  Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to such Persons under this Trust Agreement and the Plan.

10.3    <u>Tax Identification Numbers</u>.   The Trustee may require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and such other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status).   The Trustee may condition the payment of any distribution to any Beneficiary upon receipt of such number and records or documents.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1    <u>Plan Incorporation</u>.   The terms of the Plan and the Confirmation Order are incorporated into this Trust Agreement.

11.2    <u>Notices</u>.   All notices or deliveries required or permitted hereunder shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

[TRUSTEE ADDRESS]

13

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

11.3    <u>Waiver</u>.  No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.4    <u>Reimbursement of Costs</u>.  If the Trustee or the Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement thereof, the Trustee or the Trust, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

11.5    <u>Entirety of Trust Agreement</u>.  This Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter hereof.  This Trust Agreement, together with the Exhibits hereto, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed therein.

11.6    <u>Counterparts</u>.    This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.7    <u>Captions</u>.    The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

11.8    <u>Independent Legal and Tax Counsel</u>.

All parties to this Trust Agreement have been represented by counsel and advisors (collectively referred to as "Counsel") of their own selection in this matter.  Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against any party.  It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America.

11.9    This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Minnesota applicable to contracts and trust agreements made and to be performed therein, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and Treasury Regulations thereunder shall be governed by federal tax law, and all matters of federal bankruptcy law shall be governed by federal bankruptcy law.

IN WITNESS WHEREOF, the Debtors and the Trustee execute this Trust Agreement as of the Effective Date of the Plan.

**Trustee**:

By: _____
Printed Name: _____
Title: _____


**Crosier Fathers and Brothers Province, Inc.**

By: _____
Printed Name: _____
Title: _____


**Crosier Fathers of Onamia**

By: _____
Printed Name: _____
Title: _____


**The Crosier Community of Phoenix**

By: _____
Printed Name: _____
Title: _____

QB\155907.00003\49955065.1

# EXHIBIT E

## **FILE PRODUCTION PROTOCOL**

1. Within 120 days of confirmation, the Debtors will make available to Certain Claimants' Counsel, Jeff Anderson & Associates, P.A., copies of the files maintained by the Debtors pertaining to Crosiers whom the Debtors have disclosed on their website as having credible claims of sexual abuse of a minor against them (the "Credibly Accused Files"). The Debtors may redact certain otherwise-privileged information from the Credibly Accused Files, including attorney-client privileged and work product privileged information, and medical information to the extent such information is not related to Abuse. The Debtors agree to provide the Credibly Accused Files with the expectation that these documents are made public. However, Jeff Anderson & Associates agrees to work cooperatively and in good faith with Counsel for the Debtors regarding documents or portions of documents containing any privileged, nonpertinent, or third-party information that should be redacted before public disclosure. If an agreement cannot be reached, Keith Hunter shall determine whether good cause exists to publicly release the disputed documents. Hunter's determination shall be final.

2. Within 120 days of confirmation, the Debtors will make available to Certain Claimants' Counsel, Jeff Anderson & Associates, P.A., under the confidentiality provisions of the "Confidentiality and Non-Disclosure Agreement" executed on June 28, 2017, copies of the files maintained by the Debtors pertaining to Crosiers accused of child sexual abuse, as defined by Section 2.2 of the Joint Plan of Reorganization, in a Proof of Claim filed with the U.S. Bankruptcy Court, but who are not listed on the Crosiers' website as having credible claims of sexual abuse of a minor against them (the "Other Crosier Files"). The Debtors may redact certain otherwise-privileged information from the Other Crosier Files, including attorney-client privileged and work product privileged information, and medical information to the extent such information is not related to Abuse. Access to the Other Crosier Files by Jeff Anderson & Associates shall be pursuant to the "Confidentiality and Non-Disclosure Agreement" executed on June 28, 2017, which is hereby modified to include Other Crosier Files within the definition of "Confidential Information." If Jeff Anderson & Associates believes that any of these documents produced should be made public, it shall notify the Debtors of the names and documents that should be made public. Jeff Anderson & Associates and the Debtors will work cooperatively and in good faith in an effort to determine what documents or portions of documents should be made public. If an agreement cannot be reached, Hunter shall determine whether good cause exists to publicly release the disputed documents. Hunter's determination shall be final.

3. Any person, including any Crosier whether or not listed on the Debtors' website as having been "credibly accused" of Abuse, who has an objection to disclosure of one or more Files must file such objection to Hunter. Hunter's determination shall be final. The Debtors will use reasonable efforts to notify individuals against whom credible claims of sexual abuse of a minor have been made whose files have not already been produced to Jeff Anderson & Associates, and individuals accused of child sexual abuse in a Proof of Claim filed with the U.S. Bankruptcy Court who are not listed on the Crosiers' website,

about the terms of this File Production Protocol and the contact information for Hunter to whom such objection may be directed.

4.  This File Production Protocol applies only to documents that are not already publicly available.  To the extent that documents contained within a Credibly Accused File or Other Crosier File is publicly available, such documents may be accessed through the public medium and the Debtors and/or Committee are under no obligation to provide such documents to anyone.

5.  This File Production Protocol is incorporated into and made a part of the Plan.

QB\155907.00003\50742432.1